**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HAYDEN EVERHART, STEPHANIE ZOBAY individually, and as representative of the ESTATE OF STEPHEN EVERHART, LINDSAY EVERHART, HANNAH EVERHART, JAMES CONNOLLY, MANUELA LEIJA, DOMINGO LEIJA, DOMINGO LEIJA JR., RAMIRO LEIJA, ROBERT LEIJA, JAN COLLINS, GARY MATHENY, KAREN MATHENY, PAUL MATHENY, ASHLEY DUNKIN, SHALAN WEBB, CHRISTINE WORTMAN, JENNIFER DENGEL, RACHEL MILLER, SHANE PRATER, MADISEN PRATER, KATANA RICHARDSON, IYANA RICHARDSON, STEPHEN RICHARDSON JR., SHENANDOAH ARNETTE, DMITRI QUIST, ANDREW FUKUZAWA, ANTHONY DONALD PELLECCHIA, KATHRYN JOHNSON, ANTHONY PELLECCHIA, MICHELLE LINDSEY, LESLIE GENEVIE, MICHAEL DUNN, BRANDON EMORY, AUSTIN EMORY, LEA EMORY, WILLIAM ZAPPA, HAEKYUNG ZAPPA, PATSY BELL, TONYA GUYTON, JAIDYN GUYTON, KENYON GUYTON, ANDREA MCDONALD, LARRY GUYTON SR., KATHLEEN STEPHENS, TRENT STEPHENS, BRITTANI HOBSON, DEREK STEPHENS, RHETT STEPHENS, SUMMER STEPHENS, JENNIFER GABLE, LAURIE MANYLIGHTNINGS as representative for the ESTATE OF LELAND THOMPSON, NOEL FONTANILLA, FRANCES QUICHOCHO, LEE CASTRO, CHRISTINE CONCEPCION, KARISSA ROSELYN QUICHOCHO, RAMON QUICHOCHO JR., JENNIFER MATZEN, ELLEN WEIGLEIN, MARK CASHMAN, DERRICK STINNETT, BRANDI STINNETT, SARAH SIMMONS, FARY MALDONADO, MARK BALMER, JORDAN BRACKETT, JOSHUA ATCHLEY, CONNIE ATCHLEY, BENNY ATCHLEY, ELISSA ATCHLEY, KATELYN WEATHERFORD, BENJAMIN JOHNSON, TAMALA JOHNSON, GREGORY JOHNSON, BRANDON JOHNSON, BROOKE PLUMB, LEROY LANCASTER, LUCAS SASSMAN, MELISSA SASSMAN, PATRICIA GRASS, FRANKLIN GRASS, BRENTYN BISHOP, FLOR FUENTES, FRANCISCO GIETZ, MARGARET JOHNSON, DONALD SPENCER, RONALD ETHERIDGE JR., RICHARD GILMORE JR., MEGAN | 1:26-cv-3312<br><br>JURY TRIAL DEMANDED |

CLEMENT, JENAE MADDIES, VANESSA GUTIERREZ, DAVID MANGANELLA, ERIC NEIBERGER, individually, and as representative for the ESTATE OF CHRISTOPHER NEIBERGER, MARY NEIBERGER, RICHARD NEIBERGER, AMI NEIBERGER, ROBERT NEIBERGER, JARETH PAYNE, ANGELINA BOYD, ABELINO GOMEZ, DUSTIN BAUER, KIYA BAUER, SOPHIA BAUER, BRANDON BYBEE, MARTHA LOONEY, SHAWN DONNERY, CHRISTOPHER LANDRY, NATHANIEL MCCLURE, JACOB HARBIN, LINDA HARBIN, individually and as representative for the ESTATE OF ELIJAH HARBIN, DANNY HARBIN, ESTHER TATE, LESLIE BOYD, individually and as representative for the ESTATE OF JOSHUA REEVES, JOSHUA REEVES, WANDA REEVES, JAMES REEVES, individually and as representative for the ESTATE OF MICHAEL JOSEPH REEVES, SHERRI HOILMAN, JONI LITTLE, MICHELLE AYRES, KONRAD LUDWIG, JARED OSBURN, BARRY MCDONALD JR., AYINDE WILLIAMS, SHEENA BANKS-WEST, DEREK BANKS-WEST JR., JARROD LAGRONE, JANICE VANEK, ANNE ST. MARTIN, ALI SAFI, CHRISTOPHER HALSKI, ANDREW KIRCHOFF, WILLIAM KELSO II, TODD BARNUM, RICKY ZHORNE JR., NICHOLAS ANNA, TIMOTHY DUVALL JR., CHRISTOPHER HILL as representative for the ESTATE OF ALAN ROGERS, DOUGLAS RAGONE, DANTE RAGONE, DAVID RAGONE, DANIEL RAGONE, JOSHUA ECKHOFF, JAMES WILSON JR., SILVIA BITTON, ELIZABETH BITTON, JACQUELINE BITTON, JAMES FLEMMING III, NAFTALI MOSES, AND RIVKAH MOSES MORIAH, individually and as co-representatives for the ESTATE OF AVRAHAM MOSES, CHAI MORIAH, NOAM MORIAH, AYELET MOSES, ELISHA MOSES, ORA MOSES, DAVID MORIAH, IFAT COHEN, CHAGIT GIBOR, ATARA KATZ, AVIAD MORIAH, EYTAN MORIAH, TZUR MORIAH, NAFTALI SHITRIT, GILA SHITRIT, OSHRAT AMIR, AVISHAI SHITRIT, ELYASHIV SHITRIT, MEIRI SHITRIT, NOYA SHITRIT, YEDIDYA SHITRIT, JIMMY RUNDELL JR., JOSUE MOLINA, MARIA MOLINA, MANUEL MOLINA, JEREMY WALLACE, CODY BARHAM, ALEJANDRO CONTRERASBAEZ, JESSICA CONTRERASBAEZ, ARYANNA CONTRERASBAEZ, JESSE CONTRERASBAEZ,

PETER PASILLAS, PATRICK HANLEY, KATHERINE HANLEY, EDWARD HANLEY, CECELIA HANLEY, DARREN LESLIE, CORY KENFIELD, BENJAMIN ZIBUTIS, SAMUEL MONTALBANO, DEBORAH WILSON, BRANDON JOSEY, JESSICA NICHOLS, BEAU LEVINE, AND JESSICA LEVINE individually, and as co-representatives for the ESTATE OF HUNTER LEVINE, OLIVIA GORHAM, STEVEN ELLIS, CAMERON ELLIS, JOHN ARAGON SR. individually, and as representative for the ESTATE OF JOHN ARAGON, ROSEMARIE FITZMORRIS-CURRIER, EMILY STEVENSON, MARY TOLLEFSON, JAMIE TOLLEFSON, JEFFREY TOLLEFSON, PRISCILA MONCADA, OBDULIA MONCADA, ALEXANDRA AGUILAR, MIRIAM LOPEZ, DANIELA MONCADA, MATTHEW MONCADA, KAREN JAMES, CHERYL LARSON, BRANDY LOSS, STEPHEN EVANS, ATYINIA WILLIAMS, C.W. by and through his next friend Atyinia Williams, KYLE LLOYD, JOSHUA CRAVEN, HOLLY CRAVEN, ABDUL MUGHAL, SITORAI KHASANZOD, ANGELA MUGHAL, HAMID MUGHAL, KHALID MUGHAL, M.M. by and through his next friend Abdul Mughal, NABILA MUGHAL, SHMUEL BRAUNER, NECHAMA BRAUNER, ESTHER BRAUNER, MORDECHAI BRAUNER,

Plaintiffs,

v.

COMMERZBANK AG,

Defendant.

**<u>COMPLAINT FOR VIOLATIONS OF THE ANTI-TERRORISM ACT</u>**

**TABLE OF CONTENTS**


INTRODUCTION ..... 3

THE PARTIES ..... 8

A. Plaintiffs ..... 8

B. Commerzbank AG ..... 8

JURISDICTION AND VENUE ..... 9

SOURCING ..... 10

FACTUAL ALLEGATIONS ..... 11

I. As Iran Became the World's Leading Sponsor of Terrorism and Other Banks Exited Iran, Commerzbank Cultivated Clients Associated with Iranian Terrorism by Scheming to Disguise their Transactions. ..... 11

A. Iran's Axis of Resistance ..... 12

B. Warnings and Counterterrorism Controls ..... 22

C. Commerzbank's Special Money Laundering Services for Iran Clients ..... 27

II. Commerzbank's Money Laundering for IRISL Enabled the Supply of Weapons to Terrorists in Iraq. ..... 36

A. IRISL's Worldwide Shipping Network Supplied Weapons to Terrorists. ..... 37

B. The International Community Issued Numerous Warnings and Imposed Sanctions and Counterterrorism Controls to Stop IRISL from Supplying Weapons to Terrorists. ..... 42

C. Commerzbank Laundered IRISL's Payments in Defiance of Sanctions and Counterterrorism Controls. ..... 55

D. Commerzbank Sustained IRISL's Operations Through 2011, Enabling it to Keep Supplying Weapons to Terrorists. ..... 63

E. IRISL's Continued Operations Were Vital to the Supply of Weapons to Terrorists in Iraq. ..... 72

III. Commerzbank Enabled Hizballah's Martyrs Foundation to Fund Incentive Payments for Terrorists in Iraq and Israel. ..... 89

IV. With Weapons from IRISL and Incentives from the Martyrs Foundation, Hizballah Planned, Authorized, and/or Committed the Terrorist Attacks in Iraq that Injured Plaintiffs. ..... 95

V. With Weapons from IRISL and Incentives from the Martyrs Foundation, Hamas Committed the Terrorist Attacks in Israel that Injured Plaintiffs. .... 100

VI. Plaintiffs Were Injured in the Attacks. .... 102

CLAIM FOR RELIEF .... 125

JURY DEMAND .... 129

PRAYER FOR RELIEF .... 129

## INTRODUCTION

1. This lawsuit seeks civil damages under the Antiterrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"),[1] which entitles any U.S. national injured by reason of an act of international terrorism committed, planned, or authorized by a designated Foreign Terrorist Organization ("FTO") to recover against any person "who aids and abets, by knowingly providing substantial assistance."[2] For many years through at least 2010, Defendant Commerzbank AG kept the chief supplier of weapons to Hizballah terrorists operating when the rest of the world was trying to stop it. This lawsuit seeks compensation for the American victims who suffered when the weapons supplied with Commerzbank's assistance reached the terrorists.

2. Commerzbank's major client, the Islamic Republic of Iran Shipping Lines ("IRISL"), was no ordinary company. It was the primary maritime cargo carrier for the world's leading State Sponsor of Terrorism, and it functioned as the logistical backbone of a campaign by Iran's Islamic Revolutionary Guard Corps ("IRGC") and Hizballah to target Americans by supplying terrorists with large quantities of weapons. These weapons and their components—including the rockets, mortars, explosives, and armor-piercing ammunition that those terrorists used to take countless American lives in Iraq—were frequently sourced in bulk from Asia and supplied in bulk to Iran's proxies in the Middle East. IRISL was indispensable at both ends of this pipeline, carrying hundreds of tons of precursor chemicals for rocket engines and explosives, containers packed with armor-piercing ammunition, crates upon crates of rockets and mortars,

[1] 18 U.S.C. § 2333, amended by Pub. L. No. 114-222, 130 Stat. 852 (2016).

[2] 18 U.S.C. § 2333(a), (d)(2).

and more—all camouflaged by IRISL's regular shipment of ordinary goods on common shipping routes between Asia, the Middle East, and Europe.

3. None of this was a secret. Iran's use of maritime shipping to arm its terrorist proxies was made clear when ships were seized and the international media publicized their illicit cargo. The international community and the U.S. government publicly identified IRISL as Iran's maritime weapons supplier, and they issued numerous warnings—even delivered in person to European banks—that doing business with companies like IRISL would enable terrorist attacks on Americans by Iran's proxies in Iraq. These warnings culminated in sanctions the U.S. government imposed on IRISL, intended to stop IRISL's operations by cutting IRISL off from the international financial system upon which it depended. To the international community, IRISL was a pariah.

4. But not to Commerzbank. As nearly every other Western bank heeded the warnings and abandoned Iran, Commerzbank saw opportunity. Through its offices in Hamburg and Tehran, Commerzbank developed a close and unusual relationship with IRISL. Iran's maritime weapons supplier became one of Commerzbank's most lucrative clients, and Commerzbank maintained its relationship with IRISL by giving it the most illicit service a bank can offer: secrecy. Contrary to its legal obligations to report suspicious transactions to government authorities, Commerzbank promised IRISL "absolute confidentiality." Commerzbank devised a "Safe Payment Solution" that enabled IRISL to send payments in U.S. dollars through the international financial system without identifying that IRISL was behind the payments. Commerzbank also set up a special concealment system for IRISL within the bank that allowed IRISL to transact with counterparties through a web of shell companies without

revealing that IRISL controlled their accounts. These efforts by Commerzbank kept IRISL operating while violating the sanctions and counterterrorism controls designed to stop it.

5. Commerzbank knew its conduct was unusual and wrong. Indeed, it charged IRISL four times as much for these special services as it charged ordinary clients for ordinary payment services. Commerzbank also knew that shielding Iran's maritime weapons supplier behind a veil of shell companies would keep the weapons flowing. Commerzbank even circulated the U.S. government's sanctions announcement within the bank, noting that IRISL "systematically circumvents" the "arms embargo." But none of this deterred Commerzbank. The bank continued to help IRISL hide behind shell companies and evade U.S. counterterrorism controls for long thereafter, and this secrecy enabled IRISL to continue supplying weapons to terrorists in Iraq as the terrorists accelerated their deadly campaign against Americans.

6. Importantly, Commerzbank's assistance to IRISL and the terrorists it armed went far beyond providing IRISL with the ability to access money. Rather, Commerzbank enabled two functions critical to the terrorists' operations: logistics and obstruction. By facilitating IRISL's shipping network, Commerzbank enabled a critical logistics function, maintaining the essential supply lines that allowed weapons and their components to move undetected to the places where they were needed for terrorist attacks. And by concealing IRISL behind a web of shell companies and obscuring its identifying information, Commerzbank enabled a critical obstruction function, thwarting counterterrorism authorities, including financial regulators and intelligence agencies, who relied on reporting from banks to interdict and stop these shipments and the inevitable ensuing attacks.

7. At the same time Commerzbank enabled IRISL to keep the weapons flowing, it also enabled Hizballah to incentivize many of the terrorists who used them. Commerzbank

maintained a fundraising account in Germany for Hizballah's Martyrs Foundation, which Hizballah operated to raise money in Europe to fund "martyr payments" to the families of Hizballah and Hamas terrorists killed or injured in terrorist attacks. Hizballah's attack incentive payments were provided systematically to Hizballah terrorists and the Hamas terrorists Hizballah supported, and Hizballah's use of this specific fundraising account to incentivize attacks was widely known and publicized on the foundation's own website. Yet Commerzbank continued to enable Hizballah's European fundraising through this account for years until German authorities eventually shut down the Martyrs Foundation there in 2014.

8. U.S. authorities eventually discovered Commerzbank's misconduct. Commerzbank entered into deferred prosecution agreements with the U.S. Department of Justice ("DOJ") and the New York County District Attorney's Office ("DANY"); a settlement agreement with the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"); a consent order with the New York Department of Financial Services ("NYDFS"); and orders with the Board of Governors of the Federal Reserve ("FRB"). These resolutions in which Commerzbank admitted much of its illegal conduct confirm just how conscious and culpable its actions were. The Assistant Attorney General explained that Commerzbank "concealed hundreds of millions of dollars in transactions prohibited by U.S. sanctions" on behalf of customers like IRISL, and it "committed these crimes even though managers inside the bank raised red flags." The U.S. Attorney for the District of Columbia summarized: "Commerzbank undermined the integrity of our financial system and threatened our national security by hiding the business they were doing with entities in Iran." Such actions, the New York County District Attorney added, flouted the "sanctions [we have] in place to prevent rogue nations and terrorists from accessing the U.S. financial system." Commerzbank agreed to pay

hundreds of millions of dollars to resolve those enforcement actions, in recognition of its immense culpability.

9. But Commerzbank has not yet paid its debt to the victims who suffered from its misconduct. The weapons that Commerzbank enabled IRISL to supply, and the martyr payments that Commerzbank enabled Hizballah to fund, fueled terrorist attacks in Iraq and Israel. The Plaintiffs are victims of many of those terrorist attacks in Iraq and two in Israel from 2007 to 2011. These attacks were committed with the types of weapons that IRISL supplied and by terrorists motivated with the prospect of payment from the Martyrs Foundation.

10. In enacting JASTA, Congress sought "to provide civil litigants with the broadest possible basis … to seek relief against" anybody that has "provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."[3] This includes those who act "knowingly or recklessly," and support terrorism "directly or indirectly."[4] Congress later reaffirmed the "long-standing policy of the United States that civil lawsuits against those who support, aid and abet, and provide material support for international terrorism serve the national security interests of the United States by deterring the sponsorship of terrorism and by advancing interests of justice, transparency, and accountability."[5] Plaintiffs' claims advance these vital national interests.

---

[3] JASTA § 2(b).

[4] JASTA § 2(a)(6).

[5] Sudan Claims Resolution Act, Pub. L. No. 116-260, div. FF, tit. XVII, § 1706(a)(1), 134 Stat. 3294 (2020).

## THE PARTIES

### A. Plaintiffs

11. Plaintiffs are direct and indirect victims of numerous terrorist attacks committed in Iraq and two in Israel from 2007 through 2011. Direct victims were physically injured or killed in the attack. Indirect victims are the direct victims' close family members who suffered financially and emotionally as a result of the attacks. They include spouses, children, parents, siblings, and other close relations of the direct victims. Each Plaintiff is either a U.S. national or the estate, survivor, or heir of a U.S. national.[6]

### B. Commerzbank AG

12. Defendant Commerzbank AG ("Commerzbank") is a global financial institution headquartered in Frankfurt, Germany. Commerzbank maintains over 1,200 branches in Germany. It also maintains several branches and representative offices outside of Germany.

13. According to Commerzbank's annual reports, the bank opened a representative office in Tehran, Iran in 1974 and continuously maintained that office until 2010. Commerzbank also maintained a representative office in Beirut, Lebanon.

14. Since 1971, Commerzbank has maintained a U.S. branch in New York pursuant to a license from NYDFS. Although the New York Branch is Commerzbank's only current branch in the United States, the bank also operated branches in Atlanta, Chicago, and Los Angeles during parts of the relevant period (2007 to 2011).

---

[6] "Estate" as used herein encompasses established estates, anticipated estates, as well as certain estate-like constructs available under the laws of certain States (such as "heirships"). The process of establishing certain estates is ongoing, and the identified family members or other individuals, as the anticipated personal representatives, bring these claims on behalf of the anticipated estates of such decedents and all heirs thereof. Each person so identified reserves all rights, including the right pursuant to Fed. R. Civ. P. 25, to seek to substitute for itself the decedent's estate, any successor thereto, or any subsequently named and/or designated estate representative.

15. Commerzbank's securities are listed on exchanges in Germany, London, and Switzerland. In addition, Commerzbank offers its securities to investors in the United States by sponsoring American Depository Receipts for its shares in the United States.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. §§ 2333(a) and (d), and 18 U.S.C. § 2338.

17. Commerzbank is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a) and Fed. R. Civ. P. 4(k). As detailed below, Commerzbank's tortious acts were facilitated by its U.S. personnel and its correspondent banks in the United States that played a central role in providing U.S. dollar clearing and in misleading U.S. authorities, including the Department of the Treasury's Office of Foreign Assets Control ("OFAC") in Washington, D.C., about Commerzbank's transactions on behalf of IRISL. Commerzbank purposefully availed itself of U.S. jurisdiction to commit the tortious acts described in this Complaint, including by processing financial transactions through its U.S. branch and its U.S. correspondent banks for the benefit of IRISL, knowing these transactions were enabling IRISL to maintain its weapons smuggling operation as detailed herein. Moreover, Commerzbank made numerous misrepresentations in the U.S. to compliance staff, correspondent banks, and government authorities in Washington, D.C. regarding its transactions for IRISL, including falsifying business records relied upon by OFAC and counterterrorism authorities. Commerzbank's conduct also aided and abetted terrorists who were at all times actively targeting Americans and committing terrorist attacks that killed or injured Americans, including the Plaintiffs.

18. Commerzbank entered the United States voluntarily and has maintained a branch in New York since 1971.

19. Venue in this District is proper pursuant to 18 U.S.C. § 2334(a), because Plaintiffs Hayden Everhart, Lindsay Everhart, Estate of Stephen Everhart, Stephanie Zobay, and James Connolly reside in this District.

20. Venue in this District is also proper pursuant to 28 U.S.C. § 1391 because a material and substantial part of Commerzbank's activity occurred within the District, including one or more meetings in the District between Commerzbank and officials of the U.S. Department of the Treasury regarding Commerzbank's services for IRISL.

**SOURCING**

21. The allegations herein are based in part on settlement agreements that Commerzbank entered with regulatory authorities to resolve several enforcement actions against the bank. Those settlement agreements include a Deferred Prosecution Agreement ("DPA") with DOJ and DANY, and Settlement Agreements and Consent Orders entered with OFAC, FRB, and NYDFS. Each settlement document contains lengthy and detailed factual statements regarding Commerzbank's conduct. Commerzbank has stipulated to the truth of these factual statements and has admitted that it is "responsible under United States law for the acts of its officers, directors, employees, and agents as set forth" in those statements.[7] Commerzbank has also

[7] Deferred Prosecution Agreement ¶ 2, *U.S. v. Commerzbank AG and Commerzbank AG New York Branch*, No. 15-cr-31 (D.D.C. Mar. 12, 2015), ECF 1, att. 1 (hereinafter, "DOJ DPA"); Sanctions Statement of Facts, DOJ DPA att. A ("DOJ SOF(A)") ¶ 1; BSA/AML Statement of Facts, DOJ DPA att. B ("DOJ SOF(B)") ¶ 2; *see also* OFAC Settlement Agreement ("Treasury Settlement"), *available at* https://ofac.treasury.gov/media/12311/download?inline; FRB Order to Cease and Desist and Order of Assessment of a Civil Money Penalty ¶ A, *available at* https://www.federalreserve.gov/newsevents/pressreleases/files/enf20131017a1.pdf ("FRB Order"); NYSDFS a Consent Order under New York Banking Law Sections 39 and 44 at 2, *available at* https://www.dfs.ny.gov/system/files/documents/2020/04/ea150312_commerzbank.pdf ("NYSDFS Consent Order").

agreed that it will not "make any public statement, in litigation or otherwise, contradicting" those factual statements.[8]

22. Commerzbank always actively monitored every official United States warning, sanction designation, press release, report, advisory, public statement, and finding, including those relating to American sanctions and terrorist financing risks regarding Iran, Hizballah, Jaysh al-Mahdi, and Hamas, including those published by the U.S. Department of Treasury (including OFAC and FinCEN), and the U.S. Department of State. Commerzbank did so through, *inter alia*, automated diligence databases, in-house compliance and intelligence personnel, and Commerzbank's thousands of employees and agents across the globe, including in the United States, Germany, and Iran, each of whose knowledge is imputed to Commerzbank. Accordingly, Commerzbank had actual knowledge, in real-time, of each United States warning, sanctions designation, press release, report, advisory, public statement, and finding that any component of the U.S. government published when Commerzbank engaged in the conduct alleged herein.

## FACTUAL ALLEGATIONS

### I. As Iran Became the World's Leading Sponsor of Terrorism and Other Banks Exited Iran, Commerzbank Cultivated Clients Associated with Iranian Terrorism by Scheming to Disguise their Transactions.

23. For decades, elements of the Iranian regime have led an alliance—the self-styled "Axis of Resistance"—that has used terrorism to undermine American foreign policy and kill Americans across the Middle East. Their shared objective since the Islamic Revolution of 1979 was to force the United States (the "Great Satan") to exit the Middle East and abandon its allies there, including Israel (the "Little Satan").

[8] DOJ DPA ¶ 25.

24. Iran's Axis of Resistance pursued this objective through a coordinated campaign of terrorist attacks against Americans that has earned Iran a longstanding reputation as the world's leading state sponsor of terrorism.

25. Beginning in 1995 and accelerating through the 2000s, the U.S. imposed increasingly strict counterterrorism controls on the actors within the Iranian regime devoted to terrorism. Those controls prohibited certain transactions and subjected many others to surveillance and reporting. The U.S. government also initiated an intensive effort to warn European banks about the consequences of continuing to do business in Iran, as it was increasingly likely that such business would facilitate those actors' terrorism.

26. Most European banks heeded these warnings and determined that it was too risky to continue doing business in Iran. Commerzbank did the opposite. It cultivated customers associated with Iran's terrorism and developed extraordinary mechanisms to launder their transactions through the international financial system to evade counterterrorism controls.

### A. Iran's Axis of Resistance

27. Iran's Axis of Resistance consisted of elements within the Iranian regime dedicated to funding, supporting, and fueling terrorism, along with a collection of terrorist organizations that Iran supported and directed to carry out terrorist attacks targeting Americans throughout the Middle East.

28. **Islamic Revolutionary Guard Corps.** At the center of Iran's Axis of Resistance was the Islamic Revolutionary Guard Corps ("IRGC"), a parastatal terrorist organization not part of Iran's regular armed forces. The IRGC and its Qods Force ("IRGC-QF" or "Qods Force") led the Axis of Resistance by cultivating, training, and directing proxy terrorist organizations that carried out terrorist attacks targeting Americans outside Iran. These proxies were highly

dependent on the IRGC for support, including for the money they needed to pay and incentivize their terrorists and the weapons they needed to commit their violent attacks.

29. In recognition of the IRGC's prolific terrorist activities, the U.S. designated its Qods Force a Specially Designated Global Terrorist ("SDGT") under Executive Order 13224 on October 25, 2007. The U.S. subsequently extended that designation to the entirety of the IRGC, and later designated it a Foreign Terrorist Organization ("FTO"). In an April 8, 2019, fact sheet, State summarized the IRGC's terrorist activity over the past several decades, explaining that "its support for terrorism is foundational and institutional." It "fund[ed]," "fuel[ed]," and "equip[ped]" terrorists who "killed U.S. citizens." And in Iraq alone, it was "responsible for the deaths of at least 603 American service members . . . since 2003."

30. During the relevant period, the IRGC was led by Major General Mohammad Ali Jafari, who served as its Commander-in-Chief, and Major General Qasem Soleimani, who led its terrorist operations as Commander of the Qods Force. Jafari participated in the 1979 takeover of the U.S. Embassy during the Islamic revolution and then rose to become so hostile to the United States that he was known to give "new meaning to the term 'hardliner.'"[9] Jafari was sanctioned on September 29, 2010, pursuant to Executive Order 13553, for his role in serious human rights abuses. Days after he was appointed to lead the IRGC on September 1, 2007, Jafari promised to "expand" efforts against "the enemies of Iran and the revolution" by using "asymmetrical warfare capabilities, such as those used by Hezbollah," which "reflect the strengths and weaknesses of the U.S. forces in Afghanistan and Iraq"—*i.e.*, terrorism against Americans

[9] Muhammad Sahimi, *A Hardliner's Hardliner: General Mohammad Ali Jafari*, PBS Frontline, Jan. 21, 2010.

there.[10] Those efforts were directed by Soleimani, who was the principal architect of Iran's strategy to use terrorist proxies to attack Americans in Iraq and elsewhere. Soleimani was long regarded by the U.S. government as "the number-one terrorist anywhere in the world"[11] and "the point ma[]n directing the formulation and implementation of [Iran's] Iraq policy, with authority second only to Supreme Leader Khamenei."[12] After a brief lull in violence against Americans in Iraq in 2006, Soleimani taunted U.S. commanders, "I hope you have been enjoying the peace and quiet in Baghdad. I've been busy in Beirut!"[13] Soleimani was sanctioned on October 25, 2007, pursuant to Executive Order 13382, based on his relationship to the IRGC; was sanctioned again on May 18, 2011, pursuant to Executive Order 13572 regarding human rights abuses; and was designated an SDGT on October 11, 2011, for plotting to assassinate the Saudi ambassador in the United States.

31. The IRGC procured, manufactured, and supplied weapons for its terrorist proxies through Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL"), which the IRGC always controlled. During the relevant period, MODAFL was led by IRGC Brigadier General Mostafa Mohammad Najjar (2005-2009) and IRGC Qods Force General Ahmad Vahidi (2009-2013), who both ensured that MODAFL's shipping and procurement activity served the IRGC's terrorist aims. Before heading MODAFL, Najjar spent decades helping lead the IRGC, where he "played a key role in the formation of . . . Hezbollah" and was involved in the 1983 terrorist

---

[10] *Id.*; Vahid Sepehri, *Iran: New Commander Takes Over Revolutionary Guards*, Radio Free Europe, Sep. 4, 2007.

[11] President Donald J. Trump, Remarks by President Trump on the Killing of Qasem Soleimani (Jan. 3, 2020).

[12] U.S. Dep't of State, Cable, Iran's Efforts in Iraqi Electoral Politics (Nov. 13, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE101150_a.html

[13] Dexter Filkins, *The Shadow Commander*, The New Yorker, Sep. 23, 2013.

bombing of the U.S. Marine barracks in Beirut that killed hundreds of Americans.[14] Najjar publicly referred to the U.S. presence in the Middle East as a "satanic plot," hailed Hizballah as a "lesson in resistance," and vowed that "Islamic Iran . . . will give a powerful answer to enemies and oppressors."[15] Najjar was sanctioned on September 29, 2010, pursuant to Executive Order 13553, for his role in serious human rights abuses. Vahidi, who replaced Najjar as head of MODAFL in 2009, likewise spent decades orchestrating IRGC terrorism. He led the IRGC's Qods Force for many years, during which he oversaw the 1994 terrorist bombing of a Jewish community center in Argentina that killed 85 people and wounded hundreds. Vahidi was sanctioned on June 16, 2010, pursuant to Executive Order 13382, for his involvement in proliferation activities, and again on October 6, 2022, pursuant to Executive Order 13553, for his involvement in serious human rights abuses.

32. MODAFL was the IRGC's clearinghouse for the procurement, manufacture, and distribution of weapons large and small, from bullets and small arms to ballistic missiles and WMDs. MODAFL procured weapons and their components from abroad, manufactured weapons in Iran, and supplied the weapons it procured and manufactured to the IRGC's proxy terrorists.

33. Since 1996, the United States has repeatedly sanctioned MODAFL for its proliferation activities. In an action "to counter Iran's bid for nuclear capabilities and support for terrorism," the United States designated MODAFL along with the IRGC on October 25, 2007, as "key Iranian entities of proliferation concern." A September 17, 2008, sanctions announcement, the U.S. warned that MODAFL "attempts to shield its procurement activities behind a maze of

---

[14] Col. Timothy Geraghty (ret.), *Beirut Bombing at 30: 'We Came in Peace,'* USNI News, Oct. 23, 2013.

[15] *Hezbollah has taught nations a lesson in resistance: Najjar*, Mehr News Agency, Aug. 12, 2006; *Iran will resist 'any threat': defense minister*, Reuters, Aug. 9, 2007.

entities." The United States again designated MODAFL on March 26, 2019, highlighting its "logistic support to the IRGC-QF and its regional proxy groups."

34. Due to the determination of IRGC and Hizballah Supreme Commander Ayatollah Khamenei to prioritize exporting the revolution through terrorist attacks against the United States and its allies, the IRGC was also given extraordinary control over Iran's most important economic and social institutions. This included IRGC control over key sectors of the Iranian economy, such as banking and oil and gas, as well as key government institutions, such as those responsible for maritime shipping and weapons manufacturing. With the IRGC in control, the primary function of these businesses and institutions shifted to serve the IRGC's terrorist aims. Their profits were redirected to fund IRGC terrorism, and their operations were transformed to support it. As U.S. Deputy Treasury Secretary Wally Adeyemo summed up in April 9, 2024, testimony to Congress, "what we've seen time and time [again] from the Iranian regime is [that] they fail to feed their people and they put the IRGC first. Any dollar they have will go towards their violent activity before they deal with the people."

35. **Hizballah.** The IRGC's most important terrorist partner in the Axis of Resistance was Lebanese Hizballah ("Hizballah"), which has been an FTO since 1997 and has long been dedicated to terrorism targeting Americans.

36. In 1982, the IRGC founded Hizballah in Lebanon, establishing the group as its most important terrorist partner and lead external attack arm. During the relevant period, every Hizballah operative swore a religious oath of loyalty to Ayatollah Khamenei.

37. In 2003, Hizballah Secretary-General Hassan Nasrallah proclaimed: "Let the entire world hear me. Our hostility to the Great Satan [America] is absolute . . . . Regardless of

how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan: Death to America."[16]

38. To advance those aims of the Axis of Resistance, Hizballah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies. As Dr. Matthew Levitt has explained, "Hezbollah is extremely adept at recruiting members from local populations in areas where they have networks on the ground."[17] Hizballah has trained and equipped these local terrorist proxies to carry out terrorist attacks on Hizballah's behalf.

39. Hizballah was ubiquitous in Lebanon and Syria, but also maintained a significant presence in Iraq and the Palestinian Territories.

40. Hizballah was completely dependent on the IRGC and MODAFL for weapons. As its Secretary-General Hassan Nasrallah publicly admitted in June 24, 2016 speech, "everything [Hizballah] eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran."

41. References in this Complaint to "Iran" or the "Iranian regime" in the context of funding, arming, or supporting terrorist attacks refer specifically to the IRGC and Hizballah, which were always Iran's primary institutions dedicated to supporting Iran's terrorist proxies and advancing their terrorist mission. Hizballah and the IRGC were so closely intertwined that Hizballah functioned as a core part of the IRGC itself, as well as the IRGC's primary agent for orchestrating Iran-backed proxy attacks by others, including Jaysh al-Mahdi. In recognition of the IRGC's "coordination of Hizballah attacks" and "deep involvement in directing Hizballah's

---

[16] Hizballah Manifesto, *reprinted in* Anti-American Terrorism and the Middle East: A Documentary Reader 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

[17] Matthew Levitt, Hezbollah: A Case Study of Global Reach, Remarks to a Conference on "Post-Modern Terrorism: Trends, Scenarios, and Future Threats," Sept. 8, 2003).

political decision-making," the U.S. designated Hizballah on August 20, 2026, "for being owned, controlled, or directed by, or having acted or purported to act for or on behalf of, the IRGC-QF."

42. **JAM.** On March 19, 2003, the United States invaded Iraq, Saddam Hussein's government fell, and formal armed hostilities between the United States and the Iraqi government ended on May 1, 2003. After that date, American troops deployed to Iraq performed a peacekeeping and nation-building function, rather than a warfighting function. American troops' primary purpose was to create the political and security conditions conducive to Iraqi democracy. Americans in Iraq began overseeing the reconstruction of a democratic Iraqi government and formulating a plan to transfer sovereignty to the Iraqi people.

43. In April 2003, Hizballah dispatched to Iraq its chief terrorist mastermind, Imad Mugniyeh, to help Muqtada al-Sadr found a new terrorist organization, Jaysh al-Mahdi ("JAM"). Their shared goal, according to an October 2003 Israeli intelligence report, was to set up a terrorist network in Iraq to inflict "mass casualties" on the Americans working on the reconstruction.[18] A U.S. Special Operations task force report quoted by the *U.S. News & World Report* in 2004 explained that "the Lebanese Hizballah leadership believes that the struggle in Iraq is the new battleground in the fight against the U.S."[19] As one embedded war correspondent put it, JAM was created to be "the Iraqi branch of Hezbollah."[20]

---

[18] Edward T. Pound, *Special Report: The Iran Connection,* U.S. News & World Report, Nov. 22, 2004.

[19] *Id.*

[20] Michael J. Totten, *Balance of Terror*, Michael J. Totten's Middle East J., Aug. 14, 2007.

44. JAM itself proclaimed its identification with Hizballah. As Muqtada al-Sadr put it, JAM would serve as Hizballah's "striking arm in Iraq."[21] During his Friday sermons on March 26, 2004—in which he praised the attacks of September 11th and called for violence against Americans in Iraq—Sadr swore fealty to Hizballah in Shi'a Islamic terms, pledging support to "our victorious party, Hezbollah." In April 2004, Sadr proclaimed, "I will support the real Islamic unity that has been created by Hassan Nasrallah, the secretary-general of the victorious Hezbollah."[22] In an August 2007 interview, Sadr again reportedly acknowledged that JAM "ha[s] formal links with Hizbollah" and "cop[ies] Hizbollah in the way they fight and their tactics."[23]

45. JAM fighters also swore fealty to Hizballah. They regularly participated in anti-American marches in which they marched under Hizballah flags, waved Hizballah banners at demonstrations, and shouted chants identifying themselves with Hizballah. Tens of thousands of members of JAM publicly swore fealty to Hizballah in various marches in Sadr City in 2006 alone. On August 4, 2006, for example, more than 10,000 members of JAM attended a joint JAM/Hizballah march in Sadr City. As recounted in a field report in *Al-Jazeera*, demonstrators wore "white shrouds symboli[z]ing [their] willingness to die for Hezbollah, waved the Lebanese guerrillas' yellow banner and chanted slogans in support of their leader, Sheik Hassan Nasrallah."[24] The crowd of JAM fighters further declared "Mahdi Army and Hezbollah are one," and chanted "Allah, Allah, give victory to Hassan Nasrallah."[25] The close, symbiotic connection

---

[21] Jon Lee Anderson, *The Uprising: Shia and Sunnis put aside their differences,* The New Yorker, Apr. 26, 2004.

[22] *Gunmen kill 4 people in attacks on Iraqi police*, China Daily, Apr. 4, 2004.

[23] Anthony H. Cordesman & Jose Ramos, *Sadr and the Mahdi Army: Evolution, Capabilities, and a New Direction*, Center for Strategic & International Studies, Aug. 4, 2008.

[24] *Iraq's Shia March for Hezbollah*, Al-Jazeera, Aug. 4, 2006.

[25] *Id.*

between Jaysh al-Mahdi and Hizballah was summed up by JAM members' repeated declaration at the rally: "we are Hezbollah."[26]

46. Treasury formally recognized the links between Hizballah and JAM when it designated JAM commander Abu Mahdi al-Muhandis as a SDGT in 2009, noting that Hizballah "prepare[d]" JAM "for attacks against Coalition Forces" through "training in guerilla warfare, handling bombs and explosives, and employing weapons [such as] missiles, mortars, and sniper rifles."[27] Treasury did so again in 2012 when it found that "Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks."[28]

47. Hizballah supervised JAM's terrorist operations by recruiting, training, arming, and directing JAM terrorists who carried out terrorist attacks against Americans on Hizballah's behalf. Immediately after JAM's founding in April 2003, Mugniyeh recruited 300 terrorists for JAM from Shi'a communities in Kuwait and Saudi Arabia, then sent those terrorists to Lebanon for weapons training. These 300 fighters were some of JAM's first members. That same month, according to the *Asia Times*, Hizballah "opened two offices in the Iraqi cities of Basra and Safwan" to "build[] up [its] organizational and military apparatuses in Iraq."[29] By August 2003, Hizballah had established permanent teams of 30 to 40 operatives in Najaf to recruit and train JAM terrorists. At the same time, these Hizballah operatives were acquiring weapons from the IRGC for JAM's use in terrorist attacks.

---

[26] Andy Mosher, *In Baghdad, Shiites Rally for Hezbollah*, The Washington Post, Aug. 5, 2006.

[27] U.S. Dep't of Treasury, Treasury Designates Individual, Entity Posing Threat to Stability in Iraq (July 2, 2009).

[28] U.S. Dep't of Treasury, Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq (Nov. 19, 2012).

[29] Olivier Guitta, *Nasrallah's Other Fight*, Asia Times, July 29, 2006.

48. During the subsequent months and years, as explained *infra*, Hizballah expanded its presence on the ground in Iraq and armed JAM with many more weapons from the IRGC. And Hizballah leveraged JAM to accelerate the campaign of terrorist attacks on Americans in Iraq—forming joint cells of Hizballah and JAM terrorists in Baghdad and Basra, among other locations, who committed terrorist attacks together, and planning and authorizing even more terrorist attacks committed by JAM.

49. Like many terrorist organizations, JAM was structured as an integrated network of cells, militias, and "Special Groups," each of which served the mission of the broader organization. JAM's "Special Groups" included Asa'ib Ahl al-Haq (AAH) and Kataib Hizballah (KH). Despite its cellular structure, JAM's cells maintained a basic hierarchical command structure; shared membership and leadership; relied on common sources of financing and institutional support from the broader JAM organization; frequently operated together in coordinated attacks; and were unified ideologically by radical Shi'a ideology, devotion to Sadr, and violent opposition to the American presence in Iraq. All references in this Complaint to JAM include JAM's Special Groups.

50. **Hamas.** In the Palestinian Territories, Hizballah's and the IRGC's terrorist proxies included Hamas. Founded in 1987 as the Palestinian branch of the Muslim Brotherhood, Hamas' original charter advocated destroying Israel and establishing an independent Islamic state in historic Palestine. Hamas has been an FTO since 1997.

51. Iran has long encouraged and supported Hamas' quest to "eliminat[e] the root of this crisis, which is the Zionist regime imposed on the region," and the American regime that

supports it.[30] Hamas, in turn, has depended on the IRGC and Hizballah for funding and weapons. As former IRGC Aerospace Forces Commander Amir Ali Hajizadeh boasted in January 2021, "In Palestine, they are now using rockets instead of stones," thanks to the assistance provided by Iran. Former Hamas Political Bureau Chief Ismail Haniyeh acknowledged this support, gratefully observing that "the Islamic Republic of Iran, has not skimped in extending funds, weaponry, and technology to the resistance."[31] Hizballah partnered with Iran to support and supply Hamas.[32]

### B. Warnings and Counterterrorism Controls

52. Beginning in 1995, the U.S. government and the international community began warning with increasing urgency about the Axis of Resistance and how doing business with IRGC-associated entities in Iran was funding and facilitating Iran's terrorist proxies.

53. In Executive Order 12957, President William J. Clinton found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and he declared "a national emergency to deal with that threat." Through the issuance of Executive Order 12957 in March 1995 and Executive Order 12959 in May 1995, the President imposed comprehensive trade and financial sanctions on Iran. As President Clinton explained to Congress on September 18, 1995, "This action was in response to actions and policies of the Government of Iran, including support for international terrorism, efforts to undermine the Middle East peace process, and the

---

[30] Daniel Levin, Iran, Hamas & Palestinian Islamic Jihad, Wilson Center Insight & Analysis (Oct. 11, 2023).

[31] *Id.*

[32] Samia Nakhoul, *How Hamas Secretly Built a 'Mini-Army' to Fight Israel*, Reuters, Oct. 16, 2023.

acquisition of weapons of mass destruction and the means to deliver them." Warning of "Iran's continuing support for international terrorism," the President explained that comprehensive sanctions "advance[d] important objectives in promoting the nonproliferation and antiterrorism policies of the United States."

54. In a subsequent message to Congress on August 19, 1997, President Clinton explained that he was issuing another Executive Order (E.O. 13059) to "confirm[] that United States persons are prohibited from engaging in any trade- or investment-related activities with Iran." He added, "I want to make clear that this means all direct or indirect involvement in such activities wherever those activities occur." In announcing the first-ever FTO designations, which included Hizballah, on October 8, 1997, U.S. Secretary of State Madeleine K. Albright framed the designations as a "recognition that terrorism is not a self-sustaining enterprise. It needs money and supplies to succeed."

55. In the wake of the terrorist attacks of September 11, 2001, the U.S. government singled out banks as crucial gatekeepers for maintaining the U.S. government's counterterrorism controls. Those controls had three key elements: (1) economic sanctions that prohibited certain transactions at high risk for terrorism financing; (2) review and reporting of suspicious transactions by banks under the Bank Secrecy Act (BSA); and (3) direct monitoring of banking transactions by the government.

56. As Congress explained in the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, part of the USA PATRIOT Act, "defects in financial transparency" were "critical to the financing of global terrorism and the provision of funds for terrorist attacks."[33] The BSA, as strengthened by Congress in 2001, abolished bank secrecy by

[33] 31 U.S.C. § 5311.

requiring banks to carefully monitor their customers' transactions and report any suspicious activity to Treasury's Financial Crimes Enforcement Network ("FinCEN"), which disseminated these reports to law enforcement and intelligence agencies. As the U.S. government warned in the wake of September 11, such reporting was particularly important for "correspondent banking" transactions, where a foreign bank enables its customers to access the U.S. financial system by sending their transactions through a U.S. bank or branch. As Congress emphasized in 2001 when it strengthened the BSA, "correspondent banking facilities are one of the banking mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the laundering of funds by hiding the identity of real parties in interest to financial transactions."[34]

57. BSA requirements and regulatory expectations are summarized in the Federal Financial Institutions Examination Council ("FFIEC") *Bank Secrecy Act (BSA) /Anti-Money Laundering (AML) Examination Manual* ("FFIEC Manual"), which was developed by federal and state banking agencies, FinCEN, and OFAC to provide guidance to banks and their examiners, and to ensure consistency in the application of BSA/AML requirements. The FFIEC Manual was first released in 2005, but it summarized requirements and expectations in effect since before 2001. The FFIEC Manual was commonly regarded by U.S. bank personnel as an authoritative source of guidance on BSA compliance. The FFIEC Manual explained that suspicious activity reporting was "critical to the United States' ability to utilize financial information to combat terrorism."

58. Under BSA regulations, banks were required to file a Suspicious Activity Report ("SAR") for any transaction conducted or attempted by, at, or through the bank (or an affiliate) and aggregating $5,000 or more, if the bank or affiliate knows, suspects, or has reason to suspect

---

[34] *Id.*

that the transaction involves money laundering or illegal activity. The FFIEC Manual emphasized that this included any suspected "terrorism financing." Indeed, the FFIEC Manual underscored the importance of this particular type of activity, warning:

> If a bank knows, suspects, or has reason to suspect that a customer may be linked to terrorist activity against the United States, the bank should immediately call FinCEN's Financial Institutions Terrorist Hotline at the toll-free number: 866-556-3974…. [T]he bank must also file a SAR.

59. In an appendix entitled "Money Laundering and Terrorist Financing 'Red Flags,'" the FFIEC Manual listed examples of potentially suspicious activity that may indicate terrorist financing. This included "international transfers" to or from banks or persons "from high-risk locations," including Iran.

60. FinCEN explains on its website that BSA reports of such suspicious transactions have "proven to be of considerable value" in "terrorist financing . . . investigations by law enforcement."

61. In addition to receiving BSA reporting, another key counterterrorism control was the U.S. government's ongoing monitoring of payment messages sent through the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") system. The SWIFT system was the primary means by which payments were processed through the international banking system. At all relevant times beginning in 2001, Treasury monitored SWIFT payment messages through its Terrorist Finance Tracking Program ("TFTP").

62. This program was revealed and widely publicized by the press in June 2006, including in a *New York Times* article by Eric Lichtblau and James Risen. Treasury also explained the program's history and importance on its website: "After the terrorist attacks on September 11, 2001," "[Treasury] initiated the Terrorist Finance Tracking Program (TFTP) to identify, track, and pursue terrorists—such as Al-Qaida, Hizballah, HAMAS and their networks.

This was an important part of Treasury's larger effort to track terrorist money flows and assist in broader U.S. government efforts to uncover terrorist cells and map terrorist networks here at home and around the world." The TFTP "has provided hundreds of thousands of valuable leads to U.S. government agencies and other governments that have aided in the prevention or investigation of many of the most visible and violent terrorist attacks and attempted attacks of the past decade…. SWIFT information greatly enhances our ability to map out terrorist networks, often filling in missing links in an investigative chain…. By following the money, the TFTP has allowed the United States and our allies to identify and locate operatives and their financiers, chart terrorist networks, and help keep money out of their hands."

63. To underscore the importance of BSA reporting and financial intelligence in countering terrorist attacks, President George W. Bush visited FinCEN on November 7, 2001, and gave a speech to "put the world's financial institutions on notice." He explained that the War on Terrorism was "not a war just of soldiers and aircraft. It's a war fought with diplomacy, by the investigations of law enforcement, by gathering intelligence and by cutting off the terrorists' money." He explained how certain terrorist facilitators "present[ed] themselves as legitimate businesses," but enabled "the proceeds of crime in one country to be transferred to pay for terrorist acts in another." President Bush did not mince words in delivering his "clear message to global financial institutions": "you are with us or you are with the terrorists. And if you're with the terrorists, you will face the consequences."

64. By early 2003, the U.S. government's intense focus on the importance of counterterrorism controls for global banks converged with its focus on Iran-backed terrorism. Treasury initiated a "Bad Bank Initiative" to expose Iranian banks that the IRGC was using to fund terrorism and to warn the international financial sector of the dangers of doing business in

Iran. According to former Treasury Assistant Secretary for Terrorist Financing and Financial Crimes Juan C. Zarate in his 2013 memoir, *Treasury's War*, there was "direct and convincing evidence that [Iran's] Bank Saderat was being used as the bank of choice for transactions taking place between Iran and Hezbollah, with the branch in Beirut serving as the central conduit for support to Hezbollah's activities in Lebanon." Indeed, as Zarate explains, "We were not the only ones to focus on Bank Saderat—this was a bank that Israel would consider bombing during its war with Hezbollah in 2006, considering its central importance to Hezbollah's financing." Treasury's Bad Bank Initiative also singled out Banks Melli, Mellat, and Sepah, and the Central Bank of Iran ("CBI/Markazi"), all four of which had engaged in terrorist financing and "served as facilitators of proliferation deals."

65. A major goal of Treasury's Bad Bank Initiative was to send "a clear message to others in the banking world," especially European banks like Commerzbank. As Zarate explained, "[a]n argument would be made directly to banks and companies around the world that it was too risky to do business with Iran." On information and belief, Commerzbank personnel repeatedly received this message when they met with Treasury officials, banking regulators, and others in the U.S. government. Commerzbank also received this message through myriad public statements by U.S. government officials and press reports warning about the IRGC's use of economic activity in Iran to fund its terrorism.

**C. Commerzbank's Special Money Laundering Services for Iran Clients**

66. Other global banks heeded the U.S. government's warnings. Most embraced the U.S. government's counterterrorism controls, and many stopped doing business with Iran entirely. But not Commerzbank.

67. Commerzbank had a long "history of . . . conducting business on behalf of Iranian banks" and other Iranian clients, including Banks Saderat, Melli, Mellat, Sepah, and CBI/Markazi.[35] According to a book about Commerzbank published in 2020, the bank considered Iran to be a "reliable" client and used its office in Tehran to "facilitate the initiation of business contacts on site."[36] Those efforts positioned Commerzbank as a key conduit between Iran and the global banking system.

68. Beginning in the 1990s, as the U.S. government was imposing sanctions on Iran and sharply warning about its support for terrorism, Commerzbank viewed the shifting environment as an opportunity to deepen it's Iran relationship.

69. In 2002, for example, Iran chose Commerzbank as one of only two European banks to handle Iran's first Eurobond issuances since the Islamic Revolution. The *Guardian* reported at the time that Commerzbank had "agreed to handle a [E]urobond issue . . . for the Iranian government, despite US claims that Iran has been one of the world's most active sponsors of terrorism."[37] The *Financial Times* likewise remarked that "Commerzbank [had] signed up to help Iran tap international capital markets . . . despite Washington viewing it as the world's most active state sponsor of terrorism and a member of the 'axis of evil.'"[38] Commerzbank's unusual willingness to disregard warnings about Iran's terrorism raised eyebrows among financial analysts too. One told a reporter, "You are talking about a very small number of European fund managers and commercial banks that would have been interested in

---

[35] DOJ SOF(A) ¶ 28.

[36] Stephan Paul, et al., Hundertfunfzig Jahre Commerzbank 1870-2020 (2020), *translated by Google*.

[37] Sarah Left, *European banks to handle Iranian investment*, The Guardian, May 27, 2002.

[38] *Press Digest*, Financial Times, May 27, 2002.

the new issue to begin with." He surmised that these few were "primarily driven by a desire to enhance their relationship with the Iranian government."[39] Commerzbank publicly confirmed as much, declaring, "We think it's a very positive sign . . . that Iran has entrusted us with this."[40] And in its 2002 Annual Report, Commerzbank regarded the Iran issuance as one of its two "key deals" of the year in the bond market.

70. A couple years later, when the IRGC was put in charge of developing Iran's South Pars gas field, observers regarded it as a "major boost to the operations of the [IRGC]" (*Agence France Presse*, June 27, 2006)—*i.e.*, IRGC terrorism—and reported that this "ha[d] undoubtedly made foreign companies cautious" about facilitating the project (*The Economist Intelligence Unit*, August 3, 2006). But Commerzbank again had no qualms. It was one of only a few banks to take $525 million of naked risk to finance the project.

71. What was happening secretly within the bank was far worse. By late 2003, as the U.S. government was sharply warning about Iran's banks, "several of Commerz's European competitors decided to stop processing USD transactions on behalf of Iranian clients and banks."[41] Commerzbank viewed this as a "business opportunity."[42] As U.S. counterterrorism controls made it more difficult for Iran to use its banks to finance terrorism, Commerzbank deepened its ties with Iran's banks and other favored Iran clients (including IRISL, *infra*) by offering the most illicit and unusual service a bank could ever offer: secrecy.

---

[39] Hugh Bronstein and Catherine Evans, *Update 4-Moody's Withdraws Iran Ratings Under US Pressure*, Reuters, June 3, 2002 (cleaned up).

[40] Sarah Left, *European banks handle Iranian investment*, The Guardian, May 27, 2022 (quoting Commerzbank spokesman).

[41] DOJ SOF(A) ¶ 31.

[42] *Id*.

72. As Commerzbank admitted in its consent order with NYDFS, "In an effort to grow its business relationships with Iranian customers in the early 2000s, Commerzbank created internal procedures for processing U.S. dollar payments to enable those clients, which included state-controlled financial institutions such as Bank Sepah and Bank Melli, to clear U.S. dollar payments through the U.S. financial system without detection."[43] Those procedures were designed to secretly launder payments for favored Iran clients by disguising the source and/or destination of USD wire transfers when payments were sent through the U.S. financial system. This had the effect of disabling the counterterrorism controls that would have caused the transfers to be monitored, flagged, and reported.

73. Specifically, on April 17, 2003, Commerzbank finalized a policy entitled, "Routing Instructions Iranian banks for USD payments."[44] This policy admonished employees to "[u]nder no circumstances mention the Iranian background in the cover order."[45] In other words, the Germany-based recipients of this policy were prohibited from mentioning the Iranian customer or connection in payment messages sent to the United States. An earlier draft of this policy explained the reason that Iranian links were to be removed from payment instructions, warning Commerzbank's staff that "[t]here is a high risk that transactions and cover payments with Iranian Background via USA might be blocked."[46]

74. This policy was designed with Bank Saderat and Bank Melli in mind. In July 2003, an email sent at the direction of Commerzbank's "Financial Institutions Group," which

---

[43] NYSDFS Consent Order ¶ 32.

[44] DOJ SOF(A) ¶ 29; Treasury Settlement ¶ 5.

[45] DOJ SOF(A) ¶ 29.

[46] *Id*.

was responsible for servicing the Iranian banks, informed other Frankfurt employees that "two state-owned Iranian banks, Bank Melli and Bank Saderat, wanted to begin routing their entire USD clearing business through Commerz," and cautioned, "If for whatever reason CB New York inquires why our turnover has increase [sic] so dramatically **under no circumstances may anyone mention** that there is a connection to the clearing of Iranian banks!!!!!!!!!!!!!"[47] This "dramatic" increase in turnover for Commerzbank's USD clearing business shows how central Iran clients were to Commerzbank, and those thirteen exclamation points show how illicit the bank understood its activity to be.

75. At the same time, Commerzbank coached its Iranian bank clients about how to evade detection.[48] For example, on September 17, 2003, a Commerzbank employee in Frankfurt sent an email advising a major Iranian Bank that maintained a USD account with Commerzbank to list "non ref" in the ordering party field in all of its future payment messages.[49] The author of the email had tested Commerzbank's compliance systems in Frankfurt, and he knew that writing "non ref" would trigger a manual review of the payment, thereby enabling Commerzbank's personnel to ensure that the messages did not contain any Iranian information.[50] This was a typical practice at the bank for favored Iran clients. Additionally, Commerzbank personnel explained to Iranian banks the kinds of information that could lead to payments being delayed, rejected, or blocked within the United States, and encouraged the Iranian banks to omit this type

---

[47] DOJ SOF(A) ¶ 33 (emphasis in original).

[48] DOJ SOF(A) ¶ 34; Treasury Settlement ¶ 7.

[49] DOJ SOF(A) ¶ 34.

[50] *Id.*

of information from their payment requests so that Commerzbank employees would not have to manually remove it.[51]

76. Commerzbank went even further for at least one of its favored Iran clients when removing references to the client from payment messages proved insufficient. In a June 2004 email, a Commerzbank employee reported that someone from Bank Melli had "complained about four rejected payments in the USA . . . which were returned by New York because of OFAC," even though they "were formatted as always and did not show any Iranian background."[52] This prompted Commerzbank to issue special checks to Bank Melli that it could use to covertly pay U.S. beneficiaries in lieu of sending wire transfers. These checks bore the account number for Bank Melli's USD account at Commerzbank, but they nowhere identified Bank Melli as the holder of the account. A Commerzbank employee explained this scheme to his colleagues: "The checks do [not] feature stamps or similar, but rather just signatures and display no evidence of an Iranian background and thus can be cleared without any problem."[53] Bank Melli used these special checks to make millions of dollars in payments.[54]

77. Commerzbank admitted in its deferred prosecution agreement with U.S. law enforcement that it "knowingly and willfully concealed from U.S. financial institutions and regulators the sanctioned entities' connection to these transactions and intentionally falsified the business records of these institutions."[55]

---

[51] *Id.*

[52] Treasury Settlement ¶¶ 8-9.

[53] DOJ SOF(A) ¶ 45.

[54] DOJ SOF(A) ¶ 47.

[55] DOJ SOF(A) ¶ 2.

78. Commerzbank also admitted that its senior management knew of the steps it was taking to conceal the transactions of its Iranian clients.[56] Indeed, in an October 13, 2003, email to Commerzbank's senior management, the bank's Head of Audit relayed concerns from compliance staff that payment messages transiting through the U.S. for Iranian clients were being "neutralized" (*i.e.*, falsified) and that this practice had been formalized in a written policy for the bank's staff to follow.[57] The email warned, "[I]t raises concerns if we consciously reference the suppression of the ordering party in our work procedures in order to avoid difficulties in the processing of payments with the U.S.A."[58] One senior executive wanted the issue investigated and later admitted to law enforcement, "this smells."[59] But there appeared to be few qualms at the highest levels of the bank. In a memo from staff in November 2003, Commerzbank's board and senior management were informed that the April 2003 policy remained in effect.[60] And in a presentation later that month, senior management was expressly told that "the standard procedure at the bank had been to manually replace the name of" sanctioned Iranian parties in wire transfer messages "with the bank code for Commerz Frankfurt because if the text were not changed the payments might be blocked due to U.S. sanctions," and that "payments with Iranian backgrounds were 'currently being overwritten'" to disguise the identity of the client.[61]

---

[56] DOJ SOF(A) ¶ 35.

[57] DOJ SOF(A) ¶ 37.

[58] *Id.*

[59] *Id.*

[60] DOJ SOF(A) ¶ 38.

[61] DOJ SOF(A) ¶ 39.

79. Commerzbank's personnel understood how unusual this policy was and how much it "smelled," but they adhered to it. In a 2004 email, for example, one employee commented on the policy, writing with apparent irony, "NO EXPERIMENTS PLEASE!!! Have fun with this and greetings."[62] In June 2006, Commerzbank's new Global Head of Compliance solicited input from colleagues about potential issues; a New York compliance employee opined in response that "Hamburg is notorious" for "[p]ersistent disregarding of OFAC rules."[63]

80. Commerzbank was determined to provide its special services for Iran's banks even after the banks had officially been designated for sanctions. On September 8, 2006, for example, the U.S. government cut off Iran's Bank Saderat from the U.S. financial system, explaining that Iran uses Bank Saderat "to transfer money to terrorist organizations, including Hizballah" and "Hamas," and that "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations each year." Bank Sepah was designated on January 9, 2007 for being "the financial linchpin of Iran's missile procurement network, . . . actively assist[ing] Iran's pursuit of missiles capable of carrying weapons of mass destruction," and Bank Melli was sanctioned on October 25, 2007 for being "used to send at least $100 million to the [IRGC's] Qods Force." These designations occurred amidst frequent warnings by the U.S. government. As Treasury's Undersecretary for Terrorism and Financial Intelligence explained, "All the banks we've talked to . . . recognize the risks—some because of what we've told them and some on their own. You don't have to be Sherlock Holmes to see the dangers."[64] As a result, most major western banks ceased providing USD services to Iranian

[62] DOJ SOF(A) ¶ 42.

[63] DOJ SOF(A) ¶ 59.

[64] Robin Wright, *Iran Feels Pinch as Major Banks Curtail Business*, Wash. Post, Mar. 26, 2007.

clients. But Commerzbank remained obstinate. The German press reported that "Commerzbank is the last big western bank to still do U.S. dollar business with Iran."[65] As the bank's spokesperson explained to a reporter at the time: Commerzbank saw Iran as a traditionally important partner.[66]

81. In its deferred prosecution agreement with U.S. law enforcement authorities, Commerzbank admitted that between January 1, 2002 and December 31, 2007 it processed approximately $32.7 million in Iranian payments, in addition to the IRISL payments described below, that either terminated in the United States, or otherwise were connected to the United States, in violation of U.S. sanctions laws.[67]

82. In its settlement agreement with OFAC, Commerzbank further admitted: "From on or about September 14, 2005 to on or about August 29, 2008, Commerzbank processed 959 electronic funds transfers in the aggregate amount of $22,033,132.79 to or through financial institutions located in the United States in apparent violation of the prohibition against the exportation or reexportation of services from the United States to Iran, 31 C.F.R. § 560.204."[68]

83. On information and belief, Commerzbank continued to serve Banks Saderat, Melli, Mellat, Sepah, and CBI/Markazi well beyond 2008 and through at least 2010 by maintaining non-USD accounts for these banks and conducting transactions in foreign currencies. Based on the significance of the Iranian banks to Commerzbank's business and the fact that Commerzbank did not close its Tehran office until 2010, it is highly likely that

---

[65] *German Firms Anxious about U.S. Policy on Iran*, ADP Germany News, Jan. 11, 2007.

[66] *German Banks To Stay in Iran*, ADP Germany News, Jan. 24, 2006.

[67] DOJ SOF(A) ¶ 48.

[68] Treasury Settlement ¶ 26.

Commerzbank continued serving its most favored Iranian clients throughout that period.[69] In light of Commerzbank's admissions of wrongdoing, and its awareness of the dangers of serving these specific financial institutions (as reported in U.S. designations and other public sources of which Commerzbank was aware), this activity was not routine banking—but instead willful participation in terrorist finance.

## II. Commerzbank's Money Laundering for IRISL Enabled the Supply of Weapons to Terrorists in Iraq.

84. One of Commerzbank's most favored clients was at the heart of the Axis of Resistance: IRISL. As a primary means by which the IRGC secured components for weapons and supplied those weapons to its terrorist proxies. IRISL played an essential role in the weapons supply chain that armed Hizballah and JAM in Iraq. To do this, IRISL regularly and systematically hid weapons among ordinary cargo and carried them along ordinary shipping routes, making them nearly impossible to interdict. The U.S. government and the international community thus determined that the only way to stop IRISL from supplying terrorists was to make it a pariah—cutting it off from the international shipping and financial systems and warning of the extreme and intolerable consequences of its continued operations.

85. Commerzbank, however, never considered IRISL a pariah. To the bank, it was a favored client. Commerzbank developed such a close relationship with IRISL that by 2004 IRISL was among the top ten clients generating revenue for the bank in Hamburg.[70] And instead of ending its relationship with IRISL when IRISL's systematic role as a terrorist supplier came

---

[69] *See also* Avi Jorisch, Testimony Before the House Committee on Oversight and Government Reform (July 29, 2010) (citing open source research as suggesting that, even in July 2010, Commerzbank was still providing correspondent services to sanctioned Iranian banks including Bank Saderat, Bank Melli, and Bank Sepah).

[70] DOJ SOF(A) ¶ 49.

into sharp focus, Commerzbank doubled down in the most shocking way for a bank to behave: It implemented new and extraordinary measures to help IRISL hide its operations behind a veil of shell companies and charged IRISL a premium for bespoke money laundering services. In so doing, Commerzbank knowingly thwarted counterterrorism efforts and sustained IRISL's continued supply of arms to terrorists, especially Hizballah and JAM terrorists targeting Americans at that time in Iraq.

**A. IRISL's Worldwide Shipping Network Supplied Weapons to Terrorists.**

86. IRISL was essential to the IRGC's effort, through MODAFL, to procure weapons and their components from abroad, manufacture them in Iran, and supply them to Iran's terrorist proxies. As Treasury observed in a June 16, 2010, fact sheet, MODAFL "used IRISL to conceal the true destination of shipments of military-related goods destined for MODAFL."

87. Originally operating under the name Arya Shipping Lines, IRISL was renamed the "Islamic Republic of Iran Shipping Lines" after the Islamic Revolution and gave many of its ships names that referred to Iranian cities and "martyrs." One ship, the *MV Iran Sepah*, adopted the name commonly used in Iran to refer to the IRGC. IRISL was wholly owned by the Iranian government until 2008, when a portion of its ownership was "privatized" though a stock exchange listing that put some of its shares in the hands of pension funds and other quasi-governmental entities. But at all relevant times, IRISL was under the *de facto* control of MODAFL and the IRGC.

88. IRISL was deeply enmeshed with MODAFL and operated as an IRGC front. It provided ships for IRGC operations, IRISL's crews aboard merchant vessels and working in foreign and domestic ports included IRGC intelligence officers, and IRISL functioned as the

IRGC's and MODAFL's worldwide logistics arm. According to the U.S. government, "IRISL has long been Iran's preferred maritime carrier for sensitive shipments," including weapons.[71]

89. IRISL's dual role as a commercial shipper and IRGC logistics operator has been publicly known for decades. For example, after the IRGC and Hizballah orchestrated a notorious bombing of a Jewish community center in Argentina in 1994, killing 85 people, Argentine prosecutors determined that the explosives for the attack had been transported to Argentina by IRISL. As a prosecutor confirmed to *UPI Insight Magazine* on July 7, 2003, "The Iran Shipping Lines had a double purpose." "In addition to normal shipping activities," he explained, IRISL "assisted [Iranian intelligence officers] in logistics in the U.S. and Europe, and handled logistics of Hezbollah in South America."[72]

90. Most importantly, IRISL was essential to the ability of MODAFL and the IRGC to smuggle weapon components to Iran where they were manufactured or assembled, and then to distribute the weapons to their terrorist proxies. Weapons and their components were often difficult to move in large quantities by air or land, for both logistical and tactical reasons. Especially for large and heavy weapons such as rockets, mortars, and artillery, as well as their chemical precursors, maritime bulk transport was often the most efficient means of delivering them. In addition, obvious land and air routes were heavily monitored, entailing a significant risk that Iran's weapons shipments would be interdicted or exposed. The enormous scale of the

---

[71] U.S. Dep't of State, Cable, Missile Technology Control Regime (MTCR): Maritime Shipping Trends of Controlled Materials 2008-2009 (Sep. 29, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE101150_a.html. *Accord* U.S. Dep't of State, Fact Sheet, Designation of the Islamic Republic of Iran Shipping Lines, E-Sail Shipping Company Ltd, and Mahan Air (Dec. 11, 2019) ("The Islamic Republic of Iran Shipping Lines (IRISL) is the preferred shipping line for Iranian proliferators and procurement agents.").

[72] Kenneth R. Timmerman, *Evidence Fuels Iran Terror Debate*, Insight Magazine, June 28, 2003.

maritime shipping industry solved those problems by enabling MODAFL and the IRGC to use the shipping of ordinary goods on large container ships transiting ordinary trade routes as camouflage to smuggle large quantities of weapons and their components. IRISL's size and global commercial operations have thus long enabled IRISL to move materials and arms for its terrorist proxies.

91. One frequent "inbound" shipping route involved moving Chinese and North Korean weapons, components, and precursor chemicals from Asia to Iran. In 2007, IRISL announced that it would triple its container capacity for shipping from Asia, with 11 ships transiting between ports in China and Southeast Asia, the Persian Gulf, and Europe. To move a large amount of precursors for explosives manufactured in China, the chemicals would, for example, be carried by IRISL on a common shipping route from Dalian, China through the Indian Ocean to Bandar Abbas, Iran, where MODAFL would then stockpile them and use them to produce the explosives in the rockets supplied to its terrorist proxies.

92. At the same time, IRISL enabled "outbound" shipping from MODAFL's stockpiles in Iran to terrorist proxies elsewhere in the Middle East. One frequent shipping route involved moving weapons from ports in Iran to ports controlled by Iran-backed terrorists in Iraq, such as the port of Umm Qasr. Another frequent route involved shipping to Hizballah-controlled ports in Lebanon and Syria, where the weapons were then stockpiled by Hizballah, used to train Hizballah and JAM terrorists, and supplied to those terrorists for use in Iraq. But because direct shipments from Iran to these ports would be obvious targets for interdiction, IRISL used its multi-stop routes between Europe and the Middle East as camouflage. To move a large cache of weapons from Iran to Hizballah in Syria, the weapons would, for example, be loaded onto an IRISL container ship on a common shipping route from the Iranian port of Bandar Abbas,

through the Suez Canal into the Mediterranean, and then through the Strait of Gibraltar to one of Europe's busiest ports in Hamburg; the weapons would then make a return voyage to the Mediterranean, where they would be delivered to the Syrian port of Latakia for Hizballah's use. Similar routes would be used to deliver weapons to Iraq, with IRISL often delivering cargo to busy ports in Dubai, whereupon smaller boats would take it through the Persian Gulf to Umm Qasr in Iraq.

93. The following map illustrates IRISL's routes through the Middle East, Europe, and Asia.




94. Essential to the success of these maritime smuggling routes was the camouflage afforded by IRISL's bulk shipment of ordinary goods. IRISL maintained a fleet of over 100 bulk cargo ships, in addition to leasing ships and paying other shippers to carry its cargo. IRISL cargo was typically moved worldwide in 20-foot containers like those shown below on an IRISL ship, the *MV Visea*.





95. Each ship carrying hundreds of containers of ordinary goods could accommodate dozens of containers of hidden weapons, with each container typically surrounding its illicit cargo with more ordinary goods, as shown in the sketch below.



96. These techniques for disguising illicit cargo succeeded because of lax security at many ports, combined with the sheer impossibility of searching every corner of every container on every massive cargo ship to pass through high-volume shipping hubs. As the U.S. government has assessed, "Numerous proliferators exploit the flexibility, speed, and perceived anonymity of the intermodal, or containerized, shipping system."[73] In addition to the "significant cost savings to shippers, especially in the transport of large or heavy materials," the use of containers "provides a greater degree of superficial anonymity to cargoes," which, "magnified by the sheer volume of containers, has been exploited by all kinds of nefarious actors," including

[73] U.S. Dep't of State, Cable, Missile Technology Control Regime (MTCR): Maritime Shipping Trends of Controlled Materials 2008-2009 (Sep. 29, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE101150_a.html

those moving weapons in large quantities, for whom "maritime transportation remains a key method" on which they "rely heavily."[74] At the port of Dubai, for example, which is the hub for the exchange of goods between container ships and smaller commercial vessels ("dhows") that carry cargo to and from Iran, "Customs officers rarely make more than cursory inspections of dhows leaving for Iran."[75] Nor was it practicable to inspect all cargo entering high-volume ports like Umm Qasr,[76] which is Iraq's busiest commercial port, bringing in 80 to 90 percent of all its commercial goods, which amounted to 4.3 million tons of goods in 2005.[77]

97. IRISL's strategy for smuggling weapons was thus to hide them like needles in a haystack, confident that IRISL's large volume of ordinary shipments would make it nearly impossible to track and interdict the weapons hidden among them.

### B. The International Community Issued Numerous Warnings and Imposed Sanctions and Counterterrorism Controls to Stop IRISL from Supplying Weapons to Terrorists.

98. By at least 2002, it was clear that Iran was using maritime shipping to deliver arms to its terrorist proxies. That reality became impossible to ignore when, on January 3, 2002, Israel interdicted a ship, the *Karine A*, loaded with Iran-supplied weapons destined for terrorists in Gaza. Hidden in crates beneath rice, toys, furniture, and other freight were thousands of

---

[74] *Id.*

[75] U.S. Dep't of State, Cable, Iranian Dhow Trade with Dubai (Nov. 22, 2006), *available at* https://wikileaks.org/plusd/cables/06DUBAI6884_a.html.

[76] *See, e.g.*, U.S. Dep't of State, Cable, Major General Aziz Confident about Security but Acknowledges Some Violence Possible (Jan. 25, 2009), *available at* https://wikileaks.org/plusd/cables/09BASRAH2_a.html (warning that the flow of purportedly licit goods, particularly into the Umm Qasr port, creates "smuggling opportunities for lethal aid, including military hardware, ammunition, and expertise").

[77] Teri Weaver, *U.S. troops work to balance development, security at Iraq's busiest commercial port*, Stars and Stripes, May 28, 2009.

rockets (122 and 107 mm), mortars, RPGs, mines, and assault rifles, along with 3,000 pounds of C4 explosives—enough for about 300 suicide bombs.

99. Using tactics IRISL would refine and repeat at greater scale in the coming years, the *Karine A* appeared to be carrying ordinary goods along normal shipping routes. In late 2001, the ship was renamed, registered in Tonga, and then sailed from Lebanon to Sudan, where it was loaded with regular cargo. In December, the boat sailed around the Arabian Peninsula to Dubai. At some point while passing through the Strait of Hormuz, Hizballah and IRGC operatives on an Iranian ferry loaded the *Karine A* with 80 large wooden crates of Iran-supplied weapons. In Dubai, it was again loaded with ordinary cargo to camouflage the weapons and then sailed back around the Arabian Peninsula to Hodeida port in Yemen, aiming to pass through the Suez Canal and unload the weapons to fishing boats off the coast of Gaza. On January 3, 2002, in a startling raid on the Red Sea, Israel seized the *Karine A* and publicized its cargo:





100. The interdiction of the *Karine A* was widely covered in the international media, as it caused an "upheaval" in negotiations between Israel and the Palestinians.[78] It was a wake-up call demonstrating with unusually vivid proof how Iran and Hizballah were using maritime

[78] Robert Satloff, *The Peace Process at Sea: The Karine-A Affair and the War on Terrorism*, Washington Institute for Near East Policy, May 1, 2002.

shipping to arm their proxies. As Vice President Cheney underscored to CNN on January 29, 2002, "What's most disturbing isn't just the shipment of arms, it's the fact that it came from Iran, apparently in conjunction with some activities of Hezbollah as well." The German press likewise took note, reporting, "When the Israeli navy seized the ship *Karine A*, . . . the evidence of an Iranian rearmament during the Intifada was clearly visible to Jerusalem and Washington."[79]

101. Indeed, the *Karine A* was a proof-of-concept for the terrorists that marked the beginning of a strategic shift in which maritime shipping would be essential. According to a detailed account of the operation based on Israeli intelligence sources, it was a collaboration between the IRGC, Hizballah, and Palestinian terrorists that was masterminded by Hizballah terrorist chief Imad Mugniyeh (*supra* at 18-20) and directly managed by his deputy. The "Mugniyeh-IRGC plan" was to arm terrorists with rockets, which they envisioned as a "strategic game changer."[80] But rockets were heavy and difficult to move in large quantities, so maritime shipping was key. While Israeli intelligence went to extraordinary lengths to identify and surveil the *Karine A*, Mugniyeh knew that such efforts would be difficult to sustain. Accordingly, his "strategy with Iran was to keep smuggling a steady stream of weapons," on the assumption that many would escape interdiction.[81]

---

[79] *Our cause is just: If necessary, without Europe: America launches phase two of the war on terror*, Der Zeit, Feb. 7, 2002, *translated by Google*; *see also, e.g.*, *Deadly attack in the Gaza Strip: Six people are killed in a Palestinian attack on an Israeli military base*, Taz, Jan. 10, 2002 ("Last week, the ship 'Karine A' was hijacked in the Red Sea by a special Israeli naval commando unit carrying a cargo of 50 tons of military equipment, including rifles, ammunition, grenades, Katyusha rockets and anti-tank missiles."), *translated by Google*.

[80] Amos Gilboa, A Raid on the Red Sea: The Israeli Capture of the Karine A 15-16 (Potomac Books 2021).

[81] *Id*. at 19.

102. Having been involved in the Argentina bombing that used IRISL as cover to smuggle explosives far from Iran (*supra* at 38), Mugniyeh understood that IRISL's global shipping platform was the ideal vehicle for scaling-up their plans. In the years that followed, Iran and Hizballah used IRISL to dramatically increase their maritime weapons smuggling and perfect their tactics. The IRGC's Unit 190, a special unit focused on supplying arms to terrorist proxies, developed sophisticated methods to conceal arms "inside containers next to other commonplace products" and send them on ships "to their recipients as innocuous commodities," sometimes "pass[ing] through three or more ports before reaching their final destination."[82] What began with the *Karine A* soon became ubiquitous. As one scholar observed, "Over the years, the scope of these transfers has proven to be massive, with Iranian weapons and explosives used in great quantity by Hezbollah . . . and Iraqi militias."[83]

103. As Iran's maritime smuggling accelerated, international concern grew. That concern became especially urgent in 2006, when Iran resumed uranium enrichment and the International Atomic Energy Agency ("IAEA") determined that Iran had failed to comply with its nuclear commitments. Iran's nuclear proliferation activities were deeply intertwined with its proliferation of conventional weapons to terrorist proxies. Iran's efforts to develop and improve missiles and rockets, for example, enabled it to develop the technology to deliver a nuclear warhead. Further, Iran's support of proxy terrorists, and their use of Iran-supplied weapons to target Americans and others, belied Iran's claim that its nuclear ambitions were peaceful. Alarm

[82] Nadav Pollak, *Rethinking U.S. Strategy for Intercepting Iranian arms Transfers*, Washington Institute for Near East Policy, Aug. 20, 2015.

[83] *Id.*

over Iran's nuclear program and longstanding concern over its supply of weapons to terrorists thus converged in a focused international effort to stop Iranian weapons smuggling.

104. Over the next two years, the international community and the U.S. government increased the frequency and volume of their warnings to European banks and others about the dangers of doing business with Iran, singling out Iran's illicit use of maritime shipping and its supply of weapons to its terrorist proxies.

105. The warnings began with the U.N. Security Council's adoption of Resolution 1737 on December 23, 2006. Expressing its determination "to constrain Iran's development of sensitive technologies in support of its nuclear and missile programmes" and concern for "proliferation risks," the Security Council directed all states to "take the necessary measures to prevent the supply, sale or transfer . . . using their flag vessels," of sensitive materials for the benefit of Iran. The Security Council also called on states to prevent related "financial assistance, investment, brokering or other services, and the transfer of financial resources or services, related to the supply, sale, transfer, manufacture or use" of sensitive materials to Iran.

106. A few months later, on March 24, 2007, the U.N. Security Council adopted Resolution 1747, expanding the embargo from certain sensitive materials to other arms and materials Iran was supplying to its terrorist proxies. The Security Council called upon states to "exercise vigilance and restraint . . . to prevent a destabilizing accumulation of arms" by Iran. To that end, the Security Council determined that "Iran shall not supply, sell or transfer . . . using its flag vessels . . . any arms or related materiel," and "all States shall prohibit the procurement of such items . . . using their flag vessels." The Security Council called for particular vigilance regarding the use of each state's "flag vessels" to transfer arms, including "artillery systems" (*i.e.*, rockets) and "missiles or missile systems," as well as related "financial assistance,

investment, brokering or other services," to Iran. In the same Resolution, the Security Council singled out for special concern several IRGC commanders and entities, including Qasem Soleimani, the IRGC-QF commander who directed the supply of weapons to Iran's terrorist proxies, as well as an IRGC entity that "[p]roduces unmanned aerial vehicles (UAVs)" that the IRGC "has boasted of using . . . as part of its asymmetric warfare doctrine" (*i.e.*, for proxy terrorist attacks).

107. Those Security Council resolutions coincided with an aggressive "financial pressure campaign," led by Treasury's Under Secretary for Terrorism and Financial Intelligence, which directly warned European banks like Commerzbank in private. As former Treasury official Juan Zarate recounted in his memoir, Treasury's Under Secretary personally visited bank officials to "demonstrat[e] to CEOs and compliance officers around the world that the risk of doing business with Iran was too high." At each stop, he began with "a briefing on Iranian illicit activity and how it coursed through the international financial system" and gave them "briefing packets" with "information about how the Iranian government and the IRGC used front companies and obfuscation to finance and acquire what they needed for their military . . . apparatus." The fundamental message of the financial pressure campaign was: If you do business with Iranian companies in sectors controlled by the IRGC—even ostensibly legitimate transactions with business entities—you take on an unacceptable risk of supporting terrorist attacks by IRGC-funded proxies. As a large European bank that was doing business with Iran, Commerzbank was, on information and belief, one of the banks that received these briefings.

108. In March 2007, the Deputy Treasury Secretary publicly reported, "We have . . . engaged in unprecedented outreach to the international private sector, meeting with more than 40 banks around the world to share information and discuss the risks of doing business with Iran."

Explaining that most banks "want to identify and avoid dangerous or risky customers who could harm their reputations and business," he noted that several European banks were curtailing their business with Iran.

109. On May 9, 2007, at a press roundtable in Berlin, State Under Secretary Nicholas Burns publicly reiterated the message of the financial pressure campaign, warning that it was "no time for business as usual with . . . the leading supporter of the four major Middle East terrorist groups that Iran is." The German press confirmed that the U.S. government's message had been received in Germany. The German news magazine *Der Spiegel* reported in July 2007, "Anyone wishing to do business in the United States or hoping to attract US investors had best tread softly when it comes to Iran."[84] As one German banker told *Der Spiegel*, "Anti-terror officials from the US Treasury [Department] are constantly showing up to demand [German banks] cut their traditionally good relations with Iran. The underlying threat from the men from Washington is that they wouldn't want to support terrorism, would they?"[85]

110. On October 11, 2007, the Financial Action Task Force ("FATF"), a standard-setting body for the global financial system, issued a "statement of concern" in Paris, warning that Iran posed a "significant vulnerability within the international financial system" and advising banks to exercise "enhanced due diligence." This statement was circulated to Commerzbank by German regulators, along with specific guidance informing Commerzbank that the FATF statement legally obligates German banks to undertake additional due diligence on all Iran-related transactions. FinCEN likewise issued an advisory to banks on October 16, 2007,

---

[84] Von Ralf Beste et al., *US Pressures Germany to Cut Iran Business Ties*, Der Spiegel, July 30, 2007.

[85] *Id.*

reiterating the FATF's warning and emphasizing that "all customers and transactions associated with Iran" warranted "enhanced scrutiny."

111. On October 25, 2007, as noted *supra*, the U.S. government sanctioned MODAFL and the IRGC. In these "major actions . . . to counter Iran's bid for nuclear capabilities and support for terrorism," the U.S. government also designated the IRGC's Qods Force; nine IRGC-affiliated firms; five IRGC leaders; and two more Iranian banks (Bank Mellat and Bank Melli) in addition to Bank Saderat. An accompanying fact sheet explained that these designations were "consistent with [FinCEN's] warning" to banks a week earlier, and were intended to "notify the international private sector of the dangers of doing business with . . . the many IRGC-affiliated companies that pervade several basic Iranian industries." The IRGC-QF, the fact sheet warned, "provides material support to . . . Lebanese Hizballah" and other terrorist organizations. This included "lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces" in Iraq and "guidance, funding weapons, intelligence, and logistical support" to "Hizballah's . . . terrorist activities" in Lebanon, Syria, Iraq, and Israel.

112. In an accompanying public statement, State Under Secretary Nicholas Burns emphasized that "Iran has transferred arms . . . to Hezbollah in Lebanon and to the Shia militant groups in Iraq." He added, "Iranian assistance to the Shia militant groups is providing the technology with which they then subsequently . . . attack American soldiers and kill and maim American soldiers. So that's a serious issue for us," in addition to Iran's nuclear proliferation. In another accompanying statement, the Treasury Secretary issued a warning directly to banks: "Today, we are taking additional steps to combat Iran's dangerous conduct and to engage financial institutions worldwide to make the most informed decisions about those with whom

they choose to do business." The Treasury Secretary emphasized that "Iran exploits its global financial ties" and that the "IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that, if you are doing business with Iran, you are doing business with the IRGC." As this "awareness . . . has grown, many banks around the world have decided as a matter of prudence and integrity that Iran's business is simply not worth the risk. It is plain and simple: reputable institutions do not want to be the bankers for this dangerous regime." The Secretary of State reinforced the same message: "These actions will help to protect the international financial system from the illicit activities of the Iranian Government and they will provide a powerful deterrent to every international bank and company that thinks of doing business with the Iranian Government."

113. On November 10, 2007, in a press briefing after a meeting between the German Chancellor and the U.S. President, the U.S. National Security Advisor reported that "there have been steps taken by German banks, for example, to step away from Iran as the awareness has become more widespread that Iran is using banks, and sometimes its relationships with European banks, to basically launder funds that are used to support terror or for proliferation." In remarks to the European press in London on February 11, 2008, State Under Secretary Nicholas Burns similarly emphasized a "trend that has been apparent for about a year and a half" of "European banks that have either stopped lending altogether to Iran, or shut down their operations, or have diminished the operations in lending," which has been "probably the most effective leverage against Iran" and "for our international strategy of trying to prevent Iran from becoming even more destabilizing a force in the Middle East than it already is." He further emphasized Iran's "outright support in arming and funding most of the Middle East terrorist groups, from Hamas in Gaza to Hezbollah in Lebanon, to . . . the Shia militant groups in Iraq," and observed that

"there's been universal, international condemnation of this Iranian policy to support the violent groups in the Middle East."

114. In early 2008, the Office of the Director of National Intelligence reported to Congress that "Iran continues to seek and acquire conventional weapons and production technologies, primarily from entities in Russia and China, as well as high-quality weapon components and dual-use items." Iran "has a history of supplying arms to Hizballah," including "many types of rockets," and "there has been a dramatic increase in Iranian weapon and weapon system shipments through Syria, with transfers continuing even after the outbreak of hostilities with Israel in July 2006." The report assessed a "strong possibility that Iranian proliferation will continue to be a destabilizing force in the Middle East."

115. On March 3, 2008, the U.N. Security Council adopted Resolution 1803, which drew specific attention to IRISL's role in Iran's proliferation. It called upon all states to "inspect the cargoes to and from Iran" of vessels at their seaports "owned or operated by . . . Islamic Republic of Iran Shipping Line." In implementing this resolution, the U.S. government specifically urged states to "exercise vigilance with regard to all IRISL-related transport of goods through your jurisdiction, and any financial support for those transfers."[86]

116. It quickly became clear, however, that inspections and interdictions were not enough to stop IRISL from continuing to smuggle weapons under the guise of ordinary shipping. The international community recognized that the instances in which IRISL had been caught were only the tip of the iceberg, and that the true scale of IRISL's weapons smuggling from Asia to Iran and from Iran to terrorist proxies throughout the Middle East was enormous. Moreover, it

[86] U.S. Dep't of State, Cable, Implementation of the IRISL Cargo Inspection Provision of UNSCR 1803 (June 27, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE69339_a.html

was the camouflage created by IRISL's worldwide shipment of ordinary goods that made it difficult to identify and stop the weapons hidden among them. Given that IRISL's worldwide shipping activity was so permeated with weapons smuggling and its illicit cargo was so difficult to detect, the U.S. government determined that all of IRISL's shipping activity had to be stopped.

117. Accordingly, on September 10, 2008, the U.S. government sanctioned IRISL, aiming to shut down its shipping operations by cutting it off from the U.S. financial and commercial system. The sanctions announcement explained: "IRISL is Iran's national maritime carrier; a global operator with a worldwide network of subsidiaries, branch offices and agent relationships. It provides a variety of maritime transport services, including bulk, break-bulk, cargo and containerized shipping. These services connect Iranian exporters and importers with South America, Europe, the Middle East, Asia, and Africa." But at the same time, IRISL "provides logistical services to Iran's MODAFL" by "facilitat[ing] shipments of military-related cargo destined for MODAFL and its subordinate entities. . . . For example, in 2007, IRISL transported a shipment of a precursor chemical destined for use in Iran's missile program." And "[i]n order to ensure the successful delivery" of such goods, "IRISL has deliberately misled maritime authorities through the use of deception techniques . . . to conceal the true nature of shipments ultimately destined for MODAFL." For example, "IRISL has employed the use of generic terms to describe shipments so as not to attract the attention of shipping authorities and created and made use of cover entities to conduct official, IRISL business." In an accompanying press briefing, a Treasury official emphasized that "IRISL's deceptive conduct makes it nearly impossible to determine whether its shipments are licit or illicit," and he warned that the publicly available information about IRISL's illicit shipments—shocking as it was—constituted only "a subset of what we're able to identify in classified information."

118. The September 10, 2008, announcement made clear that this was a present and ongoing threat, as "IRISL has pursued new strategies, which could afford it the potential to evade future detection of military shipments." The announcement explained that IRISL's designation was intended to "highlight the dangers of doing business with IRISL," which would entail "helping the shipping line facilitate Iran's proliferation activities." These dangers, the U.S. government warned, "should give pause to any financial institution." In the accompanying press briefing, the Treasury official emphasized that the action against IRISL should be viewed in the "broader context of the U.S. Government's activities with respect to Iran," which is "continuing to pursue nuclear capabilities, develop ballistic missiles, and support terrorism."

119. In addition to designating the main IRISL entity headquartered in Iran, the September 10, 2008, announcement "highlight[ed] the dangers of doing business with . . . [IRISL's] subsidiaries." The U.S. government sanctioned 18 IRISL affiliates in Europe, Asia, and Iran, including IRISL Europe GMBH in Hamburg, Irinvestship Ltd. in London, IRISL (UK) Ltd. in Essex, Irital Shipping SRL Co. in Genova, IRISL Benelux NV in Antwerp, and IRISL (Malta) Ltd. in Malta. These IRISL affiliates were part of IRISL's "deceptive schemes to shroud its involvement in illicit commerce," while "providing logistical services to Iran's MODAFL." By exposing the affiliates through which IRISL operated, the U.S. government aimed to put legitimate operators in the shipping industry on notice. As the Treasury official explained in the accompanying press briefing, for example, maritime insurance companies needed to exercise "extreme diligence." Banks issuing letters of credit for maritime shipments were likewise put on notice. As the U.S. government explained to its allies and partners, IRISL had "directed its international offices to obtain and use deceptive documents—including false bills of lading that

remove references to IRISL and the Iranian recipient—to negotiate letters of credit with banks refusing to deal with Iranian entities."[87]

120. The U.S. government expressed confidence that its counterterrorism controls and warnings would stop IRISL's weapons smuggling by shutting it out of the international financial system on which it depended for its global operations. A Treasury official warned that the U.S. government would be monitoring IRISL transactions through its counterterrorism controls in the banking system (*supra* at 23-26), explaining, "if somebody is wiring money to IRISL as of 1:30 today [after the sanctions are imposed] and it's going between two foreign countries but it happens to be in U.S. dollars, it happens to be transiting the U.S. financial system, even for an instant, it'll be caught in a bank's filter, most likely, and we'll receive a notification of that."

121. Later, in a November 6, 2008 statement, Treasury's Under Secretary recalled that, since 2006, the U.S. government had engaged in "a campaign to warn the world about how Iran's threat to our security also posed a threat to the integrity of the international financial system." Since that time, the U.S. government had "shared information with . . . financial institutions . . . demonstrating that even seemingly benign business with Iran should be cause for concern." Iran "misuses bank accounts it holds in non-Iranian banks." As a result, "many private financial institutions and companies worldwide have voluntarily shunned business with Iran." He added, "Banks see Iran's behavior as posing an unacceptable risk to their reputations, and they would rather forgo the business and preserve their integrity."

---

[87] U.S. Dep't of State, Cable, Implementation of the IRISL Cargo Inspection Provision of UNSCR 1803 (June 27, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE69339_a.html.

**C. Commerzbank Laundered IRISL's Payments in Defiance of Sanctions and Counterterrorism Controls.**

122. While the U.S. government could count on most banks to stop IRISL, the Iranians counted on Commerzbank to shield it.

123. Commerzbank first established a customer relationship with IRISL in 2002, in the months following the *Karine A* interdiction (*supra* at 42-44).[88] In 2003, as prosecutors and news outlets publicized new details about IRISL's role in Iran's Argentina bombing (*supra* at 38), Commerzbank grew its relationship with IRISL. By 2004, IRISL had become one of the bank's most valued and lucrative clients, and a Commerzbank employee had even personally traveled from Hamburg to Iran to install special electronic banking software in IRISL's offices, enabling "many more orders."[89] Commerzbank also was aware by 2004 that the U.S. government's warnings and counterterrorism controls were causing IRISL's payments to be rejected, and it began scheming with IRISL to launder the payments.

124. In an April 2004 email, for example, in response to increased scrutiny by U.S. banks, a Commerzbank employee considered whether "the address of the German subsidiary [of IRISL] can be modified" so it "will not end up in the payment order."[90] This alarmed a member of the bank's compliance department, who responded in a June 2, 2004 email with a stern warning: "I expressly note that the circumvention of [sanctions] regulations is punishable and exposes our institution to high risk."[91] Yet these warnings were swiftly ignored. In a November 2004 email, a Commerzbank employee confirmed that "[u]ntil now, we have subsequently

---

[88] DOJ SOF(A) ¶ 49.

[89] *Id.*; Treasury Settlement ¶¶ 10, 12.

[90] Treasury Settlement ¶ 10.

[91] Treasury Settlement ¶ 11.

deleted the address so that foreign banks would not notice anything."[92] In another email, employees explored new ways to ensure that "the Americans do not learn about the background of the commercial payment."[93]

125. A January 2005 internal Commerzbank memorandum reported that "sanctions that have existed for some years against Iran and Iranian companies have been tightened," and "**[t]he number of rejected payments recently increased sharply since the word 'IRISL' results in inquiries at foreign banks**."[94] Rather than take this as a cue to cease doing business with IRISL, Commerzbank and IRISL convened a meeting wherein they swore themselves to secrecy. As the memo reported, "Commerzbank and [IRISL] agreed to absolute confidentiality with respect to the conduct vis-à-vis third parties [*i.e.*, the Americans]."[95]

126. They also crafted a new, bespoke money laundering arrangement, which Commerzbank called "Safe Payments." In a follow-up written presentation Commerzbank delivered to IRISL to "visualize our thoughts regarding a 'safe payments' solution,"[96] Commerzbank explained that "**[t]he current rejections show that IRISL is in the OFAC list**," but "payments which are sent through a . . . subsidiary are unlikely to be rejected to our present knowledge."[97] Thus, under the new Safe Payment arrangement, Commerzbank would open accounts for IRISL shell companies registered in places like Malta and Cyprus (referred to as "special purpose entities" or SPEs), and payments to and from IRISL would be routed through

[92] *Id.*

[93] *Id.*

[94] DOJ SOF(A) ¶ 51 (emphasis in original).

[95] Treasury Settlement ¶ 12.

[96] DOJ SOF(A) ¶ 53.

[97] *Id.* (emphasis in original).

these accounts.[98] Since only Commerzbank would know that the shell companies were operating on behalf of IRISL, U.S. sanctions filters would not catch the payments through their accounts.[99] Commerzbank would zero out the balance of these special pass-through accounts every day and transfer the funds to one of IRISL's main accounts pursuant to a secret agreement.[100]

127. With this Safe Payment arrangement, Commerzbank conspired with IRISL to hide IRISL's payments behind a false façade, which the bank secured with a vow of "absolute confidentiality." To the outside world, IRISL's various shell companies did not appear to be affiliated with a shipping company that was becoming a pariah for arming terrorists. But hidden inside the bank with "absolute confidentiality," Commerzbank maintained the secret system that enabled IRISL to operate through those shell companies. In doing so, Commerzbank and IRISL formed a near-common enterprise focused on shielding IRISL's shell companies from scrutiny by counterparties in the shipping industry, U.S. compliance officials, and counterterrorism authorities.

128. This was plainly illegal. As Commerzbank admitted in its deferred prosecution agreement, the payments it processed for IRISL not only violated sanctions laws but also "caused false entries to be made in the business records of financial institutions located in New York," in violation of New York law.[101] Commerzbank admitted that it "knowingly and willfully concealed from U.S. financial institutions and regulators the sanctioned entities' connection to these transactions and intentionally falsified the business records of these institutions."[102] The

---

[98] DOJ SOF(A) ¶¶ 10 n.4, 52.

[99] DOJ SOF(A) ¶ 52.

[100] *Id.*

[101] DOJ SOF(A) ¶ 65.

[102] DOJ SOF(A) ¶ 2.

arrangement was nevertheless approved by Commerzbank's management. Commerzbank later admitted in its deferred prosecution agreement that "Senior Management at Commerz knew of the steps taken to evade U.S. sanctions involving Commerz's Iranian clients," chiefly including IRISL, and "[s]upervisors in Commerz's Hamburg office knew of and condoned the 'safe payments solution.'"[103]

129. Such illicit secrecy for IRISL required special handling that came at a special price. Commerzbank demanded to be paid more money for payments through this special arrangement than for ordinary banking services. For Safe Payments that obscured IRISL as the beneficiary, Commerzbank charged four times as much as it did for regular payments.[104] The January 2005 internal memorandum confirmed, "It was agreed with [IRISL] that the Safe Payments will be processed for a higher price."[105]

130. Commerzbank implemented this Safe Payments arrangement for IRISL by at least March 2005. As a March 17, 2005, email from Commerzbank to IRISL confirmed, "two [shell company] accounts have been set in place for the purpose of [IRISL] . . . . The account names do not contain any reference to the contents of the US embargo database (OFAC list)," and "if payments are credited to the . . . safe payment account, the end of day balance will be forwarded to [IRISL's] main account."[106] The "safe payment accounts will always remain at an end of day balance of zero."[107] Commerzbank used this system to hide IRISL payments throughout the

[103] DOJ SOF(A) ¶¶ 35, 57.

[104] DOJ SOF(A) ¶ 56.

[105] Treasury Settlement ¶ 12.

[106] Treasury Settlement ¶ 13.

[107] *Id.*

relevant period, and when OFAC filters were updated to detect the use of a particular shell company, Commerzbank and IRISL would switch the companies.[108]

131. From 2006 and into 2008, as the U.N. Security Council issued three resolutions calling for vigilance about Iran's use of shipping vessels to obtain and transport weapons, specifically singling out IRISL, and as the U.S. government was warning Commerzbank that doing business with companies like IRISL would enable terrorism, Commerzbank continued to launder IRISL's payments through its Safe Payment system.

132. Acutely aware of concerns about IRISL, Commerzbank gave the false impression that it had heeded them. For example, according to a Treasury Department cable published by Wikileaks, Treasury's Deputy Secretary Robert Kimmitt met with Commerzbank's CEO, Klaus-Peter Mueller, on February 12, 2007, to emphasize the U.S. government's warnings in person. While admitting that he was "uneasy about Commerzbank's business in Iran," Commerzbank's CEO painted a misleadingly rosy picture: He assured the Deputy Secretary that "Commerzbank gave the Iranians eight weeks warning that it was suspending its clearing business, much less time than other banks had given them"; and he professed ignorance about the bank's clients, suggesting the bank "could act more effectively if the [U.S. government] would quickly share information it receives."[109]

133. What Commerzbank did not tell the Treasury Department was that, far from suspending its business with IRISL, it was continuing to clear IRISL's payments; and far from lacking information about its clients, Commerzbank had promised "absolute confidentiality" and

[108] DOJ SOF(A) ¶ 55.

[109] U.S. Dep't of State, Cable, Treasury Deputy Secretary Kimmitt Meets Commerzbank CEO (Feb. 2, 2007), *available at* https://wikileaks.jcvignoli.com/cable_07FRANKFURT732

implemented a Safe Payment system for IRISL to hide that very information from the U.S. government.

134. Commerzbank gave a similarly misleading impression to others in Germany. As a March 14, 2008, cable published by *Wikileaks* reported, Commerzbank "complained" at an industry conference in Germany "that their virtually complete withdrawal from Iran had opened the field to much smaller, less scrupulous operators whose transactions would be much more difficult to track than their own."[110] What they did not say was that the "less scrupulous" operator continuing to serve such clients was Commerzbank itself.

135. Commerzbank's senior management knew the bank was continuing to serve IRISL. In a May 23, 2008, email, for example, a concerned member of Commerzbank's compliance department alerted a member of Commerzbank's senior management that "the customer relationship with Acena Shipping [an IRISL subsidiary] and [IRISL Europe] still exist[s]."[111] But such relationships continued.

136. Commerzbank was still maintaining its relationship with IRISL when, on July 15, 2008, multiple senior Commerzbank compliance officials met with the Director of OFAC in Washington, D.C.[112] According to notes taken by one of Commerzbank's representatives at the meeting, OFAC officials "appeared taken aback to hear that IRISL remained a Commerzbank customer."[113] Commerzbank assured OFAC that the bank's "head office is conducting a review

[110] U.S. Dep't of State, Cable, Germany/Iran – Exporters and Banks "Doing Their Part" But Want Precise Guidance (Mar. 14, 2008), *available at* https://wikileaks.org/plusd/cables/08BERLIN333_a.html

[111] Treasury Settlement ¶ 17.

[112] Treasury Settlement ¶ 18; DOJ SOF(A) ¶ 60.

[113] *Id.*

of their relationship with IRISL."[114] But the impression Commerzbank gave to the U.S. government was, yet again, misleading. Commerzbank continued to process USD payments through U.S. financial institutions on behalf of IRISL and several of its affiliates.[115]

137. Shortly thereafter, on September 10, 2008, OFAC specifically sanctioned IRISL and several of its affiliates, including IRISL's UK branch, its European office, and numerous IRISL vessels, prohibiting all transactions with them and leaving absolutely no doubt that IRISL's operations had to be stopped in their entirety (*supra* at 52-54). Commerzbank received this message and understood it. Indeed, the day after the sanctions announcement, a senior official at OFAC personally forwarded it to the head of compliance at Commerzbank's New York branch.[116] That same day, one of Commerzbank's relationship managers for IRISL forwarded the sanctions announcement to several Commerzbank employees in Hamburg with responsibilities related to IRISL. In the email, the relationship manager highlighted that the sanctions were "directed toward IRISL and their subsidiaries" and that, according to the U.S. government, "IRISL as Iranian government carrier systematically circumvents the Iranian arms embargo."[117]

138. Even after being directly and officially informed that IRISL "systematically circumvents the Iranian arms embargo" to equip terrorists, Commerzbank continued to help it do so. The sanctions announcement warned that IRISL used "deception techniques" in order "to ensure the successful delivery of military-related goods," including "creat[ing] and mak[ing]

[114] Treasury Settlement ¶ 18.

[115] *Id.*

[116] DOJ SOF(A) ¶ 62.

[117] *Id.*

cover entities to conduct official, IRISL business." This deception was exactly what Commerzbank had pioneered for IRISL with its Safe Payment arrangement, and the deception continued.

139. Although OFAC's sanctions announcement had identified 18 entities that were owned, controlled, or acting on behalf of IRISL, Commerzbank knew about other such entities and knew that all IRISL entities were blocked by the sanctions.[118] Yet Commerzbank continued its Safe Payment scheme by processing USD payments for IRISL through the IRISL entities that had not been identified. In this manner, Commerzbank helped IRISL stay one step ahead of the U.S. government. A month after the sanctions announcement, for example, an IRISL employee confirmed in an email that included multiple Commerzbank employees: "Kindly note per yesterday's arrangement with [Commerzbank] the following accounts have been allocated for IRISL Tehran . . . . FYI the Acena/Lancelin/Adara safe accounts [are] still [valid]."[119]

140. Commerzbank's illicit services for IRISL continued through at least early 2010. Commerzbank admitted in its settlement agreement with OFAC that it processed 141 USD transactions for IRISL and its subsidiaries through the United States between September 16, 2008 and January 8, 2010.[120] And in just the four months following the sanctions announcement through the end of 2008, many of the more than $39 million in USD payments Commerzbank transmitted through New York were for IRISL.[121] Moreover, on information and belief, Commerzbank continued to assist IRISL via accounts for IRISL and its deceptive web of shell

---

[118] DOJ SOF(A) ¶ 63.

[119] Treasury Settlement ¶ 19.

[120] *Id.*; DOJ SOF(A) ¶ 64.

[121] DOJ SOF(A) ¶ 65.

companies held in other currencies through at least 2010, when the bank finally closed its Tehran office.

**D. Commerzbank Sustained IRISL's Operations Through 2011, Enabling it to Keep Supplying Weapons to Terrorists.**

141. Unfortunately for the Plaintiffs in this case, the U.N. and U.S. sanctions failed to stop IRISL. With Commerzbank's vital help, IRISL was able to employ more camouflage that enabled it to continue its global operations, continuing to ship hidden weapons to terrorists for the next several years. As U.S. Secretary of State Condoleezza Rice told the U.N. Security Council on December 10, 2009, "We must ensure that these sanctions [on IRISL] are rigorously enforced to ensure that destabilizing weapons are not allowed to flow from Iran to other parts of the Middle East . . . ." And because banks play an integral role in maritime shipping, the U.S. government believed that "banks are in a key position to detect the movement of cargoes on IRISL ships," to "reject any fund transfers involving [IRISL] vessels or entities," and to "effectively restrict[] IRISL from doing business in U.S. dollars."[122] Banks were the crucial gatekeepers to stop the flow of weapons through IRISL. But with a willing banker in Commerzbank sworn to "absolute confidentiality," IRISL kept operating and the weapons kept flowing.

142. Following the approach Commerzbank had pioneered for IRISL and with Commerzbank's indispensable assistance, IRISL hid its operations behind a veil of shell companies. As the U.N. Panel of Experts reported in 2012, the arms embargo was "difficult to implement because of actions by the Islamic Republic of Iran Shipping Lines, following the adoption of resolution 1803 (2008), to modify regularly its corporate ownership structure and the

---

[122] U.S. Dep't of State, Cable, Iranian Shipping in a Post-UNSCR 1803 Environment (Oct. 2, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE102919_a.html.

names and flags of its vessels."[123] These activities, according to the report, "introduced a complex and amorphous structure to the Islamic Republic of Iran Shipping Lines that serve[d] to obscure its activities as a whole and the identities of individual vessels."[124] As a *Reuters* investigation uncovered in 2012, IRISL had changed the name, flag, or ownership of its fleet 878 times since October 2008.[125] Those tactics meant that "despite the sanctions 130 of the 144 banned ships in IRISL's fleet continue[d] to call at many of the world's major ports hidden behind a web of shell companies and diverse ownership."[126] "Dozens of Iranian ships have used Singapore several hundred times in the past two years, for instance, as a stop-off on their way to other destinations such as China."[127] Similarly, in 2012, "[t]wenty three sanctioned Iranian ships ha[d] visited 12 EU ports since July 2010," and "IRISL containers could be seen stacked on the concrete yards of [Malta's] Freeport."[128] Based on reporting from Western and Middle Eastern intelligence agencies, the Iranians in 2010 "boasted that the West had only discovered half of the shell companies and front individuals it used."[129] The undiscovered shell companies included those Commerzbank continued to use to process Safe Payments for IRISL through 2010.

143. As Commerzbank kept IRISL operating behind a veil of shell companies, the consequences were illustrated in technicolor visuals for the world to see.

---

[123] U.N. Security Council, Final Report of the Panel of Experts Established Pursuant to Resolution 1929 (2010), June 4, 2012, at 36.

[124] *Id*. at 37.

[125] Rachel Armstrong, et al., *Iran's Global Cat-and-Mouse Game on Sanctions*, Reuters, Feb. 15, 2012; *see also Web of Shell Companies Veils Trade by Iran's Ships*, N.Y. Times, June 7, 2010.

[126] Rachel Armstrong, et al., *Iran's Global Cat-and-Mouse Game on Sanctions*, Reuters, Feb. 15, 2012.

[127] *Id*.

[128] *Id*.

[129] *Id*.

144. In January 2009, a Cypriot-flagged ship leased and operated by IRISL, the *M/V Monchegorsk* (shown below), was seized by U.S. naval forces in the Red Sea while sailing from Iran's port of Bandar Abbas to Latakia, Syria.[130]



145. Hidden in the *Monchegorsk*'s 98 shipping containers were artillery and mortar shells, black powder, and materials for producing rockets. According to a January 22, 2009, State cable released by *Wikileaks*, IRISL's cargo on the *Monchegorsk* included "120 mm, 122 mm, 125 mm, and 160 mm high explosives that originated in Iran," as well as "7.62 mm shell casings, compressed gunpowder, silver dollar-sized slugs, primer, and magnesium primers," all of which, according to a scholar, were being delivered "most likely to Hezbollah."[131]

[130] *See, e.g.*, *UN action urged over Iran arms ship*, Al Jazeera, Mar. 11, 2009.

[131] U.S. Senate, Comm. on Banking, Housing, and Urban Affairs, Hearing, Minimizing Potential Threats from Iran: Assessing Economic Sanctions and Other U.S. Policy Options, Prepared Statement of Danielle Pletka (July 30, 2009).

146. A few months later, in October 2009, a German-flagged ship, the *M/V Hansa India* (shown below), was seized while sailing from Iran to Latakia, Syria. The *Hansa India*'s cargo included eight containers full of 7.62 mm bullet casings and cartridges. This ship, which IRISL frequently used, was leased by IRISL from a German company based in Hamburg. On October 12, 2009, the German newsweekly *Der Spiegel* reported that the *Hansa India* "part of an Iranian shipment bound for either the Syrian army or for Hezbollah, the militant Islamist group."[132]







147. That same month, an IRISL ship, the *M/V Visea* (below left)—a ship owned by IRISL shell company Byfleet—sailed from Bandar Abbas, Iran to the port of Damietta, Egypt, where another ship owned and operated by German firms, the *M/V Francop* (below right), picked up IRISL's cargo for delivery to Syria, by way of Cyprus.

[132] *German Ship Transporting Arms for Iran*, Der Spiegel, Oct. 12, 2009.






148. The *Francop*'s shipping manifest claimed IRISL's cargo consisted of 24,228 bags of polyethylene, ordinary goods commonly used in consumer packaging. But when the shipment was seized en route by the Israeli military on November 3, 2009, 36 of IRISL's 400 containers were found to contain munitions destined for Hizballah hidden behind bags of polyethylene.













149. The following photograph shows the way the munitions were concealed:




150. The munitions seized from the *Francop* included 2,815 rockets (107 and 122 mm), 685 rocket fuzes, 8,770 mortar shells (60, 81, and 120 mm), 20,100 grenades, and 566,220 bullets (7.62 mm). The munitions crates were stamped "IRISL," and contained documentation bearing the IRGC's logo and indicating that they were manufactured by Iran between 2007 and 2009. The Government of Israel determined that the 107mm rockets it found onboard were "identical to those used by Iranian-armed Iraqi insurgents," and that the "large number" of AZ111-A2 fuzes for the munitions were "manufactured solely by the Iranian armament industries [*i.e.*, MODAFL]."[133] Those photos and more were released by the Israeli government and widely publicized by news outlets around the world.[134] *Der Spiegel* quoted Israeli Navy Commander Rani Ben-Yehuda: "What Israeli naval special forces found during the search of the German freighter *Francop* on Wednesday night is enough for a small war. More than 3,000 rockets, plus hand grenades, armor-piercing ammunition, and crates of assault rifle cartridges.

---

[133] Israeli Ministry of Foreign Affairs, Documented proof of Iranian complicity in arms smuggling to terrorists, Nov. 10, 2009.

[134] *See, e.g.*, *Israel: Photos Prove Iran Link to Arms Ship*, NBC News, Nov. 11, 2009.

Had the dangerous cargo not been discovered, the Lebanese Shiite militia Hezbollah could have waged war on Israel for a month or longer."[135] And after the *Francop* seizure, Prime Minister Netanyahu said the weapons' "sole objective … was to attack and kill as many civilians—women, children and the elderly—as possible."[136]











151. As France's representative to the United Nations explained on December 10, 2009, "*Monchegorsk*, *ANL Australia*, *Hansa India* and now *Francop*. These ships represent a true flow of arms and other dangerous material that is designed to destabilize fragile regions and to perpetuate conflicts," but these "regular shipments originating in the port of Bandar Abbas

[135] Matthias Gebauer & Ulrike Putz, *Israel halts Iran-Hezbollah Shipment – 36 containers for the war*, Der Spiegel, Nov. 5, 2009, *translated by Google*.

[136] *PM: UN should discuss Iran 'war crime,'* Jerusalem Post, Nov. 5, 2009.

probably represent only the tip of the iceberg." That assessment was correct. Myriad other instances of IRISL smuggling were identified in classified cables released by *Wikileaks*. During the period 2003 to 2006, the U.S. government observed IRISL ships diverting or attempting to divert from their originally scheduled port calls, in response to perceived threats of interdiction.[137] And in just 2007 and 2008, the U.S. government catalogued an enormous number of IRISL shipments believed to contain weapons or their components.[138] For example:

a. An IRISL vessel in early 2007 loaded 56 containers containing fuzes and ammunition (7.62 mm) in Dalian, China for delivery to Bandar Abbas, Iran.

b. An IRISL vessel in mid-2007 was attempting to ship electronic parts and machine tools used to manufacture weapons.

c. An IRISL vessel in mid-2007 was carrying electronic parts and lathes used to manufacture weapons.

d. An IRISL vessel in mid-2007 was carrying aluminum sheets and plates used to manufacture weapons, intended for Iran and associated with a MODAFL subsidiary.

---

[137] U.S. Dep't of State, Cable, Information for UK Designation of IRISL (July 6, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE69684_a.html.

[138] *Id.*; U.S. Dep't of State, Cable, Multiple Shipments of Sodium Perchlorate from China to Iran (May 18, 2007), *available at* https://wikileaks.org/plusd/cables/07STATE68969_a.html; U.S. Dep't of State, Cable, Shipment of Sodium Perchlorate, Ammunition, and Fuzes from China to Iran (April 14, 2007), *available at* https://wikileaks.org/plusd/cables/07STATE49749_a.html; U.S. Dep't of State, Cable, M/V Gant Star: GOS Provides Storage Cost Estimate (May 24, 2007), *available at* https://wikileaks.org/plusd/cables/07SINGAPORE1003_a.html; U.S. Dep't of State, Cable, Demarche on Impending Conventional Arms Transfer and Interim Follow Up on Ongoing Issues of Proliferation Concern (Nov. 22, 2007), *available at* https://wikileaks.org/plusd/cables/07STATE159388_a.html; U.S. Dep't of State, Cable, Information on Shipment of Proliferation Concern Held in Dubai (Mar. 18, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE27996_a.html; U.S. Dep't of State, Cable, Shield S05-08: Imminent Transfer of CW Precursor Chemical to Iran (April 7, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE35977_a.html; U.S. Dep't of State, Cable, M/V Anne E Shipment of Anhydrous Hydrogen Fluoride from Thailand to Iran (April 23, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE42958_a.html; U.S. Dep't of State, Cable, Shipment of Chinese Origin Goods Destined for Iran (Sep. 2, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE93558_a.html; U.S. Dep't of State, Cable, Shipment of Japanese-Origin Chemical Used in Missile Propellant Bound for Iran (April 28, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE42999_a.html.

e. An IRISL vessel in mid-2007 was en route from Dalian, China, to Bandar Abbas, Iran, carrying cargo for a MODAFL subsidiary used to produce solid fuel for rockets.

f. An IRISL vessel in mid-2007 loaded weapons-related cargo supplied by a MODAFL subsidiary for Syria.

g. An IRISL vessel in late 2007 was carrying potassium perchlorate, a propellant for artillery rockets, destined for a MODAFL subsidiary.

h. IRISL arranged for numerous shipments in 2007 from China to a MODAFL subsidiary in Iran of hundreds of metric tons of sodium perchlorate, used to produce solid-fuel motors for rockets. At least 400 metric tons of sodium perchlorate were confirmed to have arrived in Iran, while another 400 metric tons in 20 containers were seized in Singapore.

i. An IRISL vessel in late 2007 was carrying a variety of weapons-related goods from China to Iran that were consigned to a known MODAFL front company.

j. An IRISL vessel in late 2007 loaded weapons-related cargo supplied by a MODAFL subsidiary for Syria.

k. An IRISL vessel in late 2007 was scheduled to load nearly 200 containers believed to contain "military cargo" in Tianjin, China before sailing to Bandar Abbas, Iran to deliver them to a MODAFL subsidiary.

l. In late 2007, the U.S. government observed IRISL change the policy of one of its shipping lines to avoid refueling while en route to Iran, thus preventing the possibility of inspection and seizure of sensitive cargo.

m. An IRISL vessel in early 2008 was en route from Dalian, China, to Bandar Khomeini, Iran, carrying materials used to produce solid fuel for rockets.

n. An IRISL vessel in early 2008 loaded a "very large shipment" of Chinese-origin anhydrous hydrogen fluoride, used to produce liquid rocket propellants and to refine uranium, in Laem Chabang, Thailand for delivery to Bandar Abbas, Iran.

o. An IRISL vessel in mid-2008 carried from Dalian, China to Bandar Abbas, Iran 13 containers loaded with 208 metric tons of chemical precursors. The shipment, which was consigned to a MODAFL subsidiary, contained potassium perchlorate, a propellant for artillery rockets, as well as liquid poly butadiene, which is used to produce solid rocket propellant. On the same voyage, in Tianjin, China, the IRISL vessel loaded an industrial, two-stage centrifuge with a capacity of 20 tons per hour, useful in rocket manufacturing.

p. An IRISL vessel in mid-2008 was scheduled to ship 1000 metric tons of sodium sulfide, used in the production of chemical weapons, from Tianjin, China to Bandar Abbas, Iran.

q. An IRISL vessel in mid-2009 was scheduled to load 210 metric tons of toluene diisocyanate, used to produce solid rocket propellant, in South Korea for shipment to Bandar Abbas, Iran.

152. The ultimate beneficiaries of these shipments were Iran's terrorist proxies. As the U.S. government highlighted in a State cable, it was "extremely concerned" in 2007 that material transferred from China to Iran by IRISL was "being retransferred by Iran to terrorists, insurgents, and other sub-state groups, where it is being used against U.S. and coalition forces" in Iraq.[139] The U.S. was "continu[ing] to see transfers of military items" and had "specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern."[140] Numerous shipments almost certainly arrived undetected. As the U.S. government lamented, the *Monchegorsk* shipment to Hizballah "would likely not have been identified if not for the boarding of the ship and inspection of its cargo and documents."[141]

**E. IRISL's Continued Operations Were Vital to the Supply of Weapons to Terrorists in Iraq.**

153. With Commerzbank keeping IRISL's maritime smuggling network operating, Iran's weapons flowed in large quantities to its terrorist proxies in Iraq. Commerzbank's efforts

---

[139] U.S. Dep't of State, Cable, Demarche on Impending Conventional Arms Transfer and Interim Follow Up on Ongoing Issues of Proliferation Concern (Nov. 22, 2007), *available at* https://wikileaks.org/plusd/cables/08STATE93558_a.html.

[140] *Id.*

[141] U.S. Dep't of State, Cable, Iranian Shipping in a Post-UNSCR 1803 Environment (Oct. 2, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE102919_a.html; U.S. Dep't of State, Cable, Shipment of Chinese Origin Goods Destined for Iran (Sept. 2, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE93558_a.html.

on behalf of IRISL empowered the Axis of Resistance at a crucial moment when Hizballah was carrying out Imad Mugniyeh's plan (*supra* at 44) to use Iran-supplied rockets, artillery, IEDs, and other weapons to shift the balance of power against the United States. Between 2005 and 2011, as Commerzbank was keeping IRISL's arms shipments flowing amid increasing warnings and sanctions, those shipments were supplying the terrorists in Iraq with an unprecedented arsenal of deadly new weapons, which they stockpiled and used against Americans.

154. As an intelligence analyst summarized, the IRGC and Hizballah "open[ed] the floodgates" during the 2006-2011 time period to provide weapons to JAM terrorists.[142] As another scholar summarized in 2007, "Iran has provided its Iraqi proxies with advanced weapons, including light and heavy mortars, 107-mm and 240-mm rockets, advanced large-caliber sniper rifles, and explosively-formed penetrators (EFPs), capable of penetrating tank armor."[143] Iran's role in supplying these weapons was underscored in December 2006, when U.S. forces in Iraq detained two senior Iranian operatives. According to a *Washington Post* report, "the captured Iranians had detailed weapons lists" and "documents pertaining to shipments of weapons into Iraq."[144]

155. By mid-2007, U.S. military officials reported that the IRGC was regularly supplying between $750,000 and $3 million worth of weapons and funding to Iraqi terrorists *every month*.[145] This continued for the next several years, with "Vice President Joe Biden

[142] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC Sentinel, Nov. 2010.

[143] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[144] Sudarsan Raghavan & Robin Wright, *Iraq Expels 2 Iranians Detained by U.S.; American Defense Official Calls Release 'Obviously Troubling*, The Washington Post, Dec. 30, 2006.

[145] Marisa Cochrane, *Iraq Report 12: The Fragmentation of the Sadrist Movement*, Iraq Report, Institute for the Study of War, Jan. 2009.

estimat[ing]" in 2010 that "Iran spent $100 million to strengthen its Iraqi proxies."[146] As a JAM commander told journalists in June 2007, "All of the Mahdi Army's weapons except for the AK-47 rifles come from Iran."[147] And as one military official put it in August 2007, JAM (including its Special Groups) "would be unable to conduct their terrorist attacks in Iraq without Iranian-supplied weapons."[148]

156. Certain weapons Iran supplied to its Iraqi proxies during this period proved especially deadly.

157. **IEDs**. Americans in Iraq were often targeted with roadside improvised explosive devices (IEDs). These were most effective when made with military-grade high explosives such as C4 or TNT and sophisticated triggering systems, all of which Iran supplied. As Army Maj. Gen. Richard Zahner, the deputy chief of staff for intelligence with Multinational Force Iraq, confirmed in 2006, "The Iranian government is behind shipping components used to make improvised explosive devices to Iraqi insurgents."[149]

---

[146] Michael Eisenstadt, et al., *The Regional Impact of Additional Iranian Money*, Washington Institute for Near East Policy, July 28, 2015.

[147] Leila Fadel, *Chilling Stories from the Mahdi Army*, McClatchy DC, June 22, 2007.

[148] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[149] *See* U.S. Dep't of Defense, Iranian Government Behind Shipping Weapons to Iraq, American Forces Information Service (Sep. 28, 2006).

158. One particularly deadly type of IED was the explosively formed penetrator (EFP), a weapon designed to "convert[] the chemical energy of an explosive filler into kinetic energy by propelling a metal liner at high-velocity."[150] As shown in the following diagram, an EFP consists of an explosive charge and a concave copper or steel disk, which upon detonation becomes a molten slug of metal capable of piercing heavily armored vehicles.




159. Scholar Michael Knights described the EFP as "a signature weapon for Iranian-backed groups" in Iraq. This "new breed of roadside bomb" was "more lethal than any seen before."[151] According to *The New York Times*, "Iran passed E.F.P. technology to the Lebanese militia Hezbollah, which in turn passed E.F.P. kits to proxy groups fighting in Iraq."[152] As one JAM member told an interviewer, "We learned [from Hizballah] how to take advantage of an

---

[150] *A History Of Iranian Weapons Shipments To Iraq, Interview With Arkenstone Blog's Galen Wright*, Musings on Iraq, Aug. 9, 2012.

[151] Michael Ware, *Inside Iran's Secret War for Iraq*, Time, Aug. 22, 2005.

[152] John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times, Oct. 18, 2013.

armored vehicle's weakness"—referring to the use of EFPs—"and how to wait and kill the soldiers who try to escape."[153]

160. According to a 2007 analysis, the number of EFPs used against Coalition and Iraqi forces rose "at a rate of 150 percent" in 2006.[154] And in the first half of 2007, "Shi'a militants increased their attacks . . . , conducting 65 explosively formed penetrator (EFP) attacks against coalition troops in April alone"[155] and eventually rising to 99 attacks in July 2007.[156] Although EFPs were first used in Iraq as early as 2004, the rapid acceleration of EFP attacks between 2006 and 2008 was likely due to the increasing flow of these weapons and their components from Iran during that period. And while the number of EFP attacks "peaked in 2008,"[157] the EFP continued to be a deadly and popular weapon deployed by JAM against U.S. forces through 2011.[158]

161. U.S. military officials determined that most or all EFPs during the 2006-2008 period were "produced in Iran and smuggled into Iraq."[159] As the U.S. Army noted in detailed presentations, EFPs needed to be produced in Iran because they were "made from special copper

---

[153] Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, Independent, Aug. 20, 2007.

[154] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[155] Col. Joel D. Rayburn & Col. Frank K. Sobchak, *The U.S. Army in the Iraq War: Volume 2 – Surge and Withdrawal 2007-2011* (US Army War College Press 2019).

[156] *Id.*; Michael O'Hanlon & Jason Campbell, *Iraq Index*, Brookings Institution, Mar. 31, 2008, at 29.

[157] Alex Horton, *Soleimani's legacy: The gruesome, advanced IEDs that haunted U.S. troops in Iraq*, The Washington Post, Jan. 3, 2020.

[158] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC Sentinel, Nov. 2010.

[159] Charles Crain, *How Much is Iran to Blame for Iraq?*, Time, Feb. 12, 2007; *see also* Clay Wilson, *Improvised Explosive Devices (IEDs) in Iraq and Afghanistan: Effects and Countermeasures*, CRS Report for Congress, Aug. 2007.

disks manufactured with highly-calibrated machine tools," and "[m]any of the EFPs found in Iraq ha[d] the markings that indicate[d] that they were manufactured in Iran as recently as 2006."[160] Indeed, "one FBI agent charged with determining the origin of arms caches found that the thousands of [EFP] liners examined were being produced from a relatively small number of individual dies" and "none of these dies had ever been located in Iraq."[161] "Iranian-made C4, identifiable through chemical analysis," was also often used as the explosive charge in EFPs.[162]

162. **Rockets, Mortars, and RPGs**. The range, accuracy, and effectiveness of the rockets, mortars, and rocket propelled grenades (RPGs) Iran supplied to its Iraqi proxies during the 2005-2011 period made them unusually deadly. With powerful engines manufactured in Iran using precursors sourced from Asia, the Iran-supplied rockets could travel up to 30 miles, according to U.S. officials in 2007, making them more difficult for the Americans to stop.[163] For example, three of the rockets targeted U.S. facilities in Baghdad's Green Zone around that time, with one coming very close to hitting the U.S. Embassy, according to U.S. officials.[164] Iran-supplied components made these indirect fire attacks more deadly.

163. By 2010, a scholar estimated that U.S. bases in Iraq were suffering approximately 20-30 rocket attacks each month, "almost all of which involve[d] entire rocket/mortar systems or components (such as fuel packs) identified as Iranian-produced by U.S. weapons intelligence

[160] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[161] *A History Of Iranian Weapons Shipments To Iraq, Interview With Arkenstone Blog's Galen Wright*, Musings on Iraq, Aug. 9, 2012.

[162] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC Sentinel, Nov. 2010.

[163] Robin Wright, *Iranian Flow Of Weapons Increasing, Officials Say*, Washington Post, June 3, 2007.

[164] *Id*.

specialists."[165] As one U.S. military official put it in June 2007, "much of the indirect fire that we receive . . . is, in fact, Iranian," and "when we check the tail fins of the mortars, when we find the rockets—and frequently we're able to find them preemptively before they actually launch—there's no doubt that they're coming out of Iran."[166] He added, "Most of them are made fairly recently, in the past several years, and they have lot numbers that we can . . . trace" to Iran.[167] Indeed, the Long War Journal reported that the rockets JAM fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[168] As for the mortar attacks, a scholar noted in 2010 that "[i]n Baghdad and other cities, [JAM] Special Groups tend to make greater use of 60mm and 81mm mortars to precisely target small U.S. Joint Security Stations."[169] According to the U.S. military, these mortars were Iranian in origin.[170] The 81 mm mortar is uniquely Iranian because the remainder of the region uses 82 mm mortars.[171]

164. **7.62 mm Armor-Piercing Ammunition**. Sniper and small arms attacks also became a persistent problem for Americans in Iraq during the 2005-2011 time period. As the *Los Angeles Times* reported, "By the fall [of 2006], sniper attacks had become so frequent, U.S. military officials said, that U.S. Secret Service agents flew to Baghdad to help establish new

---

[165] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC Sentinel, Nov. 2010.

[166] *Friday, June 29*, CNN, June 30, 2007.

[167] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[168] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J., June 3, 2007.

[169] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC Sentinel, Nov. 2010.

[170] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[171] *Id.*; Robin Wright, *U.S. vs. Iran: Cold War, Too*, The Washington Post, July 29, 2007.

countermeasures and training."[172] Sniper attacks were growing more frequent because they had become more effective. According to a 2004 report by the National Ground Intelligence Center, Iraq saw a "rise of sniper systems, specifically of the 7.62x54R-mm caliber," employed by Iran's terrorist proxies.[173] The report noted that this development had a "significant" impact on increasing the lethality of attacks on U.S. forces by these groups.[174] Americans in Iraq also saw a rise of armor-piercing 7.62 mm bullets fired from sniper rifles and other small arms. As a 2007 report from Iraq explained, those "armour-piercing rounds pose a deadly threat to US troops on patrol."[175] According to an American soldier, they will "rip through us like we don't even exist."[176]

165. The source of these sniper rifles and armor-piercing ammunition was Iran. As the *Washington Post* explained in 2006, "U.S. military officials have long said they believed Iran was responsible for sending . . . advanced sniper rifles . . . into Iraq to help insurgents and militia groups."[177] In the late 2000s, the U.S. military reported seizure after seizure of Hizballah and

---

[172] Solomon Moore & Tony Perry, *The Conflict in Iraq: 3,000 U.S. Military Deaths; U.S. Military Deaths in Iraq Hit 3,000 Mark*, Los Angeles Times, Jan. 1, 2007.

[173] National Ground Intelligence Center, Iraq Small Arms Handbook (Oct. 1, 2004).

[174] *Id*.

[175] Dave Clark, *Small Victories Make Big Difference in Baghdad Market*, Agence France Presse (English), March 21, 2007.

[176] Ben Murray, *Troops in Iraq Fill Their Days with Hunt for Insurgents*, Stars and Stripes, November 4, 2006.

[177] Sudarsan Raghavan & Robin Wright, *Iraq Expels 2 Iranians Detained by U.S.; American Defense Official Calls Release 'Obviously Troubling*,' The Washington Post, Dec. 30, 2006; *see also, e.g.*, Michael R. Gordon & Andrew W. Lehren, *Leaked Reports Detail Iran's Aid for Iraqi Militias*, N.Y. Times, Oct. 23, 2010 (summarizing leaked military field reports that "recount[ed] Iran's role in providing Iraqi militia fighters with . . . weapons").

JAM weapons caches in Iraq that included many Iran-supplied sniper rifles and thousands of rounds of armor-piercing 7.62 mm ammunition.[178]

166. In sum, as State succinctly explained in its 2008 *Country Reports on Terrorism*, Iran was "continu[ing] to provide . . . weapons . . . to Iraqi militant groups that targeted Coalition and Iraqi forces," including "Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces," as well as "sophisticated IED technology" such as EFPs "that were specially designed to defeat armored vehicles."[179] And as the U.S. government underscored in a 2008 diplomatic cable, Iran's terrorist proxies "depend[ed] on the ability to bring resources into Iraq for their success."[180]

167. IRISL's continued operations through 2011 were vital to the supply of mass quantities of those deadly weapons that were being used against Americans with alarming frequency in Iraq. As noted above (*supra* at 40-42), one key route for IRISL shipments was through the Iraqi port of Umm Qasr. Smuggling into Iraq's busiest port under the cover of ordinary shipments enabled large quantities of weapons to be delivered in bulk, while avoiding more heavily monitored land routes from Iran. As the United States assessed in a January 2009 State cable published by *Wikileaks*, the flow of commercial goods into Iraq, particularly at the Umm Qasr port, created "smuggling opportunities for lethal aid, including military hardware"

[178] *See, e.g.*, *Iraqi, U.S. Forces Continue Hunting for Weapons*, U.S. Fed News, Nov. 29, 2005; *U.S. Troops Kill Terrorists in Iraq, IEDs Claim Two Soldiers*, American Forces Press Service, July 15, 2006.

[179] U.S. Dep't, of State, Country Reports on Terrorism (2008).

[180] U.S. Dep't of State, Cable, Improving Iraqi Border Security: A Work in Progress (July 11, 2008), *available at* https://wikileaks.org/plusd/cables/08BAGHDAD2163_a.html.

and "ammunition."[181] IRISL shipments—including Iranian weapons for its proxies—were a major part of that flow. When a *Washington Post* reporter visited the Umm Qasr port in 2006, he observed that many of the shipping containers stacked around the port bore the IRISL logo.[182] And when he inquired about the containers with a U.S. official who oversaw the shipment into the port of American goods for the Army Corps of Engineers, he was told, "God knows what they're bringing in here."[183]




168. Moreover, as of July 2008, according to another State cable, "Iraq's most important port" at Umm Qasr had been "assessed to be thoroughly infiltrated by criminal gangs

[181] U.S. Dep't of State, Cable, Major General Aziz Confident about Security but Acknowledges Some Violence Possible (Jan. 25, 2009), *available at* https://wikileaks.org/plusd/cables/09BASRAH2_a.html.

[182] Nelson Hernandez, *For Water Truck 103, a Perilous Path to the End*, Wash. Post, May 16, 2006.

[183] *Id.*

associated with JAM."[184] Indeed, Treasury later designated 20 Iran- and Iraq-based companies and individuals for providing support to Hizballah (through the IRGC-QF) in transferring lethal aid to JAM terrorists by "smuggling through the Iraqi port of Umm Qasr." Treasury emphasized that the "IRGC-QF leveraged Shiite militia group contacts to evade Iraqi government inspection protocol at Umm Qasr port."[185]

169. IRISL's shipments to Iraq were similar to those discovered on the *Francop* in 2009. Indeed, the weapons found in IRISL containers on the *Francop* were virtually identical to Iranian weapons found in large JAM weapons caches seized in Iraq during the same period. For example, the 107 mm rockets seized from IRISL's *Francop* shipment are shown at the top of the image below, and the same weapons found in JAM caches in Iraq are shown beneath it. The markings are nearly identical.







[184] U.S. Dep't of State, Cable, Improving Iraqi Border Security: A Work in Progress (July 11, 2008), *available at* https://wikileaks.org/plusd/cables/08BAGHDAD2163_a.html.

[185] U.S. Treasury Dep't, Treasury Designates Vast Network of IRGC QF Officials and Front Companies in Iraq, Iran (Mar. 26, 2020).

170. The 60 mm mortars found on the *Francop*, shown below in canisters (left), were likewise similar to images of mortars found in Iraq and presented by the U.S. military in April 2007 (right). They bore the same physical design and were marked as containing the same Iran-produced AZ111-A2 fuzes, in addition to similar lot numbering and markings.






171. Similarly, C4 explosives, which were typically used for the main charge in EFPs, were often found alongside other EFP parts in the arms caches seized by the U.S. Army in Iraq during 2006-2008, and senior intelligence officials observed that the labels on C4 seized in Iraq in 2006 were identical to the C4 Iran had supplied and shipped on the *Karine A*.[186]

172. So too with 81 mm mortars and canisters. Those found on the *Francop* are shown on the left, with similar mortars recovered by the U.S. military in Iraq in 2006, 2007, and thereafter shown on the right. The canisters have the same black cardboard construction, fuze designation, and lot numbering convention, and the mortars have the same fuze designation, design, and ribbing.

[186] Jim Garamone, *Iranian Government Behind Shipping Weapons to Iraq*, American Forces Information Service, Sep. 28, 2006.







173. Shipping to Umm Qasr, however, was only one of several ways that IRISL maintained the flow of deadly weapons into Iraq. Another was by shipping key weapons and components in bulk from Asia to Iran before they were smuggled to Iraq. As the U.S. government assessed in 2009, Iran's weapons programs "remained reliant on outside sources for a variety of materials."[187] Even where some materials were available domestically, "Tehran has continued to acquire such goods abroad" because it "does not trust the quality of indigenously produced goods."[188] For example, Iran's domestic production of solid rocket engines—essential in the artillery it produced—was heavily dependent on precursor chemicals such as sodium

---

[187] U.S. Dep't of State, Cable, Missile Technology Control Regime (MTCR): Iran's Ballistic Missile Program (Sep. 23, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE 98727_a.html.

[188] *Id.*

perchlorate and potassium perchlorate that Iran shipped from China.[189] Iran's weapons programs also required sophisticated machine tools, including precision aluminum milling machines to make Iran's rocket fuzes (shown left from the *Francop*) and dewatering and extruding machines to make "extruded double-base propellants" for Iran's rockets and artillery (rocket propellant shown right from the catalog of Iran's Defense Industries Organization).





FAJR 2

General

**Specifications:** This propellant belongs to the extruded double-base propellants group and can be produced by solventless process.
**Application:** It can be used as a propellant in 240mm FAJR 2 rocket (artillery system).
**Storage:** This propellant should be stored in -10°C up to +30°C
**Shelf life:** 15 years (min)

| TECHNICAL SPECIFICATIONS | |
|---|---|
| Length | 1676 ± 6 mm |
| External Diameter | 208.5 ± 3.5 mm |
| Internal Diameter | 55 ± 1 mm |
| Grain Weight | 85 kg |
| Specific gravity | min 1.57 gr/c³ |

174. Those precursor chemicals and machines were shipped to Iran by IRISL, where they were turned into finished weapons that were supplied to Iran's terrorist proxies in Iraq. As the many cases described above demonstrate, IRISL regularly shipped precursor chemicals from China to Iran. *Supra* at 70-72. Another incident demonstrated IRISL's role in procuring machines for weapons production. In May 2007, the U.S. government urged the UAE to search containers on an IRISL ship, the *M/V Iran Kerman*, which revealed "11 tools/machines related to aluminum cutting."[190] Diplomatic cables published by *Wikileaks* show numerous other

---

[189] *See also, e.g.*, U.S. Dep't of State, Cable, Request to Investigate Shipment Destined for Iran's DIO (July 3, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE72026_a.html (Iran seeking to ship 18 metric tons of diphenylamine, commonly used as a stabilizer in explosives and propellants).

[190] U.S. Dep't of State, Cable, IRAN KERMAN—UAE Releases One Container, Holds the Other (May 31, 2007), *available at* https://wikileaks.org/plusd/cables/07ABUDHABI906_a.html.

procurement efforts from Europe and Asia, which likely would have been shipped to Iran by IRISL.[191]

175. In addition, IRISL imported fully manufactured weapons and components from China, which Iran distributed to its terrorist proxies in Iraq. These included armor-piercing 7.62 mm ammunition like those shown below found on the *Francop* in tins with Chinese lettering. In a 2007 diplomatic cable, the U.S. government warned that a Chinese company had "shipped a large quantity of 7.62x39 mm armor piercing ammunition to Iran" multiple times aboard IRISL ships.[192]

[191] *See, e.g.*, U.S. Dep't of State, Cable, Iran's Solid-Fueled Ballistic Missile Program Seeking German Equipment via Chinese Entities (Nov. 4, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE113696_a.html ("co-rotating twin screw extender" and "metering gear pumps" from China useful in an "extrusion production line" for solid rocket propellant); U.S. Dep't of State, Cable, Italian Machine Tools Sold to Iranian Clients via Turkish Based Distributor (May 23, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE55497_a.html (five-axis CNC processing machines from Italy "designed to work with advanced materials such as aluminum"); U.S. Dep't of State, Cable, Iranian Firm Seeking Computer Numerical Controller for Use with Filament Winding Machine (Jan. 9, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE2430_a.html (CNC system from Germany for use with a six-axis filament winding machine for producing "rocket motor cases") U.S. Dep't of State, Cable, Iranian Company's Efforts to Procure a Spanish-Made Milling Machine (July 30, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE81940_a.html (CNC milling machines from Spain, including "5-axis milling machine equipped with a rotary table"); U.S. Dep't of State, Cable, Additional Information Regarding the Turkish Firm Ak Makina's Dealings in Iran (Mar. 24, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE27957_a.html ("a number of highly-capable machine tools" from Turkey) U.S. Dep't of State, Cable, Iran Seeking Machine Tool Assistance from Taiwan's Roundtop (Dec. 3, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE124113_a.html (CNC machine tools from Taiwan).

[192] U.S. Dep't of State, Cable, Demarche Concerning ISNA Sanctions on Chinese Conventional Arms Transfers to Iran (March 7, 2007), *available at* https://search.wikileaks.org/plusd/cables/07STATE28998_a.html.






176. Another 2007 cable documented that another IRISL ship had loaded 56 containers in Dalian, China believed to include "7.62 mm ammunition[] and fuzes."[193]

177. After IRISL vessels shipped this ammunition to Iran, it was supplied to terrorist proxies in Iraq. One analyst reported in 2008, "For over a year, U.S. officials have been complaining to their Chinese counterparts about the shipment of Chinese-made" weapons to "Iraqi insurgents," which occurred "largely via Iran."[194] With its IRISL shipments from China, Iran functioned as the "provider of Chinese weapons to forces killing Americans" in Iraq.[195] "The list of Chinese weapons ending up in hands of Iraqi . . . insurgents include[d] . . . armor-

[193] U.S. Dep't of State, Cable, Shipment of Sodium Perchlorate, Ammunition, and Fuzes from China to Iran (April 14, 2007), *available at* https://wikileaks.org/plusd/cables/07STATE49749_a.html.

[194] Richard D. Fisher, Jr., *China Military: Chinese Arms Cost American Lives*, Far E. Econ. Rev., July 4, 2008.

[195] *Id*.

piercing ammunition,"[196] which was regularly used against Americans in Iraq and found in weapons caches recovered there.[197]

178. The same method was used to supply other Chinese weapons. According to Indo-Pacific security scholar Michael Maza, in addition to "components for roadside bombs" made with chemicals supplied by China and "armor-piercing rounds" manufactured in China, Iran "provid[ed] insurgents and terrorists in Iraq . . . with Chinese-manufactured . . . large-caliber sniper rifles, . . . 107mm rockets, [and] 60mm and 82mm mortars."[198] In diplomatic cables released by *Wikileaks*, the U.S. government documented "concrete examples" of such weapons being shipped by Iran from China for distribution to terrorist proxies in Iraq.[199] The U.S. had "captured a number of new-condition Chinese produced small arms from Shia militants in Iraq . . . found together with newly-produced Iranian military materiel."[200] And the U.S. had "recovered in Iraq since mid-2006 hundreds of newly-produced Iranian PG-7-AT1 rocket-propelled grenades that contain[ed] Chinese-made base detonators manufactured as recently as 2004," which "Iraqi Shia militants repeatedly have fired" at Americans.[201]

---

[196] *Id.*

[197] *See, e.g.*, *U.S. Troops Kill Terrorists in Iraq, IEDs Claim Two Soldiers*, American Forces Press Service, July 15, 2006 (recovery of "200 7.62mm armor-piercing rounds"); *Iraqi, U.S. Forces Kill Three al-Qaida Terrorists*, American Forces Press Service, June 10, 2008 (recovery of "more than 700 7.62 mm armor-piercing rounds").

[198] Michael Mazza, *China-Iran Ties: Assessment and Implications for U.S. Policy*, Critical Threats Project, American Enterprise Institute, April 21, 2011).

[199] U.S. Dep't of State, Cable, Soliciting Allies, Support to Engage China on Proliferation-Related Trade with Iran (Sep. 16, 2008), *available at* https://www.wikileaks.org/plusd/cables/08STATE99000_a.html.

[200] *Id.*

[201] *Id.*

179. By 2008, the U.S military was finding so many new Chinese-made weapons in Iraq that Deputy Secretary of State John Negroponte personally conveyed his concerns to Chinese officials during a visit to Beijing in May 2008.[202] As the U.S. government summarized in an August 2008 cable, "[o]ver the past several years" the U.S. had "made repeated approaches to Beijing at all levels regarding transfers by Chinese entities of weapons-related items to Iran, as well as transshipments of concern via Chinese sea ports."[203] The U.S. was "particularly concerned that Iran ha[d] in turn supplied weapons purchased from China to militants fighting against U.S. and Coalition forces in Iraq."[204] IRISL made this supply of weapons from China to Iraq possible.

## III. Commerzbank Enabled Hizballah's Martyrs Foundation to Fund Incentive Payments for Terrorists in Iraq and Israel.

180. In addition to enabling the flow of weapons to Iran's terrorist proxies in Iraq, Commerzbank facilitated fundraising for the Orphans Project Lebanon, a Hizballah fundraising subsidiary of the Martyrs Foundation in Lebanon, which raised millions of dollars in Germany through its Commerzbank account to pay the families of Hizballah and Hamas terrorists.

181. In designating the Martyrs Foundation as a SDGT on July 24, 2007, the U.S. government explained that it was "an Iranian parastatal organization that channels financial support from Iran to several terrorist organizations in the Levant," including "Hezbollah" and "Hamas." The Martyrs Foundation "established branches in Lebanon staffed by leaders and

---

[202] P. Parameswaran, *U.S. Warns China over Weapon Links in Iran, Iraq, Afghanistan*, Agence France-Presse (English), May 16, 2008.

[203] U.S. Dep't of State, Cable, Soliciting Allies, Support to Engage China on Proliferation-Related Trade with Iran (Sep. 16, 2008), *available at* https://www.wikileaks.org/plusd/cables/08STATE99000_a.html.

[204] *Id.*

members of these same terrorist groups," and the Martyrs Foundation in Lebanon was led by senior Hizballah and Hamas operatives who "were directly involved in Hezbollah operations against Israel" and "directed and financed terrorist cells in the Gaza Strip."[205]

182. As its name indicates, the principal purpose of the Martyrs Foundation in Lebanon was to raise money to make "martyr payments" for Hizballah and Hamas terrorists. The U.S. government designation explained that the Martyrs Foundation in Lebanon "provided financial support to the families of killed or imprisoned" terrorists, "including suicide bombers in the Palestinian territories."[206] The promise of these martyr payments was a powerful tool for Hizballah and Hamas to recruit operatives and incentivize them to risk their lives in terrorist attacks. As the Martyrs Foundation explained on its own official website in February 2006, "the culture of jihad and martyrdom was at the heart of the institution's message and promotion," and its aims included "supporting the march of the Islamic resistance in Lebanon." To underscore that point, the website prominently expressed the gratitude of Hizballah leader Hassan Nasrallah to donors for giving money to the "'martyrs' children who are truthful to their covenant with Allah."

183. The money the Martyrs Foundation distributed in martyr payments was collected by the organization's subsidiaries throughout the world. The Orphans Project Lebanon (also known as "Waisenkinderprojekt Libanon e.V.") was one such subsidiary. From the 1990s through its closure in 2014, the Orphans Project Lebanon was the German branch of the Martyrs

---

[205] U.S. Treasury Dep't, *Press Release: Twin Treasury Actions Take Aim at Hizballah's Support Network*, (Jul. 24, 2007).

[206] *Id.*

Foundation in Lebanon.[207] The Orphans Project Lebanon was beneficially owned and controlled by Hizballah; its director, Dr. Hisham Jamil Hassan, was a Lebanese national and Hizballah member; and its primary purpose was to transfer funds raised in Germany to Hizballah in Lebanon through the Martyrs Foundation.

184. The Orphan's Project Lebanon was the centerpiece of Hizballah's fundraising operations in Germany. As *The Wall Street Journal* reported in April 2007, "German security services believe that about 900 Hezbollah core activists are in the country and regularly meet in 30 cultural community centers and mosques." These Hizballah backers "financially support Hezbollah in Lebanon through fund-raising organizations, such as the 'Orphans Project Lebanon Association,'" "belong[ing] to the Lebanese '*al-Shahid* (the Martyr) Association,' which is part of the Hezbollah network that supports the families of militia fighters and suicide bombers."[208]

185. The Orphans Project Lebanon did not attempt to conceal its association with Hizballah's Martyrs Foundation or its role in raising money for martyr payments. As of 2002, for example, the Orphans Project Lebanon's website explained, "[W]e work closely with the *Aschahid* [*i.e.*, *al-Shahid* or Martyrs] Association in Beirut" and "support[] children and families of war victims"—*i.e.*, terrorists killed in Hizballah's so-called "war" against Israel and America." The website added, "The Orphan Child Project Lebanon e.V. has set itself the task of promoting the projects of the *Aschahid* Association and making them known in Germany." As of 2004, the website added that it had "committed itself to making the *Ashahid* Association known

[207] Benjamin Weinthal, *Time for the EU to Outlaw All of Hezbollah*, National Review, May 22, 2013.

[208] Alexander Ritzmann & Mark Dubowitz, *Hezbollah's German Helpers*, Wall Street Journal, Apr. 17, 2007.

in Germany and to support its projects." By at least 2005, the website was also providing direct contact information for the Martyrs Foundation.




186. In addition to the explanation on its own website, the Orphans Project Lebanon stated when it registered as an association in Stuttgart, Germany (registered under the number VR 6074) that, should the Orphans Project Lebanon be dissolved, its assets would be transferred to the Martyrs Foundation.

187. The German government confirmed that the Orphans Project Lebanon was a Hizballah fundraising organization. For example, a 2003 report publicly issued by the Baden–Württemberg State Office for Protection of the Constitution (one of the security services for the German states) warned that "'Hezbollah' has an extensive network of charitable institutions," and "certain organizations who collect funds from abroad . . . include[], for example, the 'Orphans Project Lebanon e.V.' which is active in Baden–Württemberg."[209] The following year, the Bremen State Office for the Protection of the Constitution issued another public report warning that the "'Orphans Project Lebanon' exists in Germany since 1993 and cooperates

[209] *See* Bremen State Ofc. for Protect. of the Const., *Security Service Report* (2003) (in German). A year earlier, the same office in Baden-Württemberg publicly identified "Orphan Child Project Lebanon e.V." as an organization associated with Hizballah (while noting Hizballah's recent emphasis on its role as a parliamentary party to play down its identity as a "terrorist organization").

closely with the Hezbollah organization—'Ashahid Association' (Martyrs Foundation)," and that its tasks "within the Hezbollah Network" included "support of family members of martyrs."[210]

188. Commentators have also publicly highlighted the Orphan's Project's role. For example, Alexander Ritzmann, Senior Fellow at the European Foundation for Democracy, testified before the U.S. House Foreign Affairs Subcommittee on Europe in 2007 that Hizballah activists outside of Lebanon "financially support Hezbollah in Lebanon through fund-raising organizations, such as the 'Orphans Project Lebanon Association,'" which "belongs to the Lebanese *al-Shahid* (the Martyr) Association" and "is part of the Hezbollah network that supports the families of militia fighters and suicide bombers."[211]

189. The Martyrs Foundation's affiliation with Hizballah terrorism has likewise been widely known for years. Similarly, on May 30, 2000, *The Irish Times* reported that Hizballah operatives, including personnel "from the Martyrs' Foundation," were moving into parts of Southern Lebanon.[212] On December 30, 2004, *Slate* reported that messages on Hizballah's television station, *Al-Manar*, told "[told] families of suicide bombers where to go to collect the subsidy from a martyrs' foundation."[213] Similarly, in February 2005, counterterrorism expert Dr. Matthew Levitt opined in an article published on the Washington Institute for Near East Policy website that the *Shahid* [the Martyrs Foundation] provides funds for Hizballah terrorists. In January 2008, the German newspaper *Die Welt* reported that Orphans Project Lebanon e.V.

---

[210] *See* Bremen State Ofc. for Protect. of the Const. *Security Service Report* (2004) (in German).

[211] Alexander Ritzmann, Statement Before the U.S. House of Representatives Committee on Foreign Affairs, Subcomittee on Europe, "Adding Hezbollah to the EU Terrorist List" (June 20, 2007).

[212] Michael Jansen, *Hizbullah moves to consolidate its political gains in Lebanon*, The Irish Times, May 30, 2000.

[213] *See* Jack Shafer, *Who's Afraid of Hezbollah TV?*, Slate, Dec. 30, 2004.

collected donations in Germany and belonged to the Lebanese "*Al-Shahid* (The Martyr) Association," which in turn, the publication noted, is affiliated with Hizballah. And on August 1, 2009, *The Jerusalem Post* cited a European Foundation for Democracy report identifying Orphans Project Lebanon as "the German branch of a Hizbullah suborganization which promotes suicide bombings."[214] The Orphans Project Lebanon was also implicated in press reports about the 2007–2008 recruitment for Hizballah of a medical student in Goettingen, Germany, who was arrested in Israel for spying on behalf of Hizballah.[215]

190. Despite being made aware from numerous public sources that the Orphans Project Lebanon was Hizballah's fundraising organization in Germany actively engaged in raising money for attack incentive payments, Commerzbank maintained at least one account for the Orphans Project Lebanon (whose number ended in 1688) and transferred several millions of dollars on behalf of the Orphans Project Lebanon between 2007 and 2014. In doing so, Commerzbank knowingly enabled terrorism-incentive payments to Hizballah and Hamas operatives or their families upon their deaths.

191. In 2014, the German government banned Orphans Project Lebanon and raided its locations in Germany, seizing Hizballah paraphernalia, many kilograms of gold coins, and bank accounts. According to a German government official, the Orphans Project Lebanon had raised $4.5 million for the Martyrs Foundation between 2007 and 2014.[216]

---

[214] Benjamin Weinthal, *'German charity front for Hizbullah:' Think tank: Orphans Project Lebanon is branch of group which promotes Hizbullah suicide bombings*, The Jerusalem Post, Aug. 1, 2009 (internal quotation marks and citation omitted).

[215] *See* Von Ulrike Putz, *Spy Case Casts Light on Hezbollah Recruitment in Germany*, Der Spiegel, Aug. 7, 2008 (also noting that the organization is "suspected of collecting money for Hezbollah").

[216] *See Germany bans Hezbollah-linked fundraising group*, Associated Press, Apr. 8, 2014.

192. By helping the Martyrs Foundation raise those funds, Commerzbank enabled it to promise and pay terrorism incentive payments to terrorists in Iraq and Israel. As the U.S. government determined in its sanctions designation, the Martyrs Foundation "channel[ed] financial support" to "Hezbollah" and "Hamas." That support primarily consisted of martyr payments for Hizballah and Hamas terrorists and their families in the event they were killed or injured in terrorist operations.

193. For all Hizballah terrorists placing themselves at risk on the ground in Iraq as trainers, logistics operators, and members of joint cells committing terrorist attacks, the prospect of receiving a martyr payment constituted a key incentive to carry out those terrorist operations. The same was true for Hamas terrorists participating in attacks in Israel and the Palestinian Territories.

194. The United States has confirmed the inextricable connection between martyr payments and attacks. In 2015, for example, Treasury reported to Congress that "financial aid specifically for families related to well-known Hamas operatives who had been killed or jailed … effectively rewarded past and encouraged future terrorist activities." In Country Reports on Terrorism 2020, State similarly explained that "transfers to" the "families of terrorists who died in attacks" (i.e., "prisoner and 'martyr' payments") "incentivize and reward terrorism."

## IV. With Weapons from IRISL and Incentives from the Martyrs Foundation, Hizballah Planned, Authorized, and/or Committed the Terrorist Attacks in Iraq that Injured Plaintiffs.

195. As discussed *supra* at 18-21, immediately after the U.S. entered Iraq in 2003, Hizballah began preparing JAM terrorists to attack Americans there. Those efforts escalated in the years that followed as Hizballah, working closely with JAM, orchestrated a wave of terrorist violence against Americans between 2007 and 2011, including the attacks that injured Plaintiffs.

Hizballah managed the logistics to arm the JAM terrorists with weapons from IRISL shipments, and it trained the terrorists in the use of these weapons. Hizballah operatives, supported and incentivized by its Martyrs Foundation, participated on the ground in Iraq—authorizing, planning, and often joining JAM in committing the terrorist attacks that employed those weapons against Americans.

196. In JAM's early days, Hizballah began a wide-ranging public propaganda campaign to authorize and incite Shi'a in Iraq to join JAM's campaign of terrorism against Americans there. Hizballah's message of authorization was effective because JAM fighters regarded Hizballah as a moral and religious authority. Hizballah asserted this authority over JAM fighters by, for example, issuing *fatwas* declaring a religious duty to attack Americans in Iraq. Hizballah also exerted personal authority over Sadr, who openly aligned himself with Hizballah. And Hizballah authorized JAM by training and directing JAM fighters, who swore fealty to Hizballah, to kill Americans in Iraq (*supra* at 19-20).

197. By January 2004, nearly 800 Hizballah agents had been sent to Iraq, where they were deployed to direct JAM's terrorist campaign from key JAM strongholds in Iraq, including Sadr City, Najaf, Safwan, and Basra. Eighteen of these Hizballah operatives were detained on charges of terrorism in February 2005. An October 2006 U.S. intelligence summary (as published by *WikiLeaks*) noted that "300 Hezbollah terrorists from Lebanon have joined with [the] Mahdi Militia in Najaf" after travelling to Iraq on tourist visas.[217] In addition to Hizballah terrorist mastermind Imad Mugniyeh (who continued to personally supervise JAM's campaign of

[217] U.S. Dep't of Def., US Iraq Intelligence Summary – Iran – Mahdi Militia – Hezbollah – Harbala (Oct. 10, 2006), *available at* https://wikileaks.org/wiki/US_Iraq_Intelligence_Summary_-_Iran_-_Mahdi_Militia_-_Hezbollah_-Harbala_.

terror until his death in February 2008), Hizballah deployed many of its senior terrorist planners in Iraq, including (1) senior Hizballah field commander Ali Mussa Daqduq al-Musawi, who Treasury found in 2012 was "responsible for numerous attacks against Coalition Forces in Iraq";[218] (2) Nasrallah's personal liaison to JAM Muhammad Kawtharani, who was "responsible for terrorist operations" in Iraq "[a]s the individual in charge of Hizballah's Iraq activities,"[219] and was directly involved in coordinating attacks against Americans in Baghdad; (3) senior Hizballah commander Yusuf Hashem, who coordinated Hizballah's JAM operations in Iraq;[220] (4) Hizballah member Ali Falih Hadi, who, according to a Coalition threat report (as published by *WikiLeaks*), was based in Amarah in Basra Province and was "responsible for supplying weapons" to members of a joint Jaysh al-Mahdi/Hizballah cell operating in Basra;[221] and (5) on information and belief, one or more experienced Hizballah bombmakers, who provided in-country direction to JAM terrorists. These Hizballah terrorists and many others were dedicated to providing weapons, training, and knowledge to JAM with the intent of harming Americans in Iraq.

198. The Hizballah operatives planned a campaign of escalating terrorist attacks that JAM began to carry out at Hizballah's direction in the winter of 2005. This escalation was the result of Hizballah's "strategic decision" to ratchet up pressure on the United States by boosting

---

[218] U.S. Dep't of Treasury, Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq (Nov. 19, 2012).

[219] U.S. Dep't of Treasury, Treasury Sanctions Hizballah Leadership (Aug. 22, 2013).

[220] Matthew Levitt, *Hezbollah's Regional Activities in Support of Iran's Proxy Networks*, Middle East Institute, July 26, 2021.

[221] U.S. Army, Threat Report: Ambush Threat (Jul. 16, 2008), *available at* https://wikileaks.org/irq/report/2008/07/IRQ20080716n11210.html. While the report identifies "Ali Falih Hadey," on information and belief "Hadey" has the same meaning as "Hadi."

Hizballah's "support [for] Sadr" and fostering "managed instability" in Iraq.[222] According to a senior American intelligence official cited in *The New York Times*, Hizballah "train[ed] [JAM fighters] inside of Iraq" and sent them to Lebanon for more training by Hizballah.[223] This training was designed to help "Iraqi militants to carry out numerous terrorist attacks" targeting Americans.[224] JAM recruits who had little to no combat experience were taught Hizballah's methods to be used against American forces in Iraq. This included training in how to use the most deadly weapons—including EFPs, rockets, mortars, RPGs, sniper rifles, and small arms with armor-piercing ammunition—that Hizballah was supplying to JAM from Iran.

199. The extent of Hizballah's involvement in JAM's attacks was demonstrated by evidence gathered in connection with the capture of Hizballah commander Daqduq in 2007, which included a document described by five U.S. Senators as a 22-page "planning guide" spelling out how JAM fighters should deploy the training and weaponry Hizballah provided. It included specific instructions describing how to plant IEDs and carry out abductions of Americans. Hizballah's instruction as reflected in this "planning guide" enabled JAM to execute an array of sophisticated attacks against Americans that it otherwise would have been unable to carry out.

---

[222] Michel R. Gordon & Dexter Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, N.Y. Times, Nov. 28, 2006.

[223] *Id. Accord* U.S. Treasury Dep't, Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq (Nov. 19, 2012) (finding that, in 2005, Iran "asked Hizballah to form a group to train Iraqis to fight Coalition Forces in Iraq," prompting Hizballah to "establish[] a covert Hizballah unit to train and advise Iraqi militants in Jaysh al-Mahdi (JAM) and JAM Special Groups").

[224] U.S. Treasury Dep't, Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq (Nov. 19, 2012).

200. Hizballah's involvement was also demonstrated by the types of attacks JAM committed. Many of JAM's attacks employed tactics that Hizballah had trained JAM fighters to use. As a declassified British intelligence report concluded, for example, EFPs used in Iraq during the relevant period were "exclusively associated with Hizballah," who was the world's foremost expert on EFPs.[225] Hizballah planned these EFP attacks by giving assistance to JAM regarding EFP design, helping JAM prepare these weapons, teaching JAM fighters how to use them, identifying specific target locations in Iraq, and sending senior Hezbollah terrorists to coordinate the EFP attacks. Hizballah thus not only provided the EFPs to JAM but also instructed JAM to use them against American soldiers and taught JAM how to do so. As another example, Hizballah directed JAM members to launch indirect-fire rocket attacks and instructed them on how to do so. Hizballah's direction to fire rockets on the Green Zone from Sadr City specifically included the indirect-fire attacks in early 2008 that precipitated the Battle of Sadr City. During these attacks, in 2008, JAM rocket teams showed an ability to hit specific targets several miles away, demonstrating the effectiveness of Hizballah's instruction and the sophistication of the rockets supplied from Iran. The same was true for other types of attacks with tactics that reflected specialized Hizballah training, including sniper, mortar, and RPG attacks, as well as the use of small arms in combination with other weapons.

201. Between 2003 and 2007, Jaysh al-Mahdi expanded from a fledgling group concentrated in Shi'a areas to a terrorist organization with a significant presence throughout Iraq. What began as a small group of 300 fighters in April 2003 grew to a terrorist organization of between 6,000 and 10,000 fighters by June 2004 and boasted at least 60,000 fighters by January

---

[225] Minute, Deputy Chief of Assessments Staff to Sir Nigel Sheinwald, Iraq: Lebanese Training including manuscript comment Blair (May 3, 2007).

2007. JAM operated throughout Iraq, with regional command centers in Kirkuk, Diyala, Baghdad, Wasit, Hillah, Karbala, Amarah, Basra, Diwaniyah, and Nasiriyah. Jaysh al-Mahdi maintained an especially strong presence in the Al Rashid, Karkh, and Kadamiyah Districts of western Baghdad, all of eastern Baghdad (including the areas in and around Sadr City and Rustamiyah), Baqubah, Hillah, Najaf, Basra, and Wasit (though its power extended well beyond those areas).

202. With Hizballah supplying weapons from Iran and directing JAM's attacks, JAM terrorists inflicted enormous death and suffering on Americans involved in the reconstruction of Iraq between 2007 and 2011. "Coalition sources report[ed] that by August 2007, Iranian-backed insurgents accounted for roughly half the attacks on Coalition forces, a dramatic change from previous periods,"[226] leading General David Petraeus to conclude that "JAM is more of a hindrance to long-term security in Iraq than is [Al-Qaeda in Iraq]."[227] By 2011, Hizballah Secretary General Nasrallah had declared victory, boasting in a speech that the Hizballah-JAM campaign of terror against Americans in Iraq should be considered a model for terrorist campaigns against the U.S. and its allies around the world.

## V. With Weapons from IRISL and Incentives from the Martyrs Foundation, Hamas Committed the Terrorist Attacks in Israel that Injured Plaintiffs.

203. As with Hizballah and JAM in Iraq, Iran used IRSIL to supply weapons to Hizballah and Hamas for terrorist attacks in Israel. As detailed above, Iran's shipments to Hizballah and Hamas included rockets, bullets, and small arms. In addition, as also explained

---

[226] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[227] Michael R. Gordon & Gen. Bernard E. Trainor, The Endgame: The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama 422 (2012).

above, Hizballah and Hamas operatives in Gaza and the West Bank were supported and incentivized by its Martyrs Foundation, which funded martyr payments for Hizballah and Hamas. Those efforts contributed to two terrorist attacks that injured Plaintiffs in Israel.

204. On March 6, 2008, Hamas committed a mass shooting attack in Jerusalem, Israel. A Palestinian gunman, Alaa Abu Dheim, entered a Jewish religious school in Jerusalem with a Russian-made assault rifle and hundreds of rounds of ammunition. He opened fire on a group of students in the school's courtyard, killing three, and then entered the school's library and unloaded a barrage of bullets, killing five more students and wounding nine before he was eventually shot and killed. One American studying at the school, Avraham Moses, was killed, and another, Naftali Shitrit, was injured from multiple gunshot wounds. Hamas hailed the attack as "heroic."

205. In 2018, Israeli police raided the home of Dheim's family and seized thousands of dollars in cash that Hamas had given to his family as martyr payments for Dheim's attack. The Israeli police announced, "The operation was the result of covert activity and targeted intelligence gathering by the Israeli Police and security forces which found that the family of the terrorist who live in East Jerusalem received cash and funding from Hamas in support for the murderous terror attack."[228]

206. In a second attack on August 19, 2011, Hamas and Hizballah launched multiple Grad rockets from Gaza that hit a synagogue and school in Ashdod, Israel, injuring eleven people. One of those people was Shmuel Brauner, an American living in Israel, who was severely wounded from shrapnel.

[228] Times of Israel, *Police seize thousands in Hamas cash from family of dead terrorist who killed 8*, June 27, 2018.

207. Most of the 122mm Grad rockets capable of reaching Ashdod in 2011 were manufactured in China or Iran and smuggled to Gaza by Iran.

## VI. Plaintiffs Were Injured in the Attacks.

208. The Plaintiffs in this case were injured as a result of numerous terrorist attacks in Iraq and two in Israel between 2007 and 2011. Each of the attacks would have violated the laws of war if the terrorists who committed the attack were subject to them because, among other reasons, victims of the attack were civilians not taking part in hostilities and/or terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

209. The weapons used in each attack in Iraq were the same type of weapons Iran supplied to Hizballah, and through Hizballah, to JAM operatives in Iraq.

210. The weapons used in each attack in Israel were the same type of weapons Iran supplied to Hamas (including through Hizballah).

211. The Hizballah operatives who planned, authorized, and/or committed each attack in Iraq and the Hamas and Hizballah operatives who planned, authorized, and/or committed the attacks in Israel, received, or were motivated by the promise of receiving, martyr payments funded by the Martyrs Foundation.

212. Plaintiffs are the individuals directly injured in those attacks, the estates of individuals killed in those attacks, and the family members who suffered as a result of the harm to their loved ones. The following table identifies each direct victim and their corresponding attack(s).

213. For each attack, the table below identifies the date and location of the attack, the terrorist group that committed the attack, and the types of weapons used in the attack. Attacks

identified as "Hizballah JC" were committed by Hizballah-JAM Joint Cells. For each of these attacks, the attack was planned, authorized, and committed by Hizballah, along with JAM, as part of a joint cell consisting of Hizballah and JAM operatives working together to carry out the attack. These Joint Cells operated from key regions where Hizballah was present in Iraq, including Baghdad Province, Basra Province, Diyala Province, and Babil Province. Attacks identified as "JAM" were committed by JAM but were planned and authorized by Hizballah. *See supra* at 95-100.

214. The table below identifies the individuals directly injured in each attack, most of whom are Plaintiffs. Each direct-victim Plaintiff was severely injured in his or her person and/or property as a result of the corresponding attack. Those injuries include, but are not limited to, the injuries identified in the table below. In addition, each direct-victim Plaintiff experienced severe physical and emotional pain and suffering as a result of the attack and their injuries.

215. The table below includes additional Plaintiffs who are either estates or family members of direct victims. For each family-member Plaintiff, the table identifies their relation to the direct victim. Each of these family-member Plaintiffs experienced severe mental anguish and emotional pain and suffering as a result of the attack and the injuries to their loved one. For each family-member Plaintiff who was not a spouse, or a biological parent, sibling, or child of the direct victim, the Plaintiff lived in the same household as the direct victim for a substantial period of time and considered the direct victim the functional equivalent of a biological parent or child.

216. Plaintiff Ali Safi is presently a U.S. citizen and was naturalized subsequent to the attack that injured him. Plaintiffs Ifat Cohen, Chagit Gibor, Atara Katz, Eytan Moriah, and Tzur Moriah are not U.S. nationals but are survivors and/or heirs of Avraham Moses, who was a U.S.

national at the time of the attack. Each of the other Plaintiffs was a U.S. national at the time of the attack and remains one today.

| Attack | Terrorist | Weapon | Direct Victim | Plaintiff | Injury/ Relation |
|---|---|---|---|---|---|
| Multiple attacks: 2007-2009 Saladin Governorate | JAM | Rocket, IED, Sniper | Specialist James Connolly | Specialist James Connolly | PTSD |
| 1/24/07 Baghdad Governorate | JAM | Sniper | Staff Sergeant Hector Leija, who died as a result of the attack | Manuela Leija | Mother |
| | | | | Domingo Leija | Father |
| | | | | Domingo Leija Jr. | Brother |
| | | | | Ramiro Leija | Brother |
| | | | | Robert Leija | Brother |
| 2/4/07 Baghdad Governorate | JAM | IED | Sergeant Randy Matheny, who died as a result of the attack | Jan Collins | Mother |
| | | | | Gary Matheny | Father |
| | | | | Karen Matheny | Sister |
| | | | | Paul Matheny | Brother |
| 2/19/07 Baghdad Governorate | JAM | IED | Sergeant Shawn Dunkin, who died as a result of the attack | Ashley Dunkin | Widow |
| 3/7/07 Baghdad Governorate | JAM | IED | Staff Sergeant Christopher Webb, who died as a result of the attack | Shalan Webb | Widow |
| 3/13/07 Baghdad Governorate | JAM | IED | Sergeant Robert Carr, who died as a result of the attack | Christine Wortman | Mother |
| | | | | Jennifer Dengel | Sister |
| | | | | Rachel Miller | Sister |
| 3/15/07 Baghdad Governorate | Hizballah JC | EFP | Staff Sergeant Terry Prater, | Shane Prater | Brother |

| | | | | | |
|---|---|---|---|---|---|
| | | | who died as a result of the attack | Madisen Prater | Daughter |
| 3/20/07 Baghdad Governorate | JAM | IED | Specialist Stephen Richardson, who died as a result of the attack | Katana Richardson | Widow |
| | | | | Iyana Richardson | Daughter |
| | | | | Stephen Richardson Jr. | Son |
| 3/31/07 Baghdad Governorate | JAM | IED | Staff Sergeant Jason Arnette, who died as a result of the attack | Shenandoah Arnette | Widow |
| Multiple attacks: 04/07 - 06/07 Baghdad Governorate | Hizballah JC | IED, EFP | Staff Sergeant Dmitri Quist | Staff Sergeant Dmitri Quist | Tinnitus, migraines, damage to knee and hamstring, vein issues, PTSD |
| 4/6/07 Baghdad Governorate | Hizballah JC | EFP | Private First Class Andrew Fukuzawa | Private First Class Andrew Fukuzawa | Shrapnel to arm |

| | | | | | |
|---|---|---|---|---|---|
| | | | Corporal Anthony Donald Pellecchia | Corporal Anthony Donald Pellecchia | Ruptured eardrum, partially detached kneecap, partially severed patellar tendon, crushed foot, burns to legs, shrapnel wounds to abdomen, disfigurement and nerve pain |
| | | | | Kathryn Johnson | Mother |
| | | | | Anthony Pellecchia | Father |
| 4/12/07 Baghdad Governorate | JAM | IED | Corporal James Lindsey, who died as a result of the attack | Michelle Lindsey | Widow |
| 4/16/07 Baghdad Governorate | JAM | IED | Specialist Aaron Genevie, who died as a result of the attack | Leslie Genevie | Sister |

| | | | | | |
|---|---|---|---|---|---|
| Multiple attacks: 4/26/07, 6/28/07 Baghdad Governorate | Hizballah JC | EFP | Private First Class Michael Dunn | Private First Class Michael Dunn | Ruptured ear drum, shrapnel wounds to right cheek, amputation of right arm below the elbow, shrapnel wounds to both legs |
| 4/28/07 Baghdad Governorate | JAM | Sniper | Sergeant Michael Emory, who died after the attack | Brandon Emory | Son |
| | | | | Austin Emory | Son |
| | | | | Lea Emory | Daughter |
| | | | First Sergeant William Zappa | First Sergeant William Zappa | Gunshot wound to side |
| | | | | Haekyung Zappa | Wife |
| | | | | Patsy Bell | Mother |
| 5/4/07 Baghdad Governorate | JAM | IED | Private First Class Larry Guyton, who died as a result of the attack | Tonya Guyton | Widow |
| | | | | Jaidyn Guyton | Son |
| | | | | Kenyon Guyton | Son |
| | | | | Andrea McDonald | Mother |
| | | | | Larry Guyton Sr. | Father |
| 05/08/07 Diyala Governorate | Hizballah JC | EFP | Sergeant Blake Stephens, who died as a result of the attack | Kathleen Stephens | Mother |
| | | | | Trent Stephens | Father |
| | | | | Brittani Hobson | Sister |
| | | | | Derek Stephens | Brother |
| | | | | Rhett Stephens | Brother |
| | | | | Summer Stephens | Sister |
| 5/14/07 Baghdad Governorate | JAM | Small arms, IED | Sergeant Allen Dunckley, who died as a result of the attack | Jennifer Gable | Widow |

| | | | | | |
|---|---|---|---|---|---|
| Multiple attacks: 5/15/07, 6/9/07 Baghdad Governorate | JAM | IED, RPG | Private First Class Leland Thompson, who died after the attack | Laurie Manylightnings on behalf of the Estate of Private First Class Leland Thompson | Laceration to face, severe injuries to legs and groin |
| 5/17/07 Babil Governorate | JAM | IED | Specialist Victor Fontanilla, who died as a result of the attack | Noel Fontanilla | Widow |
| | | | | Frances Quichocho | Mother |
| | | | | Lee Castro | Brother |
| | | | | Christine Concepcion | Sister |
| | | | | Karissa Roselyn Quichocho | Sister |
| | | | | Ramon Quichocho Jr. | Stepfather |
| 5/29/07 Baghdad Governorate | JAM | IED | Staff Sergeant Joseph Weiglein, who died as a result of the attack | Jennifer Matzen | Widow |
| | | | | Ellen Weiglein | Mother |
| 5/29/07 Baghdad Governorate | JAM | Sniper | Sergeant First Class Mark Cashman | Sergeant First Class Mark Cashman | Leg injuries |
| 6/2/07 Baghdad Governorate | Hizballah JC | EFP | Sergeant Derrick Stinnett | Sergeant Derrick Stinnett | Second degree burns, injuries to ribs and back, shrapnel wound to his neck |
| | | | | Brandi Stinnett | Wife |
| 6/3/07 Baghdad Governorate | JAM | IED | Sergeant Caleb Christopher, who died as a result of the attack | Sarah Simmons | Sister |

| | | | | | |
|---|---|---|---|---|---|
| 6/4/2007 Baghdad Governorate | Hizballah JC | Rocket/mortar | Specialist Fary Maldonado | Specialist Fary Maldonado | Blast exposure which resulted in a head and lower back injury, TBI, PTSD |
| 6/5/07 Kirkuk Governorate | Hizballah JC | EFP | Technical Sergeant Ryan Balmer, who died as a result of the attack | Mark Balmer | Brother |
| Multiple attacks: 6/6/07, 10/8/07 Baghdad Governorate | Hizballah JC | EFP, small arms | Private Second Class Jordan Brackett | Private Second Class Jordan Brackett | Concussion, damage to eye, shrapnel wounds to leg and arm |
| 6/8/07 Baghdad Governorate | Hizballah JC | EFP, small arms | Staff Sergeant Joshua Atchley | Staff Sergeant Joshua Atchley | Mutilated left eye, fractured right arm, other serious injuries that required six surgeries |
| | | | | Connie Atchley | Mother |
| | | | | Benny Atchley | Father |
| | | | | Elissa Atchley | Sister |
| | | | | Katelyn Weatherford | Sister |
| | | | Private First Class Benjamin Johnson | Private First Class Benjamin Johnson | Amputation of right hand, suffers from insomnia, sleep apnea, brain lesions, PTSD |
| | | | | Tamala Johnson | Mother |
| | | | | Gregory Johnson | Father |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Brandon Johnson | Brother |
| | | | | Brooke Plumb | Sister |
| | | | Private First Class Leroy Lancaster | Private First Class Leroy Lancaster | Shrapnel in legs, neck, face, burns to the legs, ruptured ear drums, migraines, back pain, PTSD, paranoia and memory loss |
| | | | Specialist Lucas Sassman | Specialist Lucas Sassman | TBI, gunshot wound to right temple that required removal of portion of his skull and other surgeries, short-term memory loss, constant migraines, vertigo, balance issues, facial deformity |
| | | | | Melissa Sassman | Wife |
| 6/16/07 Baghdad Governorate | JAM | IED | Corporal Zachary Grass, who died as a result of the attack | Patricia Grass | Mother |
| | | | | Franklin Grass | Father |

| | | | | | |
|---|---|---|---|---|---|
| 6/25/07 Baghdad Governorate | Hizballah JC | EFP | Staff Sergeant Brentyn Bishop | Staff Sergeant Brentyn Bishop | Shrapnel wounds, TBI, tinnitus, headaches, memory loss |
| 6/27/07 Baghdad Governorate | Hizballah JC | EFP | Staff Sergeant Daniel Newsome, who died as a result of the attack | Flor Fuentes | Father |
| Multiple attacks: 7/4/07, 7/6/07 Baghdad Governorate | Hizballah JC | Rocket/mortar, IED | Staff Sergeant Francisco Gietz | Staff Sergeant Francisco Gietz | Damage to eye, TBI, PTSD, anxiety, migraines |
| 7/6/07 Maysan Governorate | JAM | IED | Private First Class Bruce Salazar Jr., who died as a result of the attack | Margaret Johnson | Mother |
| 7/10/07 Baghdad Governorate | JAM | Sniper | Staff Sergeant Donald Spencer | Staff Sergeant Donald Spencer | Gunshot wound to neck |
| 7/18/07 Baghdad Governorate | JAM | IED, small arms | Specialist Zachary Clouser, who died as a result of the attack | Ronald Etheridge Jr. | Stepbrother |
| | | | Specialist Richard Gilmore III, who died as a result of the attack | Richard Gilmore Jr. | Father |
| | JAM | Small arms | Sergeant Stephen | Megan Clement | Daughter |
| | | | | Jenae Maddies | Daughter |

| | | | | | |
|---|---|---|---|---|---|
| 7/31/07 Baghdad Governorate | | | Maddies, who died as a result of the attack | Vanessa Gutierrez | Sister |
| Multiple attacks: 08/07-11/08, 3/27/08 Baghdad Governorate | Hizballah JC | EFP, IED, sniper | Staff Sergeant David Manganella | Staff Sergeant David Manganella | Injury to spine, concussion, TBI, issues with memory, sleep, speech issues, back damage to L4/5 nerve, sciatica, PTSD |
| 08/06/07 Baghdad Governorate | Hizballah JC | EFP | Specialist Christopher Neiberger, who died as a result of the attack | Eric Neiberger on behalf of the Estate of Christopher Neiberger | |
| | | | | Eric Neiberger | Brother |
| | | | | Mary Neiberger | Mother |
| | | | | Richard Neiberger | Father |
| | | | | Ami Neiberger | Sister |
| | | | | Robert Neiberger | Brother |
| 8/7/07 Baghdad Governorate | JAM | Sniper | Specialist Jareth Payne | Specialist Jareth Payne | Permanent nerve damage to hand |
| 8/8/07 Baghdad Governorate | JAM | IED | Specialist Donald Young, who died as a result of the attack | Angelina Boyd | Sister |
| 8/11/07 Baghdad Governorate | Hizballah JC | Mortar | Private First Class Abelino Gomez | Private First Class Abelino Gomez | Shrapnel injuries and lacerations to hip and abdomen |

| | | | | | |
|---|---|---|---|---|---|
| Multiple attacks: 8/14/07, 2/7/08 Baghdad Governorate | Hizballah JC | EFP, IED, RPG, mortar | Sergeant Dustin Bauer | Sergeant Dustin Bauer | TBI, lower back injury, knee and hip pain |
| | | | | Kiya Bauer | Daughter |
| | | | | Sophia Bauer | Daughter |
| 8/17/07 Baghdad Governorate | Hizballah JC | EFP | Sergeant First Class Brandon Bybee | Sergeant First Class Brandon Bybee | Second degree burns to face, lacerations to leg |
| 8/17/07 Baghdad Governorate | Hizballah JC | EFP | Sergeant Andrew Looney, who died after the attack | Martha Looney | Mother |
| Multiple attacks: 09/07 - 10/08 Baghdad Governorate | Hizballah JC | EFP | Corporal Shawn Donnery | Corporal Shawn Donnery | TBI, degenerative disc disease, PTSD |
| 09/07 - 10/08 Baghdad Governorate | Hizballah JC | EFP, IED, rocket/mortar | Sergeant Christopher Landry | Sergeant Christopher Landry | TBI, back injuries, multiple stress fractures, severe hearing loss |
| 9/2/07 Baghdad Governorate | Hizballah JC | EFP, small arms | Staff Sergeant Nathaniel McClure | Staff Sergeant Nathaniel McClure | Lacerations to abdomen and thigh, burns, fractured arm |
| 9/22/07 Baghdad Governorate | Hizballah JC | EFP | Private First Class Jacob Harbin | Private First Class Jacob Harbin | Severe injuries from shrapnel to feet |
| | | | | Linda Harbin | Mother |
| | | | | Danny Harbin | Father |
| | | | | Linda Harbin on behalf of the Estate of Elijah Harbin | Brother |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Esther Tate | Sister |
| | | | Corporal Joshua Reeves, who died as a result of the attack | Leslie Boyd on behalf of the Estate of Joshua Reeves | |
| | | | | Leslie Boyd | Widow |
| | | | | Joshua Reeves | Son |
| | | | | James Reeves | Father |
| | | | | James Reeves on behalf of the Estate of Michael Joseph Reeves | Brother |
| | | | | Wanda Reeves | Mother |
| | | | | Sherri Hoilman | Sister |
| | | | | Joni Little | Sister |
| 9/29/07 Baghdad Governorate | JAM | Small arms | Sergeant Robert Ayres III, who died as a result of the attack | Michelle Ayres | Mother |
| 9/29/07 Baghdad Governorate | Hizballah JC | EFP | Sergeant Konrad Ludwig | Sergeant Konrad Ludwig | TBI, back injuries, memory loss, aneurysm, headache condition |
| Multiple attacks: 10/07, 11/07, 2007-2008 Baghdad Governorate | Hizballah JC | EFP, IED, rocket/mortar, sniper | Specialist Jared Osburn | Specialist Jared Osburn | TBI, migraines, headaches, vertigo, hand pain and scarring, scar on head, PTSD |
| 10/8/07 Baghdad Governorate | Hizballah JC | EFP | Specialist Barry McDonald Jr. | Specialist Barry McDonald Jr. | Lacerations to face |
| 10/10/07 Baghdad Governorate | Hizballah JC | Rockets | Staff Sergeant Lillian Clamens, | Ayinde Williams | Son |

| | | | | | |
|---|---|---|---|---|---|
| | | | who died as a result of the attack | | |
| 10/25/07 Baghdad Governorate | JAM | IED | Sergeant Derek Banks Sr., who died as a result of the attack | Sheena Banks-West | Widow |
| | | | | Derek Banks-West Jr. | Son |
| Multiple attacks: 11/07 - 02/09 Baghdad Governorate | Hizballah JC | EFP, rocket/mortar | Sergeant Jarrod Lagrone | Sergeant Jarrod Lagrone | Permanent hearing loss, TBI, PTSD |
| 11/12/07 Baghdad Governorate | JAM | Small arms | Sergeant Joseph Vanek, who died as a result of the attack | Janice Vanek | Mother |
| | | | | Anne St. Martin | Sister |
| 11/26/07 Wasit Governorate | JAM | IED | Mr. Ali Safi | Mr. Ali Safi | Amputation of both legs |
| Multiple attacks: 12/07 - 03/09 Baghdad Governorate | Hizballah JC | EFP, RPG | Specialist Christopher Halski | Specialist Christopher Halski | Permanent hearing loss, injury to leg, PTSD, and tinnitus |
| Multiple attacks: 01/08 - 03/08 Baghdad Governorate | JAM | IED | Staff Sergeant Andrew Kirchoff | Staff Sergeant Andrew Kirchoff | Chronic back pain, hearing loss |

| | | | | | |
|---|---|---|---|---|---|
| Multiple attacks: 01/08 - 04/08 Baghdad Governorate | Hizballah JC | EFP | Combat Medic William Kelso II | Combat Medic William Kelso II | TBI |
| 1/4/08 Baghdad Governorate | Hizballah JC | EFP | Sergeant Todd Barnum | Sergeant Todd Barnum | TBI, concussions, sleep issues, hearing loss, cognitive dysfunction |
| | | | Sergeant Ricky Zhorne Jr. | Sergeant Ricky Zhorne Jr. | Concussion, TBI, lung damage, spinal injury including 3 herniated discs, sleep disorder, cognitive dysfunction, migraine headaches, seizures, PTSD |
| 1/18/08 Baghdad Governorate | Hizballah JC | EFP | Specialist Nicholas Anna | Specialist Nicholas Anna | Knee injury, PTSD, anxiety |
| | | | Specialist Timothy Duvall Jr. | Specialist Timothy Duvall Jr. | Concussion, headaches, tinnitus, PTSD |
| 1/27/08 Baghdad Governorate | JAM | IED | Major Alan Rogers, who died as a result of the attack | Christopher Hill on behalf of the Estate of Major Alan Rogers | |

| | | | | | |
|---|---|---|---|---|---|
| 2/2/08 Baghdad Governorate | JAM | IED | Technical Sergeant Douglas Ragone | Technical Sergeant Douglas Ragone | Concussion, TBI, two ruptured ear drums, brain trauma |
| | | | | Dante Ragone | Son |
| | | | | David Ragone | Father |
| | | | | Daniel Ragone | Brother |
| 2/6/08 Baghdad Governorate | Hizballah JC | EFP | Staff Sergeant Joshua Eckhoff | Staff Sergeant Joshua Eckhoff | Injury to head, permanent brain damage, difficulty talking, drinking, and eating, 10 brain surgeries, TBI |
| Multiple attacks: 2/10/08, 3/20/08, 4/1/08 Baghdad Governorate | Hizballah JC | IED, EFP, small arms, RPG | Staff Sergeant James Wilson Jr. | Staff Sergeant James Wilson Jr. | Concussion, loss of consciousness, TBI, back injuries, chlorine lung exposure causing breathing difficulties, severe sleep apnea |
| 2/19/08 Baghdad Governorate | Hizballah JC | EFP | Corporal Albert Bitton, who died as a result of the attack | Silvia Bitton | Mother |
| | | | | Elizabeth Bitton | Sister |
| | | | | Jacqueline Bitton | Sister |

| | | | | | |
|---|---|---|---|---|---|
| Multiple attacks: 2/20/08, 4/7/08 Baghdad Governorate | Hizballah JC | EFP, RPG | Sergeant James Flemming III | Sergeant James Flemming III | Concussion, TBI, burns from shrapnel to neck and shoulder, headaches, PTSD, fibromyalgia |
| 3/26/08 Saladin Governorate | JAM | Sniper | Specialist Gregory Rundell, who died as a result of the attack | Jimmy Rundell Jr. | Father |
| 3/27/08 Baghdad Governorate | Hizballah JC | EFP, sniper | Corporal Joshua Molina, who died as a result of the attack | Josue Molina | Father |
| | | | | Maria Molina | Mother |
| | | | | Manuel Molina | Brother |
| Multiple attacks: 3/27/08, 4/1/08 Baghdad Governorate | Hizballah JC | EFP, sniper, small arms, RPG | Private First Class Jeremy Wallace | Private First Class Jeremy Wallace | TBI, nerve damage, muscle atrophy |
| 3/28/08 Baghdad Governorate | Hizballah JC | EFP, RPG | Sergeant Cody Barham | Sergeant Cody Barham | Back injuries including substantial injuries to multiple discs, TBI, PTSD |
| | | | Staff Sergeant Alejandro Contrerasbaez | Staff Sergeant Alejandro Contrerasbaez | Intractable migraines, chronic pain, hearing loss, iodine allergy, TBI |
| | | | | Jessica Contrerasbaez | Wife |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Aryanna Contrerasbaez | Daughter |
| | | | | Jesse Contrerasbaez | Son |
| | | | | Peter Pasillas | Stepson |
| 3/29/2008 Baghdad Governorate | Hizballah JC | EFP, small arms | Specialist Patrick Hanley | Specialist Patrick Hanley | Loss of left arm and one third of his skull |
| | | | | Katherine Hanley | Mother |
| | | | | Edward Hanley | Father |
| | | | | Cecelia Hanley | Sister |
| Multiple attacks: 4/1/08 - 4/15/08 Baghdad Governorate | Hizballah JC | IED, EFP | Staff Sergeant Darren Leslie | Staff Sergeant Darren Leslie | Concussions, TBI, PTSD, migraines |
| Multiple attacks: 4/5/08, 4/28/08 Baghdad Governorate | Hizballah JC | EFP | Specialist Cory Kenfield | Specialist Cory Kenfield | Herniated discs, TBI, balance issues, memory impairment, speech issues |
| 4/27/08 Baghdad Governorate | JAM | Sniper | Sergeant Benjamin Zibutis | Sergeant Benjamin Zibutis | TBI, knee pain, back pain, nerve damage, scarring to right arm, PTSD |
| 4/28/08 Baghdad Governorate | Hizballah JC | Rockets | Private First Class Samuel Montalbano | Private First Class Samuel Montalbano | Herniated disc, hearing loss, PTSD |
| | | | | Deborah Wilson | Mother |

| | | | | | |
|---|---|---|---|---|---|
| Multiple attacks: 4/28/08, 4/29/08 Baghdad Governorate | Hizballah JC | Rockets, RPG, small arms, mortar | Staff Sergeant Brandon Josey | Staff Sergeant Brandon Josey | Concussion which caused vomiting, headaches, and inability to sleep, injuries from glass shrapnel, scars from metal shards to legs and arms, TBI, bulging discs |
| 5/1/08 Baghdad Governorate | JAM | IED | Specialist Jeffrey Nichols, who died as a result of the attack | Jessica Nichols | Sister |
| 5/9/08 Baghdad Governorate | Hizballah JC | EFP | Specialist Hunter LeVine, who died in 2013 as a result of the attack | Beau LeVine and Jessica LeVine on behalf of the Estate of Specialist Hunter LeVine | Severe damage to face, blindness, separated jaw, TBI |
| | | | | Beau LeVine | Father |
| | | | | Olivia Gorham | Sister |
| | | | | Jessica LeVine | Stepmother |
| 5/11/08 Baghdad Governorate | JAM | IED | Corporal Jessica Ellis, who died as a result of the attack | Steven Ellis | Father |
| | | | | Cameron Ellis | Brother |
| 6/12/08 Baghdad Governorate | Hizballah JC | EFP | Sergeant John Aragon, who died as a result of the attack | John Aragon Sr. on behalf of the Estate of Sergeant John Aragon | |
| | | | | John Aragon Sr. | Father |

| | | | | | |
|---|---|---|---|---|---|
| 8/25/08 Baghdad Governorate | JAM | Sniper | Specialist Steven Fitzmorris, who died as a result of the attack | Rosemarie Fitzmorris-Currier | Mother |
| 9/30/08 Baghdad Governorate | JAM | Small arms | Specialist Christopher Bartkiewicz, who died as a result of the attack | Emily Stevenson | Widow |
| 12/31/08 Baghdad Governorate | Hizballah JC | Rocket/mortar | Private First Class Benjamin Tollefson, who died as a result of the attack | Mary Tollefson | Mother |
| | | | | Jamie Tollefson | Sister |
| | | | | Jeffrey Tollefson | Brother |
| 4/13/09 Baghdad Governorate | Hizballah JC | EFP | Sergeant Raul Moncada, who died as a result of the attack | Priscila Moncada | Daughter |
| | | | | Obdulia Moncada | Mother |
| | | | | Alexandra Aguilar | Sister |
| | | | | Miriam Lopez | Sister |
| | | | | Daniela Moncada | Sister |
| | | | | Matthew Moncada | Brother |
| 5/27/09 Baghdad Governorate | JAM | IED | Specialist Chad Edmundson, who died as a result of the attack | Karen James | Mother |
| 6/29/09 Baghdad Governorate | JAM | IED | Sergeant Roger Adams Jr., who died as a result of the attack | Cheryl Larson | Sister |
| | | | | Brandy Loss | Sister |

| | | | | | |
|---|---|---|---|---|---|
| 10/12/09 Maysan Governorate | Hizballah JC | EFP | Sergeant Stephen Evans | Sergeant Stephen Evans | Burns to face and body, left tibia blown out, loss of one testicle, loss of tissue in thigh, TBI |
| 11/22/09 Wasit Governorate | JAM | Small arms | Staff Sergeant Briand Williams, who died as a result of the attack | Atyinia Williams | Widow |
| | | | | C.W. | Son |
| 7/20/10 Baghdad Governorate | Hizballah JC | EFP | Sergeant Kyle Lloyd | Sergeant Kyle Lloyd | Shrapnel wounds to glutes and legs, left distal femur blown off, severed femoral artery, sciatic nerve damage with drop foot, laceration to right hand, initial amputation of leg for limb salvage then amputation of leg above knee |
| 8/4/10 Najaf Governorate | Hizballah JC | EFP | Specialist Joshua Craven | Specialist Joshua Craven | Amputation of left leg above the knee, salvage surgery of right limb which caused paralysis |
| | | | | Holly Craven | Wife |

| | | | | | |
|---|---|---|---|---|---|
| 6/23/11 Baghdad Governorate | Hizballah JC | EFP | Dr. Stephen Everhart, who died as a result of the attack | Stephanie Zobay on behalf of the Estate of Dr. Stephen Everhart | |
| | | | | Stephanie Zobay | Widow |
| | | | | Hannah Everhart | Daughter |
| | | | | Hayden Everhart | Son |
| | | | | Lindsay Everhart | Daughter |
| | | | Mr. Abdul Mughal | Mr. Abdul Mughal | Broken hand, partial loss of hearing, shrapnel injuries, PTSD |
| | | | | Sitorai Khasanzod | Wife |
| | | | | Angela Mughal | Daughter |
| | | | | Hamid Mughal | Son |
| | | | | Khalid Mughal | Son |
| | | | | M.M. | Son |
| | | | | Nabila Mughal | Daughter |
| 3/6/08 Jerusalem, Israel | Hamas | Small arms | Mr. Avraham Moses, who died as a result of the attack | Naftali Moses and Rivkah Moses Moriah on behalf of the Estate of Avraham Moses | |
| | | | | Naftali Moses | Father |
| | | | | Rivkah Moses Moriah | Mother |
| | | | | Chai Moriah | Brother |
| | | | | Noam Moriah | Brother |
| | | | | Ayelet Moses | Sister |
| | | | | Elisha Moses | Brother |
| | | | | Ora Moses | Sister |
| | | | | David Moriah | Stepfather |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Ifat Cohen | Stepsister |
| | | | | Chagit Gibor | Stepsister |
| | | | | Atara Katz | Stepsister |
| | | | | Aviad Moriah | Stepbrother |
| | | | | Eytan Moriah | Stepbrother |
| | | | | Tzur Moriah | Stepbrother |
| | | | Mr. Naftali Shitrit | Mr. Naftali Shitrit | Multiple gunshot wounds |
| | | | | Gila Shitrit | Mother |
| | | | | Oshrat Amir | Sister |
| | | | | Avishai Shitrit | Brother |
| | | | | Elyashiv Shitrit | Brother |
| | | | | Meiri Shitrit | Brother |
| | | | | Noya Shitrit | Sister |
| | | | | Yedidya Shitrit | Brother |
| 8/19/11 Ashdod, Israel | Hamas, Hizballah | Rockets | Mr. Shmuel Brauner | Mr. Shmuel Brauner | Shrapnel to back and stomach, loss of a kidney and part of small intestine |
| | | | | Nechama Brauner | Wife |
| | | | | Esther Brauner | Mother |
| | | | | Mordechai Brauner | Father |

## CLAIM FOR RELIEF

### Aiding and Abetting Under the Anti-Terrorism Act
### 18 U.S.C. § 2333(d)(2)

217. Plaintiffs incorporate their factual allegations above.

218. To establish a claim for aiding and abetting under JASTA, 18 U.S.C. § 2333(d), Plaintiffs must show: (1) that they are U.S. nationals, or the estates, survivors, or heirs of U.S. nationals; (2) that they were injured by an act of "international terrorism," as defined by 18 U.S.C. § 2331(1); (3) that the act of international terrorism was committed, planned, or authorized by a designated FTO; (4) that Commerzbank was generally aware that it was playing a role in an overall illegal or tortious activity from which the act of international terrorism was a foreseeable consequence; and (5) that Commerzbank knowingly provided substantial assistance.

219. Every Plaintiff is a U.S. national, or the estate, survivor, or heir of a U.S. national.

220. The terrorist attacks that injured Plaintiffs were acts of "international terrorism" because:

a. the attacks involved violent and dangerous acts that violate the criminal laws of the United States and many States (or would if committed in the United States). In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively;

b. the attacks, carried out by terrorists bent on expelling the United States and its allies from Iraq and the Middle East, appear to have been intended (i) to intimidate or coerce the civilian populations of Iraq, Israel, the United States, and other nations, (ii) to influence the policy of the U.S., Iraqi, Israeli and other governments by intimidation and coercion, and (iii) to affect the conduct of the U.S., Iraqi, Israeli, and other governments by mass destruction, assassination, and kidnapping; and

c. the attacks occurred primarily outside the territorial jurisdiction of the United States, in Iraq and Israel.

221. Every attack was committed, planned, or authorized by Hizballah or Hamas, each of which was an FTO at all relevant times.

222. Commerzbank was generally aware that it was playing a role in illegal activity. Commerzbank knew at all relevant times that it was helping IRISL evade U.S. counterterrorism controls and international scrutiny by omitting or falsifying information regarding IRISL's transactions, in violation of New York state law, the Bank Secrecy Act, and U.S. banking laws that required the transmittal of accurate business records to U.S. branches and correspondent banks, customer due diligence, and suspicious activity reporting. In many cases when Commerzbank processed IRISL transactions through the U.S. financial system, Commerzbank also violated U.S. sanctions laws. Commerzbank further knew that those laws were in place precisely to deprive IRISL of the secrecy it needed to maintain its systematic shipment of weapons to Iran's terrorist proxies. Commerzbank knew that it was playing a role in IRISL's weapons smuggling when it helped IRISL hide from international scrutiny and continue the maritime shipping operations that IRISL used as cover to smuggle weapons. Commerzbank also knew at all relevant times that it was helping Hizballah's Martyrs' Foundation raise money in

Europe for the purpose of funding terrorism incentive payments to Hizballah and Hamas terrorists.

223. Commerzbank provided assistance knowingly, and not innocently or inadvertently. Commerzbank's conduct was part of a deliberate, years-long scheme to court and protect its favored Iranian clients, despite Commerzbank's acute knowledge that its conduct would facilitate terrorist attacks in Iraq and Israel.

224. Commerzbank did not merely engage in passive nonfeasance or routine banking transactions. Instead, it actively sought out business from favored Iranian clients like IRISL; provided them with extraordinary, illegal services (including special treatment affording illicit bank secrecy designed to facilitate evasion of counterterrorism controls); all while deceiving law enforcement and counterterrorism authorities about Commerzbank's transactions. At all times, Commerzbank exhibited contempt for U.S. counterterrorism rules and warnings that were intended to protect Americans targeted by Hizballah and Hamas terrorism, choosing instead to prioritize business with favored clients over the lives of their victims. Commerzbank did all of this with knowledge that it was aiding terrorist organizations carrying out attacks on Americans.

225. Commerzbank's assistance was substantial. Commerzbank's extensive efforts to launder IRISL's transactions and subvert counterterrorism controls, in exchange for an extra fee, were especially egregious for a financial institution that knew the key role it played as a gatekeeper to the international financial system. The extent of assistance—comprising covert, illegal money laundering services and access to the international financial system over many years—was critical to the ability of terrorists in Iraq to obtain the weapons they used to commit their terrorist attacks, including the attacks on Plaintiffs. Commerzbank was also present in Iran, providing indispensable and close support to IRISL throughout its period of assistance.

Commerzbank's state of mind was highly culpable, consisting of prolonged, willful misconduct accompanied by systematic deception. Despite specific warnings from the U.S. government, Commerzbank took deliberate steps to enable IRISL to evade detection, and provided extraordinary financial services to IRISL in an unusual, dangerous way. And the duration of its support lasted for years. Collectively, these factors easily make Commerzbank's support for the attacks substantial.

226. The attacks that injured Plaintiffs were a foreseeable risk of Commerzbank's illegal acts. The many warnings about the role IRISL played in arming Iran's terrorist proxies in Iraq and Israel and Commerzbank's continued services despite those warnings made it reasonably foreseeable that Commerzbank was facilitating acts of terror. Indeed, a litany of authoritative sources established, at all relevant times, that facilitating transactions for IRISL would cause terrorist attacks. Commerzbank was aware of these sources, and could easily foresee that its illegal acts would result in the attacks in this case—but persisted anyway.

227. Likewise with Commerzbank's services to the Martyrs Foundation, Commerzbank knew from warnings and public sources that its client was controlled by Hizballah. Commerzbank also knew that its services for the Martyrs Foundation were enabling the Foundation to raise money in Europe not merely to provide fungible resources to Hizballah, but specifically to fund martyr payments—a form of support earmarked for and designed to cause terrorist attacks. Commerzbank could easily foresee that financing the Martyrs Foundation would result in the attacks in this case.

228. Commerzbank's assistance was pervasive, systemic, and culpable, involving the highest levels of management, years of willful misconduct, and extraordinarily wrongful behavior that provided critically important operational assistance to Iran's systematic smuggling

of weapons to terrorists, while obstructing U.S. counterterrorism controls, intelligence gathering, and investigations.

229. As a result of Commerzbank's liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

230. In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

231. Wherefore, Plaintiffs pray this Court:

a. Enter judgment against Defendant finding it liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

b. Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

c. Award Plaintiffs their attorneys' fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

d. Award Plaintiffs prejudgment interest; and

e. Award Plaintiffs any such further relief the Court deems just and proper.

Dated: September 23, 2026

Respectfully submitted,

SPARACINO PLLC

*/s/ Jacob R. Loshin*

Ryan R. Sparacino (DC Bar No. 493700)
Jacob R. Loshin (DC Bar No. 989320)
Kathryn L. Rakoczy (DC Bar No. 994559)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
jacob.loshin@sparacinopllc.com
kate.rakoczy@sparacinopllc.com

*Counsel for Plaintiffs*